**BEFORE THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Farm-to-Consumer | : | |
| Legal Defense Fund, | : | Case No. 1:08-cv-01546-RMC |
| 8116 Arlington Blvd, Suite 263 | : | |
| Falls Church, VA 22042 | : | |
| | : | |
| Plaintiff | : | Judge Rosemary M. Collyer |
| | : | |
| Dan Nolt | : | |
| Jubilee Farms | : | |
| 545 Albright Road | : | |
| Myerstown, PA 17067 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| Greg Niewendorp | : | |
| 4185 Beishlag Road | : | |
| East Jordan, Michigan 49727 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| Robert Alexander | : | |
| 15497 Church Road | : | |
| Coral, Michigan 49322 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| Joe Golimbieski | : | |
| 2366 South M76 | : | |
| Standish, Michigan 48658 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| Robert Keyworth | : | |
| 8702 Arendt Road | : | |
| Yale, Michigan 48097 | : | |
| | : | |
| Plaintiff | : | |

Glen Mast                          :
5625 W. Fremont Road               :
Blanchard, Michigan 49310          :
                                   :
          Plaintiff                :
                                   :
Andrew Schneider                   :
15689 Pratt Road                   :
Westphalia, Michigan 48894         :
                                   :
          Plaintiff                :
                                   :
Reverend Roseanne Wyant            :
5493 Chapman Road                  :
Remus, Michigan 49340              :
                                   :
          Plaintiff                :
                                   :
     v.                            :
                                   :
U.S. Department of Agriculture     :
Ed Schafer, Secretary              :
1400 Independence Ave., S.W.       :
Washington, DC 20250               :
                                   :
          Defendant                :
                                   :
     and                           :
                                   :
Michigan Department of Agriculture :
Don Koivisto, Director             :
P.O. Box 30017                     :
Lansing, Michigan 48909            :
                                   :
          Defendant                :

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY, PRELIMINARY AND OTHER INJUNCTIVE RELIEF

Pursuant to Fed. Rule Civ. P. 57 and 65(a), Plaintiffs hereby file their First

Amended Complaint seeking declaratory, preliminary and other injunctive relief.

Plaintiffs allege as follows:

## GENERAL ALLEGATIONS

**Nature of the Action**

1.      This is an action brought by Plaintiffs Farm-to-Consumer Legal Defense Fund ("Fund" or "FTCLDF") and several of its members under, in part, the Fifth and Fourteenth Amendments to the Constitution of the United States; the Declaratory Judgment Act, 28 U.S.C. 2201; the Administrative Procedure Act ("APA"), 5 U.S.C.S. 701, *et seq.*; the Animal Health Protection Act ("AHPA"), 7 U.S.C. 8301 *et seq.*; the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C.S. 4321 *et seq.*; the Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601 et. seq., the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb, et seq.; the Michigan Administrative Procedure Act, MCL 24.201 et seq.; the Michigan Animal Industry Act, MCL 287,701 *et seq.*; Article 1, Section 4 of the Michigan Constitution; and regulations adopted thereunder.

2.      Plaintiffs seek to enjoin the implementation and enforcement of the National Animal Identification System ("NAIS") currently being implemented by the United States Department of Agriculture ("USDA") through its Animal and Plant Health Inspection Service ("APHIS") and by the Michigan Department of Agriculture ("MDA").

3.      A preliminary injunction is necessary at the appropriate time because Plaintiffs will suffer irreparable, actual harm if enforcement of NAIS is not enjoined due to its several violations of state and federal laws.  Specifically, the individual Plaintiffs have either already decided that complying with NAIS is too costly and thus will have to quit farming altogether, that it infringes on their personal freedoms and invades their privacy, or that the NAIS program violates their religious freedoms and beliefs.

4.     The FTCLDF is a nation-wide non-profit organization dedicated to protecting and promoting sustainable, environmentally sound farming practices and direct farm-to-consumer transactions which the FTCLDF believes furthers the common good and general welfare of all Americans.  The FTCLDF defends and protects the right of farmers to directly provide and for consumers to directly obtain unprocessed and processed farm foods.  Toward this end, the FTCLDF provides advocacy, education and legal services for farmers against any local, state, and federal government interference with the legal transfer of products produced and processed on the farm.

5.     The FTCLDF and its members are strongly opposed to the NAIS program. Many FTCLDF members are or will be suffering economic and other harm from implementation of NAIS at the federal and state levels.  Specifically, they are incurring monetary costs to comply with NAIS as it is being implemented by Defendants; they are having to register their private premises and other private information with Defendants against their will; and their private information is being forwarded against their will into databases operated by Defendants and by other private third parties.  NAIS is having and will have significant environmental impacts on constituent members.  Specifically, small, sustainable, environmentally friendly farming operations and the consumers who interact with those farms are being and will be significantly harmed by the added economic and regulatory burdens imposed by NAIS.  NAIS also violates the Constitutional and statutory rights of FTCLDF members.  Specifically, NAIS as implemented by Defendants interferes with the legal, fundamental and natural right of farmers to provide food directly to consumers or persons affiliated with those farms.

**The Parties**

6. Plaintiff Fund is a non-profit organization organized under the laws of the State of Ohio. The Fund's principal place of business is located at 8116 Arlington Blvd, Suite 263, Falls Church, VA 22042.

7. As of January 5, 2009, the Fund consisted of 1,670 members, 98 of whom are residents and taxpayers of the State of Michigan and 140 of whom are residents and taxpayers of the State of Pennsylvania.

8. Plaintiff Dan Nolt is a member of the Fund, believes that God and the Bible authorize him with dominion over all animals on the planet and prohibit him from taking the "mark," and resides at 545 Albright Road, Myerstown, PA 17067.

9. Plaintiff Greg Niewendorp is a member of the Fund, believes that God and the Bible authorize him with dominion over all animals on the planet and prohibit him from taking the "mark," and resides at 4185 Beishlag Road, East Jordan, Michigan 49727.

10. Plaintiff Robert Alexander is a member of the Fund, is a member of the Old Order Amish Church, believes that God and the Bible authorize him with dominion over all animals on the planet and prohibit him from taking the "mark," and resides at 15497 Church Road, Coral, Michigan 49322.

11. Plaintiff Joe Golimbieski is a member of the Fund, believes that God and the Bible authorize him with dominion over all animals on the planet and prohibit him from taking the "mark," and resides at 2366 South M76, Standish, Michigan 48658.

12. Plaintiff Robert Keyworth is a member of the Fund, a Pentecostal minister, believes that God and the Bible authorize him with dominion over all animals on the

13.     Plaintiff Glen Mast is a member of the Fund, is a member of the Old Order Amish Church, believes that God and the Bible authorize him with dominion over all animals on the planet and prohibit him from taking the "mark," and resides at 5625 W. Fremont Road, Blanchard, Michigan 49310.

14.     Plaintiff Andrew Schneider is a member of the Fund and resides at 15689 Pratt Road, Westphalia, Michigan 48894.

15.     Plaintiff Roseanne Wyant is a member of the Fund, is an ordained Reverend of the Christian faith, believes that God and the Bible authorize her with dominion over all animals on the planet and prohibit her from taking the "mark," and resides at 5493 Chapman Road, Remus, Michigan 49340.

16.     The Plaintiffs identified in paragraphs 8 through 15 are collectively referred to as "individual Plaintiffs."

17.     Plaintiffs Nolt, Niewendorp, Alexander, Golimbieski, Keyworth, Mast, Schneider and Wyant are all farmers engaged in agricultural activities and raise some form of livestock and are subject to NAIS as it is being implemented by Defendants.

18.     Defendant Ed Schafer is the current Secretary of the United States Department of Agriculture ("USDA"), an agency of the United States.  As Secretary, Mr. Schafer is responsible for the direction and supervision of all operations and activities of the USDA.  USDA has at least one office located in Michigan.  Defendant Schafer is being named a party in his official capacity as Secretary of USDA.

19.     Defendant Don Koivisto is the current Director of the Michigan Department of Agriculture ("MDA").  As Director, Mr. Koivisto is responsible for the direction and supervision of all operations and activities of the MDA.  Defendant Koivisto is being named a party in his official capacity as Director of MDA.

**Jurisdiction and Venue**

20.     This Court has jurisdiction pursuant to 28 U.S.C.S. 1331 because this case addresses a federal question, 28 U.S.C.S. 1346(a)(2) because an agency of the United States is a party, and 28 U.S.C.S. 1367 because the case also alleges claims brought under State law.

21.     Venue lies with this Court under 28 U.S.C.S. 1391(b)(2) and (e)(2) because this action involves a federal question and an agency of the United States which is located in the District of Columbia.

22.     As a general rule, a citizen may not sue a state in federal court. U.S. Const. Amend. XI.  However, state officials may be sued in federal court to enjoin ongoing and future violations of federal statutory and constitutional law.  *Ex Parte Young*, 209 U.S. 123 (1908).  A state may also waive its sovereign immunity by consenting to be sued in federal court.  *College Sav. Band v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999); *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275 (1959).  A state's waiver of immunity may be inferred by the state's conduct.  *Garrity v. Sununu*, 752 F.2d 727, 738 (1st Cir. 1984).  A state may consent to suit in federal court by virtue of the state's participation in federal programs or by receipt of federal funding.  *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002).  See also *Vann v. Kempthorne*, 534

23.     On May 14, 2008, Plaintiff Fund sent a 25-page "Notice of Intent to Sue" letter to both Defendants that outlined Plaintiff's legal issues and concerns with NAIS and attached numerous documents in support of Plaintiff's position in order to make a record.  In its letter, Plaintiff Fund requested a response from Defendants within 30 days but as of the date of the filing of this First Amended complaint the Fund has not received any response from Defendants to this letter.

24.     On June 19, 2008, Plaintiff Fund sent a supplemental letter to both Defendants, attaching more documents in support of its position and requested a response on or before June 30, 2008.  As of the date of this filing Plaintiff Fund did receive a response from Defendant MDA but has not received any response from Defendant USDA to this letter.

25.     On July 14, 2008, Plaintiff Fund sent a second supplemental letter to both Defendants, attaching more documents in support of its position.  As of the date of this filing Plaintiff Fund has not received any response from either of the Defendants to this letter.

**Standing**

26.     All of the individual Michigan Plaintiffs have received materials from MDA informing them that in order for MDA to continue to enjoy "split state status" under the AHPA, USDA would no longer accept "metal tags" as official identification but would instead accept only a nine digit, alpha-numeric "Animal Identification Number" ("AIN") in the form of a Radio Frequency Identification Device ("RFID").

27.     All of the individual Michigan Plaintiffs have received materials from MDA informing them that any and all cattle which leaves their farms must be tagged with an Electronic Information Device ("EID") (aka RFID) as part of a bovine tuberculosis eradication program coordinated by both MDA and USDA under the AHPA.

28.     All of the individual Michigan Plaintiffs incur anywhere from $4 to $6 to purchase an RFID, and it costs more to have the RFID tagged to the animal.

29.     All of the individual Michigan Plaintiffs have also received materials from MDA informing them that before they can obtain or purchase any RFIDs they must first obtain a "Premises Identification Number" ("PIN") from USDA.

30.     All of the individual Michigan Plaintiffs have received materials from MDA informing them that the PIN issued by USDA would include their name, address where their cattle are housed, 911 emergency address, city, zip code, phone number and type of cattle (e.g., beef, dairy, feedlot).

31.     All of the individual Plaintiffs, including Plaintiff Nolt, have received materials informing them that their premises have been registered with the national database maintained by USDA and have been issued a PIN, even though the individual Plaintiffs never voluntarily chose to obtain a PIN.

32.     For example, the PIN assigned to Plaintiff Robert Keyworth is PIN #00626B1 while the PIN assigned to Plaintiff Dan Nolt is PIN #00GLWJ0, and these PINs are identified on wallet cards issued to Plaintiffs Keyworth and Nolt.

33.     On September 24, 2007, Plaintiff Keyworth wrote to MDA requesting that all of his personal information be removed from the state and federal databases under which his PIN was issued.

34.     On October 18, 2007, MDA responded to Plaintiff Keyworth's letter and denied his request, stating that a "Memorandum of Understanding" executed between MDA and USDA pursuant to the AHPA and regulations adopted thereunder mandate requirements for animal testing, animal movement and animal identification, which are defined by a PIN and an AIN.  Thus, MDA refused to remove his personal and private information from the state and federal databases.

35.     Plaintiff Nolt has already has his premises registered by USDA against his will and has already had his private data transferred to a database that can be accessed by either the State of Pennsylvania, the USDA, or by a private third party.

36.     All the individual Plaintiffs will be damaged and will suffer an injury in fact by the conduct engaged in by Defendants as described in this Amended Complaint. Specifically, all individual Plaintiffs are incurring monetary costs to comply with NAIS as it is being implemented by Defendants; they are all having to register their private premises with Defendants against their will; and all of their private information is being forwarded against their will into databases operated by Defendants and by other private third parties.

37.     Plaintiffs' injury in fact will be caused by Defendants' conduct described in this Amended Complaint.  Specifically, Defendants have orchestrated a program under the federal AHPA, its implementing regulations, and through various written agreements authorized by the AHPA under the guise of eradicating TB, that requires: the forced attachment of RFIDs to all cattle owned by the individual Plaintiffs; the registration of all private premises information of all individual Plaintiffs where they house cattle; the transmission of all private data related to the premises of these individual Plaintiffs to a database operated by Defendants and by other third parties; and the tracking and movement of all cattle any time any or all cattle are moved away from the individual Plaintiffs' premises.

38.     A favorable ruling on the claims presented in this Amended Complaint would redress Plaintiffs' injury in fact.  Specifically, a ruling that each or any of the major federal actions as described in this complaint are illegal, or that the NAIS program either in its entirety or in any of its component parts is illegal, would obviate the need for each of the individual Plaintiffs from having to comply with NAIS requirements.

39.     The Fund Plaintiff has standing because several of its members, including but not limited to the individual Plaintiffs, have standing to sue in their own right.  The interests at stake in this suit, namely the halting of an intrusive, overly burdensome, and environmentally harmful program that interferes with farmers' ability to raise food and consumers' ability to obtain such foods, are germane to the Fund's purpose and mission.  With the exception of the religious freedom claims, which are asserted only by the individual Plaintiffs, none of the claims asserted nor the relief requested require the participation of individual members.

**Background of the National Animal Identification System ("NAIS")**

40.     NAIS was developed by USDA and is being implemented through its Animal and Plant Health Inspection Service ("APHIS") and various state agencies, including but not limited to MDA.

41.     USDA and MDA have ignored the substantive and procedural rights of FTCLDF and its members and the individual Plaintiffs in the course of developing and implementing NAIS, including how it is being implemented in Michigan.

42.     On November 8, 2004, USDA adopted an interim rule (the "2004 interim rule" or "interim rule") that recognized a numbering system for animals as a "key element of the national animal identification system that is being implemented by the U.S. Department of Agriculture, at present on a voluntary basis." The alleged purpose of the rule was to "facilitate the development and implementation of the NAIS." The 2004 interim rule stated it was being proposed under the authority of the AHPA and that the AHPA "regulates the interstate movement of certain animals to prevent the spread of livestock and poultry diseases within the United States."

43.     As described in the 2004 interim rule, NAIS alleges to be a comprehensive program of animal tracking whose alleged goal is to prevent, minimize or reduce disease in animals. NAIS allegedly accomplishes this goal by: 1) assigning and registering in a nationally coordinated database a unique PIN for every farm that houses a livestock or poultry animal; 2) assigning and registering in a nationally coordinated database every animal on said premises a unique AIN or group identification number ("GIN"); and 3) tracking and tracing the movements of all such identified animals.

44.	In the 2004 interim rule, USDA claimed that NAIS was necessary to control disease in animals due to the *ongoing success* of existing animal disease control programs: "[A]s diseases such as tuberculosis, brucellosis, and pseudorabies are eradicated from the United States, fewer animals are required to be officially identified under the regulations.  As a result, our ability to trace diseased animals back to their herds of origin and to trace other potentially exposed animals forward is being compromised."

45.	USDA failed to explain in the 2004 interim rule why a new program, i.e., NAIS, was necessary to control animal disease in light of its admission that existing and currently ongoing animal disease control programs had already proven effective to control and eliminate animal disease problems.

46.	In the 2004 interim rule, USDA recognized the massive scope of NAIS, acknowledging the presence of over one million cattle producers and 95 million beef and dairy cattle in the United States, not including hogs, sheep, poultry and other domestic animals, which would "need to be identified if the NAIS were to be fully implemented."

47.	USDA concluded in the 2004 interim rule that it "has potential implications for small entities in the United States, both in terms of any costs they might incur to satisfy NAIS program requirements and in terms of the benefits associated with the program's establishment."

48.	USDA admitted in the 2004 interim rule that "[l]ittle information is available at this time about costs that may be incurred by producers."

49.     Notwithstanding this admission that NAIS would have unknown cost impacts, USDA refused to evaluate any such impacts based on the assumption that "participation in the NAIS is voluntary," and that "[p]roducers *can opt not to participate* in the NAIS if they anticipate that the costs they will incur will exceed the benefits they receive from participation."  Emphasis added.

50.     USDA stated in the 2004 interim rule that since "use of this numbering system is *voluntary*, no costs are imposed on participants and it is unlikely for this interim rule to have any adverse impact on small businesses."  Emphasis added.

51.     USDA failed to evaluate the economic impacts NAIS would have on small farmers because USDA officially stated that the program was "voluntary" and impliedly assumed that small farmers would choose not to participate.

52.     The 2004 interim rule constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

53.     At no time prior to adopting the 2004 interim rule did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the interim rule would have on small businesses.

54.     From 2004 to 2007, USDA developed NAIS further through the issuance of documents, business plans, and agreements with various states in an effort to "fully implement NAIS."  This development will be described in further detail in paragraphs 72-112 and 113-192 below.

55.     On July 18, 2007, USDA adopted with minor changes the 2004 interim rule as a final rule (the "2007 final rule").

56.     The 2007 final rule constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

57.     At no time prior to adopting the 2007 final rule did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the final rule would have on small businesses.

58.     From 2004 to 2007 USDA continued to allege that NAIS was a "voluntary" program.  However, on September 22, 2008, USDA's/APHIS' Veterinary Services issued Memorandum No. 575.19 ("September VS Memo") to its Veterinary Services Management Team announcing how it was going to implement its Veterinary Services' "cooperative animal disease program activities."  The effect of the September VS Memo demonstrates that USDA no longer considers NAIS a "voluntary" program.

59.     Specifically, the September VS Memo states that its purpose is to provide guidance to "VS personnel, state cooperators, and accredited veterinarians" on how to implement the premises registration component of NAIS.  Defendant MDA is a state cooperator.

60.     According to the September VS Memo, a "premises identification number" ("PIN") will be assigned to every single property where any of the activities listed below occur in relation to an existing federal disease control program:

      (i)     A vaccination;

      (ii)    A diagnostic test;

      (iii)   An epidemiologic investigation;

      (iv)   An inspection;

(v)     An appraisal;

(vi)    A quarantine;

(vii)   A movement of exposed/reactor animals;

(viii)  A certification;

(ix)    An application of an official eartag;

(x)     An application of an official backtag.

61.    According to the September VS Memo, if the person responsible for the premises "chooses not to complete the form to register his/her premises" then either a State or a federal animal health official or even a private veterinarian "will collect the defined data fields" which will then "be provided to the State so the records may be added electronically to the State's premises registration system."

62.    In addition, the September VS Memo provides that private veterinarians who collect the data will do so "for submission to the State or Federal office in that State for interfacing with the Allocator to obtain a PIN for the premises."

63.    Finally, the September VS Memo provides that the PIN will be "provided to the appropriate databases" and that from "the date of issuance of this VS Memorandum, all PINs issued in accordance with this policy will be included in all NAIS premises registration statistical summary reports."

64.    The September VS Memo constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

65.    At no time prior to adopting the September VS Memo did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any

66.     As of September 22, 2008 therefore, it was USDA's intent that anyone who owns cattle in the United States would be assigned a PIN and would have their private premises information registered into a national database, whether they agree to it or not.

67.     On December 22, 2008, USDA recognized the outcry from the farming and ranching community that the September VS Memo had generated, so USDA's/APHIS' Veterinary Services issued Memorandum No. 575.19 ("December VS Memo") to its Veterinary Services Management Team.  The December VS Memo "cancelled" the September VS Memo yet reiterated its policy for using PINs in administering animal disease programs under the AHPA.

68.     The December VS Memo specifically states that PINs will refer to "all location identifiers issued for VS disease program activities;" that all locations where VS personnel conduct disease program activities "will be identified with a standardized PIN;" and that private veterinarians "while not directly involved in the issuance of the PIN, will collect the defined data fields on official disease program forms * * * for submission to the State or Federal office in that State."

69.     The December VS Memo concludes by stating "APHIS is considering rulemaking to establish the standardized PIN as the sole premises identification number, when a PIN is otherwise required or assigned.  In the meantime, the State PIN will be issued in the administration of animal disease program activities when the State

70.     The December VS Memo constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

71.     At no time prior to adopting the December VS Memo did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2008 VS memo would have on small businesses.

72.     As stated previously in paragraph 54, USDA continued to refine and "fully implement" NAIS from 2005 to 2007.  For example, on May 6, 2005, USDA announced in the Federal Register that it had issued three documents, one of which was identified as a "Draft Strategic Plan" ("Draft Plan") and another as a "Draft Program Standards" ("Draft Standards").

73.     Notwithstanding its statements in the 2004 interim rule that (1) "[l]ittle information is available at this time about costs that may be incurred by producers;" (2) "[p]roducers *can opt not to participate* in the NAIS if they anticipate that the costs they will incur will exceed the benefits they receive from participation;" and (3) "use of this numbering system is voluntary, no costs are imposed on participants and it is unlikely for this interim rule to have any adverse impact on small businesses;" USDA stated that the Draft Plan and Draft Standards would set out its three-step plan for NAIS and that the program would become mandatory after an initial voluntary period.

74.     The 2005 Draft Plan and Draft Standards each constitute "major federal action" as referred to in 42 U.S.C. 4332(C).

75.     At no time prior to adopting the 2005 Draft Plan or the Draft Standards did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the Draft Plan or the Draft Standards would have on small businesses.

76.     In April 2006, USDA issued a "Strategies for Implementation of NAIS," ("2006 Strategies") which alleged that NAIS was voluntary at the federal level but that USDA's goal was 100% participation within three years, or by 2009.

77.     The 2006 Strategies constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

78.     At no time prior to adopting the 2006 Strategies did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2006 Strategies would have on small businesses.

79.     On July 28, 2006, USDA published in the federal register an announcement of the availability of "a revised cooperative agreement that [private] organizations may enter into" with USDA in order to "participate in the animal tracking database component" of NAIS.  The purpose of the private cooperative agreements was to "facilitate the integration of private and State animal tracking databases into the NAIS. . . ."

80.     The July 2006 announcement stated that a private organization with an animal tracing database "must complete a 'Request for Evaluation of Interim Private/State Animal Tracking Database' to initiate an APHIS review of its system.  If its

81. Each cooperative agreement entered into by USDA under the July 2006 announcement constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

82. At no time prior to entering into any cooperative agreements with any private organization did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the cooperative agreements would have on small businesses.

83. In November 2006, USDA issued a NAIS "User Guide" which again stated that NAIS was voluntary at the federal level but was quiet on numerical goals for participation. However, a concurrently issued announcement of funding for state implementation of NAIS still called for States to implement the program on the original timeline.

84. The 2006 User's Guide constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

85. At no time prior to adopting the 2006 NAIS User's Guide did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2006 User Guide would have on small businesses.

86. On February 28, 2007, USDA published a notice in the federal register that it would be conducting public meetings to discuss "the implementation of

87.     The February 2007 notice stated that the third component of NAIS, "animal tracking, is currently under development by APHIS and its State and industry partners.  Industry, through private systems, and States will manage the animal tracking databases * * * that maintain the movement records of animals."

88.     The February 2007 notice also stated that "APHIS will continue to approve identification devices for official use in the NAIS" and that producers "will continue to need" a PIN in order "to obtain AIN tags."  In other words, a producer must obtain a PIN before they can obtain an AIN for their animals.

89.     The February 2007 notice constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

90.     At no time prior to issuing the February 2007 notice did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the February 2007 notice would have on small businesses.

91.     On December 19, 2007, USDA made available for public review and comment a "Draft Business Plan to Advance Animal Disease Traceability, Through the Harmonization of State, Federal and Industry Programs and Convergence with the National Animal Identification System" ("2007 Business Plan").

92.     The purpose of the 2007 Business Plan was to provide detailed "strategies and actions" to implement NAIS which "requires a comprehensive animal-disease traceability infrastructure."  Although the Business Plan claims that

93.     For example, some actions mentioned by the 2007 Business Plan that USDA/APHIS would be taking include the following: (a) "USDA will . . . implement immediate short term strategies, as outlined in this business plan;"  (b) "Beginning with fiscal year 2008, this draft business plan will uniquely serve as a blueprint for the development of work plans associated with NAIS implementation cooperative agreement funding;" (c) "Each State, Tribe or Territory will be required to evaluate, describe, and identify animal disease traceability within their State, Tribe or Territory" and (d) "USDA will take steps to standardize data elements in existing programs. . . ."

94.     The 2007 Business Plan, therefore, proposed USDA's nation-wide plan to standardize, guide and direct USDA's/APHIS' implementation of NAIS not only through direct federal action but also through indirect federal action in the form of cooperative agreements with and funding of various State agencies.

95.     The 2007 Business Plan constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

96.     At no time prior to adopting the 2007 Business Plan did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2007 Business Plan would have on small businesses.

97.     On April 30, 2008, USDA published a notice in the federal register ("April 2008 notice") proposing "to add a system of records to its inventory of records systems.

98.     According to the April 2008 notice, APHIS' portion of the national database will consist of the "Standardized Premises Registration System * * *, the National Premises Information Repository * * *, the Animal Identification Number Management System * * *, and the Animal Trace Processing System . . . ."  The April 2008 notice fits neatly with prior actions taken by USDA to implement NAIS at the national level, i.e., requiring producers to obtain a PIN for their premises, to obtain an AIN for their animals, and to require the tracking of all animal movements.

99.     The April 2008 notice constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

100.    At no time prior to issuing the April 2008 notice did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the April 2008 notice would have on small businesses.

101.    On September 18, 2008, USDA published in the federal register an interim rule ("September 2008 interim rule") that would "limit the use of the animal identification number (AIN) with the 840 prefix to animals born in the United States." The September 2008 interim rule referred to the AIN as being a "number containing 15 digits, with the first 3 being the country code (840 for the United States), the alpha characters USA, or the numeric code assigned to the manufacturer" of the device.

102.     The purpose of the September 2008 interim rule is to phase out "the USA and manufacturer's code numbering systems as [USDA/APHIS] progress[es] toward full implementation of the NAIS and recognizing as official only the AIN with the 840 prefix." Thus, the interim rule would mandate a 15 digit AIN that commences with the numbers 840 for all animals born in the United States.  Animals born in other countries would be identified with a different 3 number prefix.

103.     The September 2008 interim rule also proposed amendments to the following regulations; 9 CFR 71.1, 77.2, 78.1, 79.1 and 80.1, all of which are promulgated under the authority of the AHPA.

104.     The September 2008 interim rule constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

105.     At no time prior to issuing the September 2008 interim rule did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct an appropriate analysis of the financial impact the September 2008 interim rule would have on small businesses.

106.     On September 23, 2008, USDA published in the Federal Register a notice that it was "making available a final version of our Business Plan ("2008 Business Plan") to Advance Animal Disease Traceability."  The 2007 Business Plan was now adopted as a final business plan.

107.     There are significant differences between the draft 2007 Business Plan and the final 2008 Business Plan.  For example, the 2008 Business Plan specifically states the following:

(i)      the long-term focus of NAIS is full traceability within the cattle industries (both beef and dairy), based on the consistent recording of all animal movements, as opposed to the "book-end" approach of the 2007 Business Plan, which was based on knowledge of the premises of origin and the most recent premises for the animal with fewer references to the recording of animal movements.

(ii)     while all producers can benefit from choosing to participate in national animal health safeguarding efforts, NAIS standards apply to the administration of disease programs.

(iii)    implementation strategies for the sheep industry are now separated out from those for the goat industry to reflect that they are separate and distinct industries and species.

(iv)     The 2008 Business plan has added an explanation of how NAIS participation provides producers with options for meeting forthcoming country of origin labeling requirements.

(v)      The 2008 Business plan explains future plans for requiring radio frequency identification (commonly referred to as RFID) of animals destined for import and export when such animals are subject to individual identification.

(vi)     USDA has updated the budget for NAIS to reflect the allocation for fiscal year 2008 and have adjusted the benchmarks and timelines for implementation of animal traceability by species and for registration of critical location points.

108.    The 2008 Business Plan projects premises registration and animal identification of anywhere from 50% to 70% between October 2008 and March 2009, and targets registration and identification from 70% to 100% by October 2009.  These registrations and identifications will be at slaughter houses, markets, auction barns, livestock dealer facilities, fairgrounds, sporting events (like horseracing), import/export facilities and veterinarian clinics.

109.    In addition, the 2008 Business Plan projects that by mid-2010, all cattle AINs will be identified by RFIDs.

110.    The 2008 Business Plan, therefore, finalizes USDA's nation-wide plan to standardize, guide and direct USDA's/APHIS' implementation of NAIS not only through direct federal action but also through indirect federal action in the form of cooperative agreements with and funding of various State agencies.  Indeed, the 2008 Business Plan states that one of the primary strategies for implementing NAIS is harmonization with existing programs.

111.    The 2008 Business Plan constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

112.    At no time prior to adopting the 2008 Business Plan did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2008 Business Plan would have on small businesses.

**Pursuant to the Alleged Mandates of the AHPA, USDA Coerces MDA to Implement NAIS at the State Level under the Guise of TB Eradication**

113.    Under the alleged authority of the AHPA, USDA/APHIS has been taking concrete actions to implement NAIS for several years now, including but not limited to

114.   However, USDA/APHIS, pursuant to its authority under the AHPA, is using the State of Michigan as a puppet to implement NAIS in Michigan under the guise of eradicating TB, a disease that is not being caused by animals on farms but rather is being caused by wildlife in Michigan.

115.   The AHPA allows USDA/APHIS to regulate the *interstate movement* of animals with TB.  Under the AHPA, USDA classifies states or portions of States into one of several zones, including 1) modified accredited (TB prevalent in less than 0.1% of herds); 2) modified accredited advanced (TB prevalent in less than 0.01% of herds; and 3) accredited free (no TB for five years prior).

116.   For a State to retain its zone status the State must, among other requirements, "enter into a memorandum of understanding with APHIS in which the state agrees to adhere to any conditions for zone recognition particular to that request." See 9 CFR 77.4(a)(3).  USDA places restrictions on the movement of livestock from various zones and all States that fail to comply with federal requirements can be heavily restricted or otherwise penalized by the USDA.  Not surprisingly, some of these "conditions for zone recognition" are NAIS program requirements.

117.   To accomplish the purposes of the AHPA, 7 U.S.C. Section 8310(a) provides, in part, that USDA may "cooperate with other Federal agencies, States or political subdivisions of States . . . ."  Further, 7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in

118.    On March 26, 2002, USDA and MDA entered into a Memorandum of

Understanding (the "2002 MOU").  The 2002 MOU states that USDA's authority to enter

into the MOU is derived from "the Organic Act of 1944, as amended, Title 21 United

States Code, Section 114a."  This section was repealed on May 13, 2002 by Pub. L.

107-171, entitled the "Farm Security and Rural Investment Act of 2002" (the 2002 Farm

Bill) and Section 10401 of the 2002 Farm Bill in its entirety ultimately became the

AHPA.

119.    On its face, the 2002 MOU stated:  "Tuberculosis was confirmed in *wild*,

free-ranging white-tailed deer in the northeast Lower Peninsula of Michigan in 1994.

The discovery of a *wildlife* reservoir in northeastern lower Michigan poses a unique and

difficult impediment in the effort to eradicate bovine TB.  Scientists, biologists,

epidemiologists, and veterinarians who have studied this problem believe that the most

logical theory is that the supplemental feeding of *free-ranging* deer serves to

congregate deer, therefore, contributing to the spread of TB.  Since 1998, supplemental

feeding was banned and baiting (the practice of hunting deer by attracting them with

feed) was limited to reduce the spread of TB between deer and eventually eliminate this

disease from the *wildlife*."  Emphasis added.

120.    According to "scientists, biologists, epidemiologists, and veterinarians who

have studied this problem," therefore, the primary cause of TB in Michigan is wildlife,

not domesticated animals like cattle or cows or poultry.

121.    The 2002 MOU established two TB zones in Michigan, one a Modified Accredited Zone ("MAZ") and the other a Modified Accredited Advanced Zone ("MAAZ").

122.    Pursuant to the 2002 MOU, USDA required MDA to "manage wildlife" and required MDA to do so in the following manner: "[D]evelop, implement, and enforce scientifically-based movement restrictions and requirements including official bovine TB test requirements, prior movement permits, official intra-state health certificates to accompany movement of animals, and official identification of animals for movement between or within a Disease-Free Zone, Surveillance Zone, and an Infected Zone [zone areas within the modified accredited zone], or any combination of those zones."

123.    In other words, and as mandated by the 2002 MOU under the AHPA, the movement and tracking of all domesticated animals was now required in order to "manage wildlife."

124.    Specifically, the 2002 MOU required MDA to mandate "official identification" on "all domestic livestock that move from any premises" within these zones, including movement within disease-free areas within the State.

125.    The 2002 MOU defined "Official identification" as either an "eartag, tattoo, electronic identification, or other identification approved by" either USDA or MDA. In other words, the 2002 MOU did not require the use of RFIDs as the only official form of identification.  However, the 2002 MOU stated that for the MAZ the "use of electronic identification would be strongly encouraged."

126.    The 2002 MOU also required MDA to mandate and "establish an inspection presence at the livestock auction markets throughout the State," and to verify

127. The 2002 MOU also stated that USDA and MDA, to monitor enforcement of the MOU, would cooperate on "implementing an electronic identification system."

128. Finally, nothing in the 2002 MOU required a PIN or the registration of premises where cattle were located.

129. The 2002 MOU constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

130. At no time prior to entering into the 2002 MOU did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2002 MOU would have on small businesses.

131. MDA's entering into and execution of the 2002 MOU constitutes a waiver of Michigan's sovereign immunity.

132. In order to comply with USDA's mandates under the 2002 MOU, MDA issued a unilateral "Order" on June 1, 2004 that pertained to the identification, testing, permitting and movement of animals within the State of Michigan.

133. The June 2004 Order provides, in part, that "all cattle" in the Modified Accredited Zone (MAZ) "must be identified with RFID Electronic identification eartags prior to movement from a premises" that is located in the MAZ.

134. With respect to the Modified Accredited Advanced Zone (MAAZ), the June 2004 Order provides, in part, that "All herds must obtain a premises identification number, and be placed into a database . . . ."

135.    MDA did not promulgate the June 2004 Order as a formal rule or regulation, it did not seek any public comment, it did not evaluate any alternatives or impacts, and it did not otherwise comply with any procedural requirements.

136.    Instead, MDA simply issued the June 2004 Order signed by its Director and imposed new, substantial legal requirements, i.e., all cattle in the MAZ had to be identified with RFIDs and all herds in the MAAZ must obtain a PIN and the premises be registered in a national database.

137.    The requirements of the June 2004 Order were necessary for MDA to receive approval from USDA under the AHPA to maintain "split zone" status under AHPA's TB eradication program.

138.    The June 2004 Order constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

139.    At no time prior to issuing the June 2004 Order did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the June 2004 Order would have on small businesses.

140.    On October 7, 2004, MDA requested that USDA reclassify Michigan's Upper Peninsula as a "TB free" zone because TB had not been diagnosed in any domestic or wild animal in the region since at least 1979, over 25 years.  (See paragraph 72 of document).

141.    In November 2004 MDA issued a letter (the "2004 letter") to all cattle producers in the MAAZ, which stated that Michigan had been awarded "split state status" by the USDA under the AHPA's TB eradication program.

142.    On July 26, 2005, MDA entered into another MOU with USDA/APHIS (the "2005 MOU").  The 2005 MOU states that USDA's authority to enter into the MOU is the AHPA.

143.    Unlike the previous 2002 MOU, the 2005 MOU now required MDA to mandate "electronic identification and a movement permit for any cattle moved from premises in the Modified Accredited Zone," and required APHIS to provide "support for acquisition and development for electronic identification, hardware and software in accordance with the National Animal Identification System (NAIS) and USDA regulations . . . ."

144.    The 2005 MOU stated that its conditions would be incorporated into a final rule to be published in the Federal Register, and that MDA would agree to these "conditions for split state status for bovine TB" as defined in the final rule.

145.    The 2005 MOU constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

146.    At no time prior to entering into the 2005 MOU did USDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2005 MOU would have on small businesses.

147.    MDA's entering into and execution of the 2005 MOU constitutes a waiver of Michigan's sovereign immunity.

148.    On October 6, 2005, and after finding that MDA had complied with all of the NAIS requirements in the 2005 MOU, USDA published an interim rule establishing Michigan's Upper Peninsula as a TB accredited free zone.  USDA stated in the interim

149.    Following the 2005 MOU, MDA took substantial steps in 2006 toward implementation of NAIS.

150.    In 2006, MDA registered nearly 45,000 premises pursuant to NAIS specifications.  MDA also used existing MDA data regarding farms to create a PIN database and collected additional information during "surveillance efforts," apparently without the knowledge or permission of the affected farmers.

151.    In 2006, MDA registered premises not only with cattle and bison, but also with sheep, swine and poultry as well.  MDA's alleged goal was to focus on cattle, due to the TB situation, but then to "expand to the other species groups" with no identified risk of TB.

152.    The 2006 registrations constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

153.    At no time prior to conducting the 2006 registrations did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2006 registrations would have on small businesses.

154.    On July 28, 2006, MDA submitted a proposal to receive a grant of $179,000 from the USDA (the "2006 grant proposal") to implement NAIS, primarily to 1) register premises, issue PINs, and forward that information into the NAIS database; 2) convince the public that NAIS is a good idea; and 3) implement the electronic identification required by NAIS and mandated by USDA in the 2005 MOU.

155.    The 2006 grant proposal was re-drafted on May 7, 2007 and formally submitted to USDA on May 8, 2007 with the stipulation that "funds may only be used for the implementation and administration of premises registration in accordance with the NAIS, and support of outreach efforts pertaining to all activities that promote the NAIS implementation plan for full participation by 2009." Consequently, the 2006 grant proposal that was approved by USDA in 2007 was clearly intended by MDA to implement NAIS in Michigan and to make its requirements mandatory by 2009.

156.    The 2006 grant proposal constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

157.    At no time prior to submitting the 2006 grant proposal did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2006 grant would have on small businesses.

158.    MDA's submission and USDA's ultimate approval of the 2006 grant proposal application constitutes a waiver of Michigan's sovereign immunity.

159.    In November 2006, MDA issued a second letter to all Michigan cattle producers informing them that MDA would begin mandatory implementation of NAIS as of March 1, 2007.

160.    In the November 2006 letter, MDA acknowledged that its existing TB program had made significant progress in eradicating TB in Michigan but nevertheless also imposed new substantive requirements implementing NAIS, including the requirement that all identification had to be *electronic*. At this point, the TB eradication

161.    Specifically, MDA required all cattle in the state of Michigan, in all TB zones, *including the TB free zone*, to be identified and tagged with an electronic RFID identification ear tag issued by MDA, linked to a specific PIN registration, prior to any movement from that premises.

162.    The November 2006 letter also stated that MDA's "TB surveillance program," which mandates that any vehicle transporting livestock (even within the state) must stop at any posted inspection point and produce documentation proving compliance with all livestock moving requirements, would "continue for one more year."

163.    With the November 2006 letter, MDA proposed to implement the first two phases of USDA's three-prong NAIS program with respect to cattle in that 1) all premises must be registered and issued a PIN; and 2) all cattle on said premises must be issued an AIN and tagged with an electronic RFID ear tag.

164.    In the November 2006 letter, MDA stated that "As these changes . . . are implemented, the [USDA] . . . has indicated that it would consider reinstating TB Free Status for the current MAAZ [modified accredited advanced zone] area of lower Michigan."  In other words, USDA was holding hostage Michigan's attempt to have its areas declared TB free in exchange for MDA's agreement to implement NAIS on a mandatory basis for all cattle.

165.    The November 2006 letter constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

166.    At no time prior to its issuance of the November 2006 letter did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the November 2006 letter would have on small businesses.

167.    In both its November 2004 and November 2006 letters, MDA did not promulgate these regulatory requirements as a formal rule or regulation, it did not seek any public comment, it did not evaluate any alternatives or impacts, and it did not otherwise comply with any procedural requirements.  Instead, MDA simply issued two letters signed by its Director that imposed new, substantive legal requirements.

168.    On February 9, 2007, MDA issued an "order" ("the February 2007 Order") that required, in part, that for the entire state "all cattle must be identified with official RFID electronic identification eartags prior to movement from a premises within Michigan, unless exempted by the director."

169.    The February Order also required for the MAAZ and the TB Free Zone that "All herds must obtain a premises identification number, and be placed into a database . . . ."

170.    The February 2007 Order constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

171.    MDA did not promulgate the February 2007 Order as a formal rule or regulation, it did not seek any public comment, it did not evaluate any alternatives or impacts, and it did not otherwise comply with any procedural requirements.  Instead, MDA simply issued the February 2007 Order that imposed new, substantive legal requirements.

172.    In 2007, MDA applied for federal funds from USDA in order to implement NAIS in the State of Michigan.

173.    In its final "Federal Grant Proposal 2006/2007 National Animal Identification System" ("2007 Grant Proposal") that was executed on May 8, 2007, MDA indicated it needed federal funding to support Michigan's "movement certification program for any cattle of any age moving from one zone in Michigan to another zone in Michigan."

174.    In the 2007 Grant Proposal, MDA stated that "all animals being moved must be tagged;" that livestock producers "will be issued a plastic premises registration card from MDA;" and that premises registration was required in order to "allow producers to purchase RFID tags."

175.    The 2007 Grant Proposal constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

176.    At no time prior to submitting the 2007 Grant Proposal did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the Grant Proposal would have on small businesses.

177.    MDA's request for federal funding under the 2007 Grant Proposal constitutes a waiver of Michigan's sovereign immunity.

178.    In 2007, USDA continued to place significant regulatory pressure on MDA to implement NAIS.

179.    In March 2007, USDA issued to Michigan a Bovine TB Program Review report (the "2007 Program Review") whereby USDA alleged 79 deficiencies by MDA in implementing its TB program and concomitant NAIS requirements.

180.    Because of these deficiencies, USDA threatened to place even greater regulatory restrictions on MDA if certain actions were not carried out.  For example, USDA was critical of MDA for not enforcing mandatory statewide electronic tagging for all cattle producers, including those who were opposed on the basis of their sincere religious beliefs.  As USDA stated in the 2007 Program Review: "[T]he State is making allowances for owners who do not want to identify their animals while on their premises . . . [T]his allowance has been made for Amish producers in particular, who claim they cannot use electronic identification on their property due to religious beliefs[.]"

181.    According to USDA, this allowance for Amish farmers "presents concerns with respect to traceability."  Therefore, USDA required MDA to "present documentation which demonstrates how traceability is ensured . . . ."

182.    After receiving the 2007 Program Review, State officials freely admitted the pressure they were receiving from USDA to implement NAIS.  For instance, Michigan State Veterinarian Steve Halstead stated: "USDA would prefer that we have a system like Mexico's, where to move between states, cattle haulers are stopped at gates by armed guards.  Our program has a lot of components in place for tracking animals, and they are effective.  But nothing is as secure as a guy at a gate with a gun. . . . The handwriting in the [2007 Executive Summary] is black and white, and there is no option for failure.  We will fix the things in the report, and it will happen in full partnership with the USDA."

183.   On June 22, 2007, MDA entered into an MOU with USDA/APHIS (the "2007 MOU") regarding the continuation of TB zone status in Michigan.  The 2007 MOU stated its purposes as "outlin[ing] and agree[ing] on the principles required for continuing three designations of State status * * * pursuant to" 9 CFR Part 77 and the TB Uniform Methods and Rules.  The 2007 MOU stated that USDA's authority for entering into the MOU was the AHPA.

184.   In addition to the NAIS electronic tagging requirement stipulated by the 2005 MOU, the 2007 MOU now mandated two additional provisions that appear to be part of the third phase of NAIS.  Specifically, the 2007 MOU requires MDA to 1) have the "ability to retrieve information concerning animal movements within 48 hours," and 2) "implement and enforce a uniform, state wide certificate system to track all interstate or interzone cattle and bison movements from farm of origin to final destination."  Thus, the 2007 MOU effectively requires MDA to implement the primary provisions of NAIS with respect to interstate and *interzone* (or intrastate) movements of cattle.

185.   The 2007 MOU requirements have been broadened to cover all livestock. Specifically, the 2007 MOU requires MDA to "[u]tilize State authority to randomly intercept and inspect vehicles that are transporting livestock on public roads *within* Michigan for compliance with State and Federal split state status requirements and this MOU."  (Emphasis added).

186.   The 2007 MOU stated that its conditions would be incorporated into a final rule to be published in the Federal Register, and that MDA would agree to these "conditions for split state status for bovine TB" as defined in the final rule.

187.    The 2007 MOU constitutes "major federal action" as referred to in 42 U.S.C. 4332(C).

188.    At no time prior to entering into the 2007 MOU did USDA or MDA prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS"), any other similar environmental document, or conduct any analysis of the financial impact the 2007 MOU would have on small businesses.

189.    MDA's entering into and execution of the 2007 MOU constitutes a waiver of Michigan's sovereign immunity.

190.    As of January 5, 2009, Plaintiff Fund has 50 farmer members in the State of Michigan, including members who reside in the MAZ and in the MAAZ who own livestock who are adversely affected by MDA's actions.

191.    Plaintiffs Niewendorp, Alexander, Golimbieski, Keyworth, Mast, Schneider and Wyant are all farmers engaged in agricultural activities and raise some form of livestock in Michigan who are adversely affected by MDA's actions.

192.    Plaintiff Nolt raises livestock in Pennsylvania and has had his premises registered against his will by USDA and his private data transferred to a database that is managed by either the state or federal government or by a private third party.

**NEPA Process**

193.    NEPA was enacted by the United States Congress in 1969 and requires federal agencies to prepare an environmental assessment ("EA") or environmental impact statement ("EIS") anytime any "major federal action" is taken, which includes projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies.

194.     NEPA applies to all federal agencies and in appropriate circumstances to state agencies that receive federal Funds or that engage in projects over which a federal agency has responsibility or control.

195.     Pursuant to 42 U.S.C.S. 4332, the environmental document required by NEPA, either an EA or an EIS, must address the following:

> (i)      the environmental impact of the proposed action,
> (ii)     any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii)    alternatives to the proposed action,
> (iv)     the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v)      any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

196.     The Council on Environmental Quality ("CEQ") was created by Congress to monitor NEPA and was authorized by Congress to adopt regulations implementing NEPA.  Contained at 40 CFR Part 1500 *et seq.*, the regulations adopted by CEQ apply to all federal agencies, including USDA.

197.     The regulations of CEQ require, in part, that federal agencies shall study, develop and prepare either an EA or an EIS for all major federal projects that significantly impact the environment.  See 40 CFR 1507.2(d).  These impacts may be cumulative, may be the result of direct or indirect effects, and shall be reviewed in their context and for their intensity of impact.  See 40 CFR 1508.7, 1508.8 and 1508.27.  The significance of a project cannot be avoided by terming an action temporary or by breaking it down into small component parts.  See 40 CFR 1508.27   Also, the CEQ regulations require that all federal agencies study, develop and describe alternatives to a proposed project.  See 40 CFR 1507.2(d).

198.    If an EA is submitted to USDA for review, USDA will either issue a Finding of No Significant Impact ("FONSI") or it will require the submittal of an EIS.  If an EIS is submitted, USDA will review it and determine if the project should be approved or rejected because it will adversely affect the environment.

199.    The NEPA process is defined to include "all measures necessary for compliance with the requirements of section 2 and title I of NEPA."  See 40 CFR 1508.21.

200.    During the NEPA process, the lead agency (in this case USDA) and the coordinating state agency (in this case MDA) are prohibited from taking any action on the project that would either have an adverse environmental impact or that would limit the choice of reasonable alternatives.

201.    Under regulations promulgated by CEQ, 40 CFR 1506.5 provides, in part, that if a federal agency "permits an applicant to prepare an environmental assessment, the agency * * * shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."

202.    Under regulations promulgated by the Secretary of USDA, 7 CFR Part 1b, "All policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations."  See 7 CFR 1b.2(a).

203.    This means that USDA is required to coordinate with state agencies such as MDA in the preparation of the environmental document required by NEPA.  A State agency, such as MDA, may prepare the environmental document but if MDA prepares

204.    USDA's APHIS is required to comply with NEPA, the regulations issued by the CEQ, and with the 7 CFR Part 1b requirements promulgated by the Secretary of Agriculture.  See 7 CFR Part 372.

205.    Thus, NAIS and each of its individual components ("the project" or "project") was a project whereby MDA and USDA were required to prepare and submit either an Environmental Impact Statement (EIS) or an Environmental Assessment ("EA") for review and approval under NEPA.  Consequently, the regulations under 40 CFR Part 1500 *et seq.* and 7 CFR Part 1b and Part 372 applied to NAIS and each of its individual components.

206.    With respect to environmental impacts, NAIS and each of its individual components requires the use of electronic "radio frequency identification devices" ("RFIDs") that are placed on animals, usually as ear tags.

207.    The RFIDs required by NAIS and each of its individual components will likely contain mercury and other hazardous substances and their production and disposal (when the animal is slaughtered) will likely be regulated under the Solid Waste Disposal Act and the Resource Conservation and Recovery Act.

208.    With approximately 35 million cattle slaughtered each year (and unknown numbers of horses, goats, sheep, llamas, alpacas, deer, elk, and bison that die or are slaughtered each year), NAIS and each of its individual components will result in tens of millions of microchips that will need to be manufactured and disposed of each year in accordance with applicable environmental law.

209.    In addition, NAIS and each of its individual components create incentives for large, vertically integrated, confined animal feeding operations (CAFO's) but not for small, sustainable, pasture-based farms.  Therefore, compliance with NAIS and each of its individual components will be easier for large operations but more difficult for small operations.

210.    Because of this disparate treatment under NAIS, additional adverse environmental impacts will accrue as environmentally friendly operations (smaller operations) go out of business while environmentally unfriendly operations (larger operations) proliferate.

211.    Specifically, small, sustainable farms and large, vertically integrated farms have different impacts on the environment.  For example, small farms, including the individual Plaintiffs and other Fund members, reduce greenhouse gases, improve air and water quality, reduce soil erosion, improve soil tilth, do not rely on chemicals, and increase the abundance of native plants and enhance ecosystems.

212.    In addition, the individual Plaintiffs and other members of the Fund in this case are stewards of the environment, seeking to protect and promote sustainable, environmentally friendly farming practices which reduce the use of pesticides and herbicides, prevent erosion, promote clean water and air, enhance soil health and productivity, protect wildlife, prevent animal cruelty and disease, reduce greenhouse gas emissions, preserve rural land and open space, and reduce the consumption of fossil fuels and other natural resources. They have a vested interest in the health of the natural environment that transcends any economic interest.

213.    Large farms, on the other hand, contribute to soil degradation and pollution of aquatic ecosystems, contaminate surface water from surface pits and lagoons, create increased methane and ammonia air pollution, and use antibiotics that may increase the risk of resistant bacterial strains jumping species.

214.    None of these environmental impacts were considered or evaluated by Defendants.

215.    With respect to economic, social and cultural impacts, NAIS increases the economic burden on small farmers that will lead to the consolidation of these farms in large industrial agriculture facilities, or even their development for residential or commercial use, creating significant land use impacts.

216.    As just one example, some NAIS documents admit that group identification numbers can be used for animals that "typically move through the production chain as a group of animals of the same species."

217.    This practice of moving animals through the food production chain as a group, however, is limited to large-scale swine and poultry industries and is not practiced by the small operations such as the individual Plaintiffs or other members of the Fund.  The Plaintiffs' small, pasture-based operations generally do not manage their animals in such artificial, isolated groups, and will therefore be faced with having to individually tag and track each animal, an additional cost that Defendants failed to address.

218.    In addition, agrarian-based communities are an integral part of the fabric of American custom and culture and all Plaintiffs help preserve and protect that culture.

219.    All Plaintiffs preserve and protect Americans' agricultural heritage and traditional farming techniques, they maintain and protect heirloom varieties of plants and animals constituting a valuable genetic resource which may help to protect America's food supply in the event of a disease outbreak, and they also provide a national security benefit founded in a diverse system in the event of a terrorist attack or natural disaster that interrupts the distant transportation of centrally-produced food across the country.

220.    None of these economic, social or cultural impacts were evaluated by either of the Defendants.

## FEDERAL CLAIMS

### COUNT ONE
### NAIS VIOLATES THE PROCEDURAL REQUIREMENTS OF THE FEDERAL ADMINISTRATIVE PROCEDURE ACT

221.    Paragraphs 1 through 220 are incorporated into this Count as if rewritten herein.

222.    5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

223.    5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

224.    5 USC 551(13) provides, in part, that "agency action" includes "the whole or a part of an agency rule, * * * relief, or the equivalent or denial thereof, or failure to act."

225.    5 USC 551(14) provides, in part, that "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . ."

226.    5 USC 551(11)(A) provides, in part, that "relief" means "the whole or part of an agency * * * grant of money."

227.    5 U.S.C. 553(b) provides, in part, that "General notice of proposed rule making shall be published in the Federal Register."

228.    5 USC 553(c) provides, in part, that after notice "required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."

229.    Each of the following documents constitute agency action in the form of a substantive rule of general applicability, i.e., they constitute a "legislative rule," because each of them were either (1) published in the Federal Register, (2) issued pursuant to AHPA or the regulations adopted thereunder, (3) issued pursuant to MOUs entered into by Defendants under AHPA, or (4) are designed to implement, interpret, or prescribe law or policy under the animal disease programs of the AHPA:

(i)      The 2004 interim rule;

(ii)     The 2007 final rule;

(iii)    The September VS memo;

(iv)    The December VS memo;

(v)     The 2005 Draft Plan;

(vi)    The 2005 Draft Standards;

(vii)   The 2006 Strategies;

(viii)  The July 2006 notice;

(ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)  The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)    The 2002 MOU;

(xvi)   The 2005 MOU;

(xvii)  The October 2005 interim rule;

(xviii) The 2007 Program Review;

(xix)   The 2007 MOU.

230.    Each of the documents identified in the preceding paragraph were not subjected to full and formal public comment and therefore constitute illegal rulemaking.

231.    Defendant USDA's conduct described in this Count constitutes a violation of 5 U.S.C. 553(b) and (c) for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

## COUNT TWO
## NAIS VIOLATES THE PROCEDURAL REQUIREMENTS OF THE REGULATORY FLEXIBILITY ACT

232.    Paragraphs 1 through 231 are incorporated into this Count as if rewritten herein.

233.    5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

234.    5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

235.    5 U.S.C. 603(a) provides, in part, that whenever a federal agency publishes in the Federal Register "any proposed rule, or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis."

236.    5 U.S.C. 603(a) provides, in part, that the initial regulatory flexibility analysis "shall describe the impact of the proposed rule on small entities."

237.    Small entities (or "small business concern") are defined under 15 U.S.C. 632(a)(1) as "enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and

238.    5 U.S.C. 604(a) provides, in part, that when an agency publishes a final rule in the Federal Register, "the agency shall prepare a final regulatory flexibility analysis."

239.    5 U.S.C. 604(a)(3), (4) and (5) provides, in part, that the final regulatory flexibility analysis must contain "(3) a description of and an estimate of the number of small entities to which the rule will apply;" "(4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule;" and "(5) a description of the steps the agency has taken to minimize the significant economic impact on small entities."

240.    5 U.S.C. 608(b) provides, in part, that if the agency "has not prepared a final regulatory analysis pursuant to section 604 of this title [5 USCS § 604] within one hundred and eighty days from the date of publication of the final rule, such rule shall lapse and have no effect."

241.    5 U.S.C. 611(a)(1) provides, in part, that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 [5 USCS §§ 601, 604, 605(b), 608(b), and 610] in accordance with chapter 7 [5 USCS §§ 701 et seq.]."

242.    With respect to cattle operations, the November 8, 2004 interim rule described a "small entity" cattle operation as one that had no more than 1,265 head of

243. With respect to hog producers, the interim rule stated that "Producers with fewer than 4,000 head of hogs * * * would likely be considered small." According to the USDA's 2002 Census, 91% of hog farms had fewer than 2,000 hogs, making them small producers according to the USDA.

244. The 2004 interim rule did not describe the economic impact it would have on 99% of cattle producers and 91% of hog producers.

245. Instead, the 2004 interim rule stated the following:

(i) "[l]ittle information is available at this time about costs that may be incurred by producers;"

(ii) "participation in the NAIS is voluntary;"

(iii) "[p]roducers can opt not to participate in the NAIS if they anticipate that the costs they will incur will exceed the benefits they receive from participation;"

(iv) "use of this numbering system is voluntary, no costs are imposed on participants and it is unlikely for this interim rule to have any adverse impact on small businesses."

246. The 2004 interim rule did not comply with 5 U.S.C. 603(a) because it did not include an initial regulatory flexibility analysis.

247. The July 2007 final rule did not comply with the requirements of 5 U.S.C. 604(a) because it did not include a final regulatory flexibility analysis.

248.   Neither the 2004 interim nor the 2007 final rule conducted the proper regulatory flexibility analysis because both rules presumed that NAIS was voluntary.

249.   Defendants' NAIS program as a whole did not comply with the requirements of either 5 U.S.C. 603(a) or 604(a).

250.   Plaintiff Legal Defense Fund represents, and all individual Plaintiffs are small entity cattle and/or hog farmers.

251.   As explained in Paragraphs 113 through 192 above, NAIS is not a voluntary program in the State of Michigan but is instead a mandatory program.

252.   As explained in Paragraphs 222 through 230 above, the following documents constitute "agency action" and a "rule" or "legislative rule" which should have been, but were not, subjected to an initial and/or final regulatory flexibility analysis:

(i)      The 2004 interim rule;

(ii)     The 2007 final rule;

(iii)    The September VS memo;

(iv)    The December VS memo;

(v)     The 2005 Draft Plan;

(vi)    The 2005 Draft Standards;

(vii)   The 2006 Strategies;

(viii)  The July 2006 notice;

(ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)   The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)   The 2002 MOU;

(xvi)   The 2005 MOU;

(xvii)   The October 2005 interim rule;

(xviii)  The 2007 Program Review;

(xix)   The 2007 MOU.

253.   Defendant USDA's conduct described in this Count constitutes a violation of 5 U.S.C. 603(a), 604(a) and 608(b), for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

**COUNT THREE**
**NAIS VIOLATES THE SUBSTANTIVE REQUIREMENTS OF THE FEDERAL**
**ADMINISTRATIVE PROCEDURE ACT**

254.   Paragraphs 1 through 253 are incorporated into this Count as if rewritten herein.

255.   5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

256.   5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

257.   7 U.S.C. 8303(a) of the Animal Health Protection Act ("AHPA") provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the importation or entry of any animal, article, or means of conveyance * * * (2) the further movement of any animal that has strayed into the United States * * * and (3) the use of any means of conveyance in connection with the importation or entry of livestock . . . ."

258.   7 U.S.C. 8304(a) provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the exportation of any animal, article, or means of conveyance * * * (2) the exportation of any livestock * * * (3) the use of any means of conveyance or facility in connection with the exportation of any animal or article * * * (4) the use of any means of conveyance in connection with the exportation of livestock . . . ."

259.   7 U.S.C. 8305 provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the movement in interstate commerce of any animal, article, or means of conveyance * * * (2) the use of any means of conveyance or facility in connection with the movement in interstate commerce of any animal or article . . . ."

260.   The AHPA regulates the importation, exportation and interstate movement of in the United States; it does not regulate the *intrastate* movement of livestock in the United States.  Therefore, any program implemented under AHPA must be rationally related to the purposes and authorization of AHPA.

261.   USDA has failed to provide a rational relationship between any of the documents identified in paragraph 229 and the control and eradication of animal disease under the AHPA.  For example, USDA has failed to show any rational basis for applying a universal NAIS program to geographic areas where particular diseases are not found or for applying NAIS requirements to every livestock producer in the state

262.    Because USDA has failed to demonstrate that any of the documents identified in paragraph 229 have any rational relationship to or causal link with animal disease control, USDA's promulgation and implementation of the documents identified in paragraph 229 pursuant to AHPA is arbitrary, capricious, an abuse of discretion and not in accord with applicable law.

263.    Each of the following NAIS documents are arbitrary and capricious and in excess of statutory jurisdiction, authority, or limitations because they impose regulatory requirements beyond the mandates of AHPA:

(i)      The 2004 interim rule;

(ii)     The 2007 final rule;

(iii)    The September VS memo;

(iv)    The December VS memo;

(v)     The 2005 Draft Plan;

(vi)    The 2005 Draft Standards;

(vii)   The 2006 Strategies;

(viii)  The July 2006 notice;

(ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)  The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)    The 2002 MOU;

(xvi)   The 2005 MOU;

(xvii)  The October 2005 interim rule;

(xviii) The 2007 Program Review;

(xix)   The 2007 MOU.

264.    Defendant USDA's conduct described in this Count is arbitrary and capricious for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

**COUNT FOUR**
**NAIS VIOLATES PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

265.    Paragraphs 1 through 264 are incorporated into this Count as if rewritten herein.

266.    The Fifth Amendment to the Constitution of the United States provides, in part, that "No person shall be * * * deprived of life, liberty, or property, without due process of law."

267.    5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

268.    5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

269.    7 U.S.C. 8303(a) of the Animal Health Protection Act ("AHPA") provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the importation or entry of any animal, article, or means of conveyance * * * (2) the further movement of any animal that has strayed into the United States * * * and (3) the use of any means of conveyance in connection with the importation or entry of livestock . . . ."

270.    7 U.S.C. 8304(a) provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the exportation of any animal, article, or means of conveyance * * * (2) the exportation of any livestock * * * (3) the use of any means of conveyance or facility in connection with the exportation of any animal or article * * * (4) the use of any means of conveyance in connection with the exportation of livestock . . . ."

271.    7 U.S.C. 8305 provides, in part, that the Secretary of Agriculture "may prohibit or restrict -- (1) the movement in interstate commerce of any animal, article, or means of conveyance * * * (2) the use of any means of conveyance or facility in connection with the movement in interstate commerce of any animal or article . . . ."

272.    The AHPA regulates the importation, exportation and interstate movement of in the United States; it does not regulate the *intrastate* movement of livestock in the United States.  Therefore, any program implemented under AHPA must be rationally related to the purposes and authorization of AHPA.

273.    USDA has failed to provide a rational relationship between any of the documents identified in paragraph 229 and the control and eradication of animal disease under the AHPA.  For example, USDA has failed to show any rational basis for

274.    Because USDA has failed to demonstrate that any of the documents identified in paragraph 229 have any rational relationship to or causal link with animal disease control, USDA's promulgation and implementation of the documents identified in paragraph 229 pursuant to AHPA is arbitrary, capricious, an abuse of discretion and not in accord with applicable law.

275.    Each of the following NAIS documents (1) constitute agency action in the form of a substantive or "legislative" rule of general applicability yet were never subjected to full and complete public comment and therefore constitute illegal rulemaking, and (2) are not rationally related to the mandates of AHPA because they impose regulatory requirements beyond the mandates of AHPA:

    (i)     The 2004 interim rule;

    (ii)    The 2007 final rule;

    (iii)   The September VS memo;

    (iv)    The December VS memo;

    (v)     The 2005 Draft Plan;

    (vi)    The 2005 Draft Standards;

    (vii)   The 2006 Strategies;

    (viii)  The July 2006 notice;

    (ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)  The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)    The 2002 MOU;

(xvi)   The 2005 MOU;

(xvii)  The October 2005 interim rule;

(xviii) The 2007 Program Review;

(xix)   The 2007 MOU.

276.    Defendant USDA's conduct described in this Count constitutes a violation of the Fifth Amendment to the Constitution of the United States for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

**COUNT FIVE**
**MICHIGAN'S IMPLEMENTATION OF NAIS VIOLATES PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

277.    Paragraphs 1 through 276 are incorporated into this Count as if rewritten herein.

278.    The Fourteenth Amendment to the Constitution of the United States provides, in part, that no State shall deprive "any person of life, liberty, or property, without due process of law."

279.    7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

280.    7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

281.    7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

282.    Michigan's Animal Industry Act ("AIA"), MCL 287.706(2) provides, in part, that several forms of "official identification" are authorized for livestock but it does not require electronic RFIDs as the exclusive form of official identification for livestock.

283.    MCL 287.711(b) provides, in part, that official identification is required only for "cattle, goats, sheep, and privately owned cervids [deer]" but it does not require official identification for swine and poultry.

284.    MCL 287.745 provides, in part, that MDA "may promulgate rules for the implementation and enforcement of this act pursuant to" the Michigan APA.

285.    However, neither the AHPA, Michigan's AIA nor their implementing regulations authorizes MDA to: (1) require electronic RFIDs for all livestock; (2) require premises registration; (3) require 48-hour traceability, and; (4) require MDA to help establish and participate in any nation-wide animal identification system or otherwise take actions which are unrelated to animal disease control.

286.    Each of the following documents (1) constitute agency action in the form of a substantive rule of general applicability yet were never subjected to full and complete public comment and therefore constitute illegal rulemaking, and (2) are not

(i)      The 2004 interim rule;

(ii)     The 2007 final rule;

(iii)    The September VS memo;

(iv)    The December VS memo;

(v)     The 2005 Draft Plan;

(vi)    The 2005 Draft Standards;

(vii)   The 2006 Strategies;

(viii)  The July 2006 notice;

(ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)  The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)    The 2002 MOU;

(xvi)   The June 2004 Order;

(xvii)  The 2005 MOU;

(xviii) The October 2005 interim rule;

(xix)   The 2006 Registrations;

(xx)    The 2006 Grant Proposal;

(xxi)   The November 2006 letter

(xxii)   The February 2007 Order;

(xxiii)  The 2007 Grant Proposal;

(xxiv)  The 2007 Program Review;

(xxv)   The 2007 MOU.

287.    Each of the documents identified above deprive Plaintiffs due process of law because they are not rationally related to the mandates of the AIA or the AHPA.

288.    Defendant MDA's conduct described in this Count constitutes an ongoing violation of the Fourteenth Amendment to the Constitution of the United States for which declaratory and other injunctive relief is available and should issue under 28 U.S.C. 1331.

## COUNT SIX
## NAIS VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT

289.    Paragraphs 1 through 288 are incorporated into this Count as if rewritten herein.

290.    5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

291.    5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

292. Pursuant to 40 CFR 1501.4 (a)(1), CEQ has determined that each Federal agency shall: "(a) Determine under its procedures * * * whether the proposal is one which: (1) Normally requires an environmental impact statement."

293. Pursuant to 7 CFR 1b.2(a) provides that, "All policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations."

294. 7 CFR 1b.2(b) provides, in part, that "Each USDA agency is responsible for compliance with this part, the regulations of CEQ, and NEPA."

295. Pursuant to 7 CFR 1b.4, USDA's Animal Plant Health Inspection Service ("APHIS") is not included on the list of USDA agencies that are "excluded from the requirements of preparing procedures to implement NEPA."

296. APHIS' regulations implementing NEPA are contained at 7 CFR Part 372, *et seq.*, including 7 CFR 372.1 which provides, in part, that "These procedures implement section 102(2) of the National Environmental Policy Act."

297. 7 CFR 372.5(a) requires the submission and preparation of an Environmental Impact Statement ("EIS") for activities that seek to "establish programmatic approaches to animal and plant health issues." These types of activities are "characterized by their broad scope (often global or nationwide) and potential effect (impacting a wide range of environmental quality values or indicators, whether or not affected individuals or systems may be completely identified at the time)." Examples of APHIS activities requiring an EIS include "(2) Adoption of strategic or other long-range plans that purport to adopt for future program application a preferred course of action."

298.　7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

299.　7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

300.　7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

301.　As explained in paragraphs 211-212 and 217-219, all Plaintiffs have an interest in protecting, promoting and enhancing the environment.

302.　Each of the following constitutes "major federal action" as referred to in 42 U.S.C. 4332(C) and at no time prior to their issuance did Defendants prepare an Environmental Assessment ("EA"), an Environmental Impact Statement ("EIS") or any other similar environmental document:

      (i)      The 2004 interim rule;

      (ii)     The 2007 final rule;

      (iii)    The September VS memo;

      (iv)    The December VS memo;

      (v)     The 2005 Draft Plan;

      (vi)    The 2005 Draft Standards;

      (vii)   The 2006 Strategies;

      (viii)  The July 2006 notice;

      (ix)    The 2006 User's Guide;

(x)     The February 2007 notice;

(xi)    The 2007 Business Plan;

(xii)   The April 2008 notice;

(xiii)  The September 2008 interim rule;

(xiv)   The 2008 Business Plan;

(xv)    The 2002 MOU;

(xvi)   The June 2004 Order;

(xvii)  The 2005 MOU;

(xviii) The October 2005 interim rule;

(xix)   The 2006 Registrations;

(xx)    The 2006 Grant Proposal;

(xxi)   The November 2006 letter

(xxii)  The February 2007 Order;

(xxiii) The 2007 Grant Proposal;

(xxiv)  The 2007 Program Review;

(xxv)   The 2007 MOU.

303.    7 CFR 372.5(c)(1), (2), (3) and (4), respectively, lists "categorical exclusions" from NEPA requirements which include such activities as "routine measures," "research and development" activities, "licensing and permitting," and "rehabilitation of facilities."

304.    None of the documents identified in paragraph 302 are defined as a "categorical exclusion" under 7 CFR 1b.3.

305.    None of the documents identified in paragraph 302 are defined as a categorical exclusion under 7 CFR Part 372.5(c).

306.    Defendants did not prepare any environmental document prior to the development of any of the documents identified in paragraph 302.

307.    Defendants have never issued a Finding of No Significant Impact ("FONSI") or invoked a "categorical exclusion" with respect to any of the documents identified in paragraph 302.

308.    Defendants' conduct described in this Count constitutes an ongoing violation of federal law, specifically, NEPA, 40 CFR 1501.4(a)(1) and 7 CFR Parts 1b and 372 for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

## COUNT SEVEN
## NAIS VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT

309.    Paragraphs 1 through 308 are incorporated into this Count as if rewritten herein.

310.    5 USC 702 provides, in part, that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

311.    5 U.S.C. 706(2) provides, in part, that a Court may "hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * *

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

312.     42 U.S.C. 2000bb-1(a) provides, in part, that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)."

313.     42 U.S.C. 2000bb-1(b) provides, in part, that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

314.     42 U.S.C. 2000bb-2(1) provides, in part, that "government" is defined to include "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity."

315.     42 U.S.C. 2000bb-3 provides, in part, that RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise . . . ."

316.     7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

317.     7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

318.     7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

319.     The 2005 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle movements" within the State of Michigan, including but not

320. The 2005 MOU was entered into on the basis of the authority of the AHPA.

321. The 2007 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle *and bison* movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle *and bison* moved from premises in the Modified Accredited zone." (Emphasis added).

322. The 2007 MOU was entered into on the basis of the authority of the AHPA.

323. According to the 2007 Users Guide (pg. 22), animal owners "who have registered their premises may choose to participate in animal identification" and group/lot identification numbers "are also an option once the premises has been registered."

324. According to MDA's 2007 Grant Proposal, "all animals being moved must be tagged;" livestock producers "will be issued a plastic premises registration card from MDA;" and premises registration is required in order to "allow producers to purchase RFID tags."

325. Premises registration and use of RFIDs in Michigan applies to "any cattle of any age moving from one zone in Michigan to another zone in Michigan" regardless of the presence of TB.

326.    Under the 2007 Grant Proposal, and the 2005 and 2007 MOUs, a premises has to be registered before it can purchase or use RFID's on livestock.

327.    Plaintiffs Niewendorp, Alexander, Golimbieski, Keyworth, Mast, Schneider and Wyant are all members of Plaintiff Legal Defense Fund, all of them live in Michigan, and all of them are engaged in agricultural activities that are subject to the requirements of the 2005 and 2007 MOUs issued under the AHPA.

328.    Plaintiff Nolt is a member of Plaintiff Legal Defense Fund, lives in Pennsylvania, is engaged in agricultural activities that are subject to the AHPA, and is in possession of a PIN issued by Pennsylvania under the authority of the AHPA.

329.    Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's religious beliefs, including but not limited to the requirement for a numbering system for their premises and/or an electronic numbering system for their animals, constitutes some form of a "mark of the beast" and/or represents an infringement of their "dominion over cattle and all living things" in violation of their fundamental religious beliefs.  These beliefs are founded upon their religious faiths and in such verses as Revelations 13, Revelations 14, Revelations 15, Revelations 16, Revelations 19, Revelations 20, 2 Peter 3, Romans 14, Genesis 1, 26, Luke 18 and Deuteronomy 28.

330.    Plaintiffs' beliefs are of deep religious conviction, are shared by all in their organized group, and are intimately related to their daily living.  Plaintiffs' religion pervades and determines virtually their entire way of life, regulating it from diet through the strictly enforced rules of their respective church communities.

331.    NAIS, the 2005 MOU or the 2007 MOU are not the least restrictive means of controlling animal disease or promoting animal health.

332.    Defendant USDA does not have a compelling interest in implementing NAIS, the 2005 MOU or the 2007 MOU because there is no rational relationship between RFIDs, PINs and animal tracking and the eradication or control of TB.

333.    NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's exercise of their religion.

334.    In addition, Plaintiffs Mast and Alexander are both members of the Old Order Amish Church which compels them to, in part, (a) reject any technology that is not community or family building based, (b) live separate from, rather than integrate with, the rest of the world, and (c) make their living by farming.

335.    NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Mast's and Alexander's exercise of their religion because it forces them to, in part, violate tenets of their Old Order Amish beliefs, i.e., they are forced to use technology they would ordinarily not use, they have to integrate with and accept the NAIS system, and they may have to quit farming.

336.    Each of the following documents constitute a substantial burden on the individual Plaintiffs' exercise of their religion and are not the least restrictive means of controlling animal disease or promoting animal health:

(i)      The 2004 interim rule;

(ii)     The 2007 final rule;

(iii)    The September VS memo;

(iv)     The December VS memo;

(v)      The 2005 Draft Plan;

(vi)     The 2005 Draft Standards;

(vii)    The 2006 Strategies;

(viii)   The July 2006 notice;

(ix)     The 2006 User's Guide;

(x)      The February 2007 notice;

(xi)     The 2007 Business Plan;

(xii)    The April 2008 notice;

(xiii)   The September 2008 interim rule;

(xiv)    The 2008 Business Plan;

(xv)     The 2002 MOU;

(xvi)    The 2005 MOU;

(xvii)   The October 2005 interim rule;

(xviii)  The 2007 Program Review;

(xix)    The 2007 MOU.

337.   Defendant USDA's conduct described in this Count constitutes a violation of 42 U.S.C. 2000bb-1(a), for which declaratory and other injunctive relief is available and should issue under 5 U.S.C. 702 and 706.

## COUNT EIGHT
## MICHIGAN'S IMPLEMENTATION OF NAIS CONSTITUTES A VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

338.   Paragraphs 1 through 337 are incorporated into this Count as if rewritten herein.

339.   42 U.S.C. 2000bb-1(a) of the Religious Freedom Restoration Act ("RFRA") provides, in part, that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)."

340.   42 U.S.C. 2000bb-1(b) provides, in part, that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

341.   42 U.S.C. 2000bb-2(1) provides, in part, that "government" is defined to include "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity."

342.   42 U.S.C. 2000bb-3 provides, in part, that RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise . . . ."

343.   As described further in this Count below, Defendant MDA is implementing federal law and is thus subject to the requirements of RFRA.

344.   The AHPA at 7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

345.   The AHPA at 7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

346.     The AHPA at 7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

347.     Michigan's Animal Industry Act at MCL 287.742(6)(b) provides, in part, that "(6) Testing and surveillance for brucellosis and tuberculosis shall be * * * (b) * * * conducted through * * * uniform methods and rules * * * approved by veterinary services of [APHIS] . . . ."

348.     The "uniform methods and rules" approved by APHIS are contained in 9 CFR 77.1 and have been incorporated by reference in MCL 287.742.

349.     Article I of the 2002 MOU between Defendants provides, in part, that "The purpose of this [MOU] is to outline and agree on the principles required for continuing three designations of State status regarding the risk of bovine tuberculosis * * * pursuant to [9 CFR 77.1] and the Tuberculosis Eradication Program's Uniform Methods and Rules . . . ."

350.     Thus, Defendant MDA is implementing federal law in the State of Michigan, to wit, the NAIS program as developed under the AHPA.

351.     The 2005 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle moved from premises in the Modified Accredited zone."

352.     The 2005 MOU was entered into on the basis of the authority of the AHPA.

353.     The 2007 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle *and bison* movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle *and bison* moved from premises in the Modified Accredited zone." (Emphasis added).

354.     The 2007 MOU was entered into on the basis of the authority of the AHPA.

355.     According to the 2007 Users Guide (pg. 22), animal owners "who have registered their premises may choose to participate in animal identification" and group/lot identification numbers "are also an option once the premises has been registered."

356.     According to MDA's 2007 Grant Proposal, "all animals being moved must be tagged;" livestock producers "will be issued a plastic premises registration card from MDA;" and premises registration is required in order to "allow producers to purchase RFID tags."

357.     Premises registration and use of RFIDs in Michigan applies to "any cattle of any age moving from one zone in Michigan to another zone in Michigan" regardless of the presence of TB.

358.     Under the 2007 Grant Proposal, and the 2005 and 2007 MOUs, a premises has to be registered before it can purchase or use RFID's on livestock.

359.     Plaintiffs Niewendorp, Alexander, Golimbieski, Keyworth, Mast, Schneider and Wyant are all members of Plaintiff Legal Defense Fund, all of them live in Michigan,

360.     Plaintiff Nolt is a member of Plaintiff Legal Defense Fund, lives in Pennsylvania, is engaged in agricultural activities that are subject to the AHPA, and is in possession of a PIN issued by Pennsylvania allegedly under the authority of the AHPA.

361.     Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's religious beliefs, including but not limited to the requirement for a numbering system for their premises and/or an electronic numbering system for their animals, constitutes some form of a "mark of the beast" and/or represents an infringement of their "dominion over cattle and all living things" in violation of their fundamental religious beliefs.  These beliefs are founded upon their religious faiths and in such verses as Revelations 13, Revelations 14, Revelations 15, Revelations 16, Revelations 19, Revelations 20, 2 Peter 3, Romans 14, Genesis 1, 26, Luke 18 and Deuteronomy 28.

362.     Plaintiffs' beliefs are of deep religious conviction, are shared by all in their organized group, and are intimately related to their daily living.  Plaintiffs' religion pervades and determines virtually their entire way of life, regulating it from diet through the strictly enforced rules of their respective church communities.

363.     NAIS, the 2005 MOU or the 2007 MOU are not the least restrictive means of controlling animal disease or promoting animal health.

364.    Defendant USDA does not have a compelling interest in implementing NAIS, the 2005 MOU or the 2007 MOU because there is no rational relationship between RFIDs, PINs and animal tracking and the eradication or control of TB.

365.    NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's exercise of their religion.

366.    In addition, Plaintiffs Mast and Alexander are both members of the Old Order Amish Church which compels them to, in part, (a) reject any technology that is not community or family building based, (b) live separate from, rather than integrate with, the rest of the world, and (c) make their living by farming.

367.    NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Mast's and Alexander's exercise of their religion because it forces them to, in part, violate tenets of their Old Order Amish beliefs, i.e., they are forced to use technology they would ordinarily not use, they have to integrate with and accept the NAIS system, and they may have to quit farming.

368.    Each of the following documents constitute a substantial burden on the individual Plaintiffs' exercise of their religion, are not the least restrictive means of controlling animal disease or promoting animal health, and MDA's implementation of them in the State of Michigan constitutes an ongoing violation of federal law:

   (i)      The 2004 interim rule;

   (ii)     The 2007 final rule;

   (iii)    The September VS memo;

   (iv)     The December VS memo;

(v)      The 2005 Draft Plan;

(vi)     The 2005 Draft Standards;

(vii)    The 2006 Strategies;

(viii)   The July 2006 notice;

(ix)     The 2006 User's Guide;

(x)      The February 2007 notice;

(xi)     The 2007 Business Plan;

(xii)    The April 2008 notice;

(xiii)   The September 2008 interim rule;

(xiv)    The 2008 Business Plan;

(xv)     The 2002 MOU;

(xvi)    The June 2004 Order;

(xvii)   The 2005 MOU;

(xviii)  The October 2005 interim rule;

(xix)    The 2006 Registrations;

(xx)     The 2006 Grant Proposal;

(xxi)    The November 2006 letter

(xxii)   The February 2007 Order;

(xxiii)  The 2007 Grant Proposal;

(xxiv)   The 2007 Program Review;

(xxv)    The 2007 MOU.

369. Defendant MDA's conduct described in this Count constitutes a violation of 42 U.S.C. 2000bb-1(a), for which declaratory and other injunctive relief is available and should issue under 28 U.S.C. 1331.

## SUPPLEMENTAL JURISDICTION FOR STATE-BASED CLAIMS

### COUNT NINE
### MICHIGAN'S IMPLEMENTATION OF NAIS VIOLATES PROCEDURAL REQUIREMENTS OF MICHIGAN'S ADMINISTRATIVE PROCEDURE ACT

370. Paragraphs 1 through 369 are incorporated into this Count as if rewritten herein.

371. Michigan Compiled Laws ("MCL") 24.207, Section 7, provides, in part, that a "rule" is defined as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency."

372. MCL 24.241, Section 41(1) provides, in part, that "Except as provided in section 44, before the adoption of a rule, an agency, or the office of regulatory reform, shall give notice of a public hearing and offer a person an opportunity to present data, views, questions, and arguments. The notice shall be given within the time prescribed by any applicable statute, or if none, in the manner prescribed in section 42(1)."

373. MCL 24.243, Section 43(1) provides, in part, that "a rule is not valid unless processed in compliance with section 42."

374. MCL 24.242, Section 42(1) provides, in part, that an agency shall "publish the notice of public hearing as prescribed in any applicable statute or, if none, the agency, or the office of regulatory reform acting on behalf of the agency, shall publish

375. Michigan's Animal Industry Act at MCL 287.742(6)(b) provides, in part, that "(6) Testing and surveillance for brucellosis and tuberculosis shall be * * * (b) * * * conducted through * * * uniform methods and rules * * * approved by veterinary services of [APHIS] . . . ."

376. The "uniform methods and rules" approved by APHIS are contained in 9 CFR 77.1 and have been incorporated by reference in MCL 287.742.

377. The AHPA at 7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

378. The AHPA at 7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

379. The AHPA at 7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

380. The following constitutes a "rule" as defined by applicable Michigan law and should have been, but were not, published and processed in accordance with applicable Michigan law and thus constitutes illegal rulemaking under Michigan state law and also an ongoing violation of the federal AHPA:

(i)     The 2002 MOU;

(ii)    The June 2004 Order;

(iii)    The 2005 MOU;

(iv)    The 2006 Registrations;

(v)    The 2006 Grant Proposal;

(vi)    The November 2006 letter

(vii)    The February 2007 Order;

(viii)    The 2007 Grant Proposal;

(ix)    The 2007 MOU.

381.    Defendant MDA's conduct described in this Count constitutes a violation of MCL 24.241, Section 41(1) and 24.242, Section 42(1), for which declaratory and other injunctive relief is available and should issue under 28 U.S.C. 1367.

## COUNT TEN
## MICHIGAN'S IMPLEMENTATION OF NAIS VIOLATES SUBSTANTIVE REQUIREMENTS OF MICHIGAN'S ADMINISTRATIVE PROCEDURE ACT

382.    Paragraphs 1 through 381 are incorporated into this Count as if rewritten herein.

383.    MCL 24.306(1)(b) and (e) provides, in part, that a "court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following: * * * (b) In excess of the statutory authority or jurisdiction of the agency * * * (e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion."

384.    Michigan's Animal Industry Act ("AIA"), MCL 287.706(2) provides, in part, that several forms of "official identification" are authorized for livestock but it does not require electronic RFIDs as the exclusive form of official identification for livestock.

385. MCL 287.711(b) provides, in part, that official identification is required only for "cattle, goats, sheep, and privately owned cervids [deer]" but it does not require official identification for swine and poultry.

386. MCL 287.745 provides, in part, that MDA "may promulgate rules for the implementation and enforcement of this act pursuant to" the Michigan APA.

387. However, Michigan's AIA does not authorize MDA to: (1) require electronic RFIDs for all livestock; (2) require premises registration; (3) require 48-hour traceability, and; (4) require MDA to help establish and participate in any nation-wide animal identification system or otherwise take actions which are unrelated to animal disease control.

388. The AHPA at 7 U.S.C. 8310(a) provides, in part, that Defendant USDA may "cooperate with * * * states or political subdivision of states."

389. The AHPA at 7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

390. The AHPA at 7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

391. However, nothing in the AHPA authorizes USDA or any cooperating state, such as the MDA, to: (1) require electronic RFIDs for all livestock; (2) require premises registration; (3) require 48-hour traceability, and; (4) require MDA to help establish and participate in any nation-wide animal identification system or otherwise take actions which are unrelated to animal disease control.

392.    The 2002 MOU entered into between Defendants provides, in part, that MDA is to require "official identification of animals for movement." However, nowhere in the 2002 MOU did it require the exclusive use of electronic RFIDs for livestock.

393.    In November 2004 MDA issued a letter to all cattle producers which stated that non-electronic ear tags and "tattoos" would be recognized as acceptable forms of official identification.

394.    The 2005 MOU, however, required MDA to mandate "electronic identification" and "a movement permit for any cattle moved from premises in the Modified Accredited Zone," while APHIS would provide "support for acquisition and development for electronic identification, hardware and software in accordance with the National Animal Identification System (NAIS) and USDA regulations . . . ."

395.    The 2007 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle *and bison* movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle *and bison* moved from premises in the Modified Accredited zone." (Emphasis added).

396.    Each of the following documents are arbitrary and capricious and in excess of statutory jurisdiction, authority, or limitations because they impose regulatory requirements beyond the mandates of the AIA and constitute an ongoing violation of federal law under the AHPA:

> (i)      The 2002 MOU;
>
> (ii)     The June 2004 Order;
>
> (iii)    The 2005 MOU;

(iv)    The 2006 Registrations;

(v)     The 2006 Grant Proposal;

(vi)    The November 2006 letter

(vii)   The February 2007 Order;

(viii)  The 2007 Grant Proposal;

(ix)    The 2007 MOU.

397.    Defendant MDA's conduct described in this Count is arbitrary and

capricious for which declaratory and other injunctive relief is available and should issue

under 28 U.S.C. 1367.

## COUNT ELEVEN
## MICHIGAN'S IMPLEMENTATION OF NAIS VIOLATES MICHIGAN'S CONSTITUTIONAL PROHIBITION AGAINST THE FREE EXERCISE OF RELIGION

398.    Paragraphs 1 through 397 are incorporated into this Count as if rewritten

herein.

399.    Article 1, Section 4 of the Constitution of the State of Michigan provides, in

part, that "Every person shall be at liberty to worship God according to the dictates of

his own conscience."

400.    Government shall not restrict the free exercise of religion unless a

compelling state interest justifies the burden and there is no other less obtrusive form of

the burden.  See: *Sherbert v. Verner* (1963), 374 U.S. 398; *Wisconsin v. Yoder* (1972),

406 U.S. 205; *McCready v. Hoffius* (1998), 459 Mich. 131.

401.    The AHPA at 7 U.S.C. 8310(a) provides, in part, that Defendant USDA

may "cooperate with * * * states or political subdivision of states."

402.    The AHPA at 7 U.S.C. 8310(d) provides, in part, that USDA may "cooperate with State authorities, Indian tribe authorities, or other persons in the administration of regulations for the improvement of livestock and livestock products."

403.    The AHPA at 7 U.S.C. 8312(a)(3) and (4) provides, in part, that Defendant USDA may "(3) make a grant" and "(4) enter into a cooperative agreement, memorandum of understanding" with States.

404.    Michigan's Animal Industry Act at MCL 287.742(6)(b) provides, in part, that "(6) Testing and surveillance for brucellosis and tuberculosis shall be * * * (b) * * * conducted through * * * uniform methods and rules * * * approved by veterinary services of [APHIS] . . . ."

405.    The "uniform methods and rules" approved by APHIS are contained in 9 CFR 77.1 and have been incorporated by reference in MCL 287.742.

406.    Article I of the 2002 MOU between Defendants provides, in part, that "The purpose of this [MOU] is to outline and agree on the principles required for continuing three designations of State status regarding the risk of bovine tuberculosis * * * pursuant to [9 CFR 77.1] and the Tuberculosis Eradication Program's Uniform Methods and Rules . . . ."

407.    Thus, Defendant MDA is implementing federal law in the State of Michigan, to wit, the NAIS program as developed under the AHPA.

408.    The 2005 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle moved from premises in the Modified Accredited zone."

409. The 2005 MOU was entered into on the basis of the authority of the AHPA.

410. The 2007 MOU between MDA and USDA/APHIS established "methods to regulate and monitor cattle *and bison* movements" within the State of Michigan, including but not limited to "Requiring electronic identification and a movement permit for any cattle *and bison* moved from premises in the Modified Accredited zone." (Emphasis added).

411. The 2007 MOU was entered into on the basis of the authority of the AHPA.

412. According to the 2007 Users Guide (pg. 22), animal owners "who have registered their premises may choose to participate in animal identification" and group/lot identification numbers "are also an option once the premises has been registered."

413. According to MDA's 2007 Grant Proposal, "all animals being moved must be tagged;" livestock producers "will be issued a plastic premises registration card from MDA;" and premises registration is required in order to "allow producers to purchase RFID tags."

414. Premises registration and use of RFIDs in Michigan applies to "any cattle of any age moving from one zone in Michigan to another zone in Michigan" regardless of the presence of TB.

415. Under the 2007 Grant Proposal, and the 2005 and 2007 MOUs, a premises has to be registered before it can purchase or use RFID's on livestock.

416.    Plaintiffs Niewendorp, Alexander, Golimbieski, Keyworth, Mast, Schneider and Wyant are all members of Plaintiff Legal Defense Fund, all of them live in Michigan, and all of them are engaged in agricultural activities that are subject to the requirements of the 2005 and 2007 MOUs issued under the AHPA.

417.    Plaintiff Nolt is a member of Plaintiff Legal Defense Fund, lives in Pennsylvania, is engaged in agricultural activities that are subject to the AHPA, and is in possession of a PIN issued by Pennsylvania under the authority of the AHPA.

418.    Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's religious beliefs, including but not limited to the requirement for a numbering system for their premises and/or an electronic numbering system for their animals, constitutes some form of a "mark of the beast" and/or represents an infringement of their "dominion over cattle and all living things" in violation of their fundamental religious beliefs.  These beliefs are founded upon their religious faiths and in such verses as Revelations 13, Revelations 14, Revelations 15, Revelations 16, Revelations 19, Revelations 20, 2 Peter 3, Romans 14, Genesis 1, 26, Luke 18 and Deuteronomy 28.

419.    Plaintiffs' beliefs are of deep religious conviction, are shared by all in their organized group, and are intimately related to their daily living.  Plaintiffs' religion pervades and determines virtually their entire way of life, regulating it from diet through the strictly enforced rules of their respective church communities.

420.    NAIS, the 2005 MOU or the 2007 MOU are not the least restrictive means of controlling animal disease or promoting animal health.

421. Defendant USDA does not have a compelling interest in implementing NAIS, the 2005 MOU or the 2007 MOU because there is no rational relationship between RFIDs, PINs and animal tracking and the eradication or control of TB.

422. NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Nolt's, Niewendorp's, Alexander's, Golimbieski's, Keyworth's, Mast's, Schneider's and Wyant's exercise of their religion.

423. In addition, Plaintiffs Mast and Alexander are both members of the Old Order Amish Church which compels them to, in part, (a) reject any technology that is not community or family building based, (b) live separate from, rather than integrate with, the rest of the world, and (c) make their living by farming.

424. NAIS, the 2005 MOU and the 2007 MOU constitute a substantial burden on individual Plaintiffs Mast's and Alexander's exercise of their religion because it forces them to, in part, violate tenets of their Old Order Amish beliefs, i.e., they are forced to use technology they would ordinarily not use, they have to integrate with and accept the NAIS system, and they may have to quit farming.

425. Each of the following documents constitute a substantial burden on the individual Plaintiffs' exercise of their religion, are not the least restrictive means of controlling animal disease or promoting animal health, and MDA's implementation of them in the State of Michigan constitutes an ongoing violation of federal law:

(i)  The 2002 MOU;

(ii)  The June 2004 Order;

(iii)  The 2005 MOU;

(iv)  The 2006 Registrations;

(v)      The 2006 Grant Proposal;

(vi)     The November 2006 letter

(vii)    The February 2007 Order;

(viii)   The 2007 Grant Proposal;

(ix)     The 2007 MOU.

426.    Defendant MDA's conduct described in this Count constitutes a violation of Article 1, Section 4 of the Constitution of the State of Michigan for which declaratory and other injunctive relief is available and should issue under 28 U.S.C. 1367.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

A. A declaration that each of the documents identified in paragraph 229 above as well as the NAIS program as a whole violates the substantive and procedural requirements of the federal Administrative Procedure Act;

B. A declaration that each of the documents identified in paragraph 380 above as well as the NAIS program as a whole violates the substantive and procedural requirements of the Michigan Administrative Procedure Act;

C. A declaration that each of the documents identified in paragraph 302 above as well as the NAIS program as a whole violates the substantive and procedural requirements of the Fifth and Fourteenth Amendments to the Constitution of the United States;

D. A declaration that each of the documents identified in paragraph 229 above as well as the NAIS program as a whole violates the Regulatory Flexibility Act;

E.  A declaration that each of the documents identified in paragraph 302 above as well as the NAIS program as a whole violates the Religious Freedom Restoration Act;

F.  A declaration that each of the documents identified in paragraph 302 above as well as the NAIS program as a whole violates the National Environmental Policy Act;

G.  A declaration that each of the documents identified in paragraph 380 above as well as the NAIS program as a whole violates Article 1, Section 4 of the Constitution of the State of Michigan;

H.  A declaration that all expenditures of federal, state and local taxpayer dollars on each of the documents identified in paragraph 302 above as well as the NAIS program as a whole was, were, have been and are in violation of applicable federal or state or local law;

I.  A declaration that each of the documents identified in paragraph 302 above as well as the NAIS program as a whole are in violation of applicable federal, state or local law;

J.  An injunction enjoining Defendants from enforcing or implementing any of the terms and/or conditions of each of the documents identified in paragraph 302 above as well as the NAIS program as a whole, including any enforcement against individuals who object to NAIS on the grounds of religious beliefs;

K.  An injunction requiring Defendants to comply with all procedural and substantive rulemaking requirements for each of the each of the documents identified in paragraph 302 above as well as the NAIS program as a whole;

L. An injunction requiring Defendants to prepare initial and final regulatory flexibility analyses for 2004 interim rule and 2007 final rule they have already issued;

M. An injunction requiring Defendants to submit in accordance with NEPA the appropriate environmental document, either an Environmental Assessment, Finding of No Significant Impact, or an Environmental Impact Statement that includes all reasonable alternatives to NAIS for each of the each of the documents identified in paragraph 302 above as well as the NAIS program as a whole;

N. An injunction enjoining Defendants from spending or receiving federal, state or local taxpayer funds on each of the documents identified in paragraph 302 above as well as the NAIS program as a whole;

O. An injunction enjoining Defendants from any further funding, developing and implementing each of the documents identified in paragraph 302 above as well as the NAIS program as a whole, including the development or issuance of any more documents, and to fully and fairly examine whether there is even a need for such a program;

P. An injunction ordering Defendants to remove all Plaintiffs and any of their personal information from any federal, state or private NAIS related data base(s);

Q. In the alternative, if the Court finds that no violations of law have occurred in this matter, Plaintiffs pray that the Court issue an injunction against Defendants enjoining Defendants from requesting, soliciting, seeking,

R. Pursuant to applicable state and federal law, award to Plaintiff all of its attorneys fees incurred in this matter;

S. Pursuant to applicable state and federal law, award to Plaintiff all of the costs it has incurred in this matter;

T. Award to Plaintiff all other relief as applicable that the Court deems just and reasonable.

Dated:      January 10, 2009      Respectfully submitted,


/s/ David G. Cox_____
David G. Cox (D.C. Bar No. OH 0020)
4240 Kendale Road
Columbus, OH 43220
dcoxlaw@columbus.rr.com
Phone: 614-457-5167
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2009, I electronically filed PLAINTIFFS'

FIRST AMENDED COMPLAINT FOR DECLARATORY, PRELIMINARY AND OTHER

INJUNCTIVE RELIEF with the Clerk of the Court using the CM/ECF system, which will

send notification of such filing to the following:

Peter T. Wechsler
peter.wechsler@usdoj.gov
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Counsel for USDA

and

James E. Riley
rileyje@michigan.gov
First Assistant
Danielle Allison-Yokom
allisonyokomd@michigan.gov
Assistant Attorney General
Michigan Department of Agriculture
Environment, Natural Resources
and Agriculture Division
525 West Ottawa Street
6th Floor Williams Building
Lansing, MI 48913
Counsel for MDA


                                         /s/ David G. Cox
                                         David G. Cox