## BEFORE THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Farm-to-Consumer | : | |
| Legal Defense Fund, et al. | : | **Case No. 1:08-cv-01546-RMC** |
| | : | |
| **Plaintiffs** | : | **Judge Rosemary M. Collyer** |
| | : | |
| **v.** | : | |
| | : | |
| U.S. Department of Agriculture, et al. | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MDA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT

Plaintiffs hereby file their Memorandum in Opposition to Defendant Michigan

Department of Agriculture's ("MDA") Motion to Dismiss First Amended Complaint and

for Summary Judgment.

Dated: March 23, 2009                     Respectfully submitted,


                                          /s/ David G. Cox
                                          David G. Cox (D.C. Bar No. OH 0020)
                                          4240 Kendale Road
                                          Columbus, OH 43220
                                          dcoxlaw@columbus.rr.com
                                          Phone: 614-457-5167
                                          Counsel for Plaintiffs

Dockets.Justia.com

# Table of Contents

I.   Introduction. ...................................................................................................... *1*

    *A. Statement of the Case.* ......................................................................... *1*

    *B. Background on NAIS.* ............................................................................ *1*

    *C. How the AHPA operates in theory.* ...................................................... 3

    *D. How the AHPA operates in the State of Michigan.* ............................. *4*

II.   *Plaintiffs have standing to bring their claims against MDA because MDA, acting in conjunction with USDA, is causing Plaintiffs' injuries.* ................................................... 11

III.    *The Eleventh Amendment is not a bar to Counts Five, Six and Eight because it does not apply to suits brought by citizens of a state against the state for ongoing violations of federal law.* .......................................................................................................... 16

IV.    *MDA violated the procedural and substantive requirements of the 14th Amendment because none of the actions it took in concert with USDA were subjected to notice and comment, and because NAIS in the State of Michigan has nothing to do with the health of animals.* ...................................................................................................... 17

    *A.  Count Five states a valid procedural due process claim under the 14th Amendment.* .................................................................................................. 17

    *B.  Count V states a valid substantive due process claim under the 14th Amendment* ................................................................................................... 22

        *1.     There is no rational relationship between any of the NAIS program requirements and the legitimate government purposes of protecting human and animal health* ..........................................23

        *2.     MDA's actions have gone far beyond the authority it enjoys under either its Animal Industry Act or the AHPA* ...................................25

    *C.  MDA is implementing federal law in the form of NAIS.* ..................... 28

V.     *MDA is subject to the requirements of NEPA because it is a "cooperating agency" and its implementation of USDA's NAIS program in the State of Michigan constitutes "major federal action."* ................................................................................................ 28

VI.   *MDA is subject to the requirements of RFRA because it is implementing federal law as USDA's agent.* ........................................................................................... 31

*VII. MDA's "collateral attack" argument lacks merit because the statute it cites does not apply*……………….........................................................................................................*35*

*VIII. A genuine issue of material fact remains on whether MDA has waived its sovereign immunity under the Eleventh Amendment.*.......................................................................... *37*

*IX.      Conclusion.*........................................................................................................... *40*

*CASES*

*Actmedia, Inc., v. Stroh,* 789 F.2d 766 (9th Cir.1986) ...................................................... 38

*Atascadero State Hosp. v. Scanlon,* 105 S.Ct. 3142 (1985)............................................. 38

*Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Regional Commission,* 599 F.2d 1333 (5th Cir. 1979) ................................................................................................... 29, 30

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 Sup. Ct. 1955 (2007) ...................... 11

*Benning v. Ga.,* 391 F.3d 1299 (11th Cir. 2004) ................................................................ 37

*Bowers v. National Collegiate Athletic Association (NCAA),* 475 F.3d 524 (3rd Cir. 2007) ............................................................................................................................. 37

*Brownson v. Bogenschutz,* 966 F.Supp. 795 (E.D. Wis.1997) ........................................ 34

*Center for Biological Diversity v. U.S. Dept. of Housing and Urban Development,* 541 F.Supp.2d 1091 (D.Ariz. 2008)................................................................................ 28, 29

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869 (9th Cir. 1987) .......................................................................................................................... 37

*Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Bd.,* 453 F.Supp. 122 (D.C. Va. 1978) ......................................................................................................... 29

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.,* 267 F.3d 1144 (D.C. Cir. 2001) ................................................................................................................................. 30

*City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ..... 32, 33

*Clark v. Barnard,* 108 U.S. 437, 2 S.Ct. 878 (1883)........................................................ 37

*Colorado River Indian Tribes v. National Indian Gaming Com'n.,* 466 F.3d 134 (D.C. Cir. 2006).................................................................................................................. 26

*Diaz-Fonseca v. Puerto Rico,* 451 F.3d 13 (1st Cir. 2006)............................................... 37

*Doe v. Maher,* 793 F.2d 1470 (9th Cir.1986) ................................................................... 38

*Doe v. Nebraska,* 345 F.3d 593 (8th Cir. 2003) ............................................................... 37

*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347 (1974)................................................. 17

*Elkins v. District of Columbia,* 527 F.Supp.2d 36 (J. Collyer) (D.D.C. 2007).....22, 25, 26

*Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441 (1908) ........................................................ 16

*Finley v. United States,* 490 U.S. 545 (1989)................................................................... 40

*Georgia R. & Banking Co. v. Redwine,* 342 U.S. 299, 72 S.Ct. 321, 324, 96 L.Ed. 335 (1952) ......................................................................................................................... 16

*Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).............. 18

*Hankins v. Lyght,* 441 F.3d 96 (2nd Cir. 2006) ................................................................ 33

*Henderson v. Kennedy,* 265 F.3d 1072 (D.C. Cir. 2001) .................................................. 32

*Hueker v. Millburn,* 538 F.2d 1241 (6th Cir. 1976) ......................................................... 37

*Ibrahim v. District of Columbia,* 357 F.Supp.2d 187 (D.D.C. 2004) .......................... 32, 33

*Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296; 117 S.Ct. 2028 (1997) ........ 16

*Jackson Sawmill Co. v. U.S.,* 580 F.2d 302 (8th Cir. 1978)............................................. 37

*Jama v. U.S.I.N.S.,* 343 F.Supp.2d 338 (D.N.J. 2004)................................................. 31, 32

*Long v. Director, Office of Workers' Comp. Programs,* 767 F.2d 1578 (9th Cir.1985) .. 34

*Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ................................................................................................................................. 35

*Madison v. Riter,* 411 F.Supp.2d 645 (W.D. Va. 2006)..................................................... 37

*Mathews v. Eldridge, 424 U.S. 319 (1976)* ..................................................................... 18

*MCI Telecomms. Corp. v. AT & T, 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)* ....................................................................................................................... 26

*Mineral Policy Center v. Norton, 292 F.Supp.2d 30, (D.D.C. 2003)* ............................... 29

*Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)* ....................................................................................................... 33

*National Organization for Reform of Marijuana Laws (NORML) v. Bell, 488 F.Supp. 123 (D.D.C. 1980)* ............................................................................................................... 18

*Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365 (1978)* ................................... 35

*Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)* ............................................................................................................. 16, 37, 39

*Preserve the Dunes, Inc v Dep't of Environmental Quality, 471 Mich. 508; 684 NW2d 847 (2004)* ...................................................................................................................... 35

*Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)* ......................... 16

*Ragland v. Angelone, 420 F.Supp.2d 507 (W.D.Va. 2006)* ............................................. 37

*Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 122 S.Ct. 1155 (2002)* ............... 26

*Redhead v. Conference of Seventh-Day Adventists, 440 F.Supp.2d 211 (E.D.N.Y. 2006)* 33

*Rendell-Baker v. Kohn, 457 U.S. 830 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)* ............... 34

*RESTORE: The North Woods v. U.S. Dept. of Agriculture, 968 F.Supp. 168 (D.Vt. 1997)* ....................................................................................................................... 30

*Roe v. Wade, 410 U.S. 113 (1973)* .................................................................................. 18

*Ross v. Federal Highway Admin., 162 F.3d 1046 (10th Cir. 1998)* .................................. 30

*S. Blasting Serv., Inc. v. Wilkes County, 288 F.3d 584, 594 (4th Cir., 2002)* ................... 22

*Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)* ....................... 16

*Seminole Tribe of Florida v. State of Fla., 1 F.3d 1016 (11th Cir. 1994)* ......................... 37

*Sierra Club v. E.P.A., 292 F.3d 895 (D.C. Cir. 2002)* ..................................................... 11

*Smith v Allen, 502 F.3d 1255 (11th Cir. 2007)* ................................................................ 37

*Sprint Corp. v. FCC, 315 F.3d 369 (D.C. Cir. 2003)* .................................................. 21, 22

*Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)* ................................................................................................................... 12

*Sutton v. Providence St. Joseph Medical Center (internal citation omitted), 192 F.3d 826 (9th Cir. 1999)* ............................................................................................................... 34

*Tennessee Dept. of Human Services v. U.S. Dept. of Educ., 979 F.2d 1162 (6th Cir. 1992)* ....................................................................................................................... 37

*United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966)* .................................... 39

*Utz v. Cullinane, 520 F.2d 467, 482 (D.C. Cir. 1975)* ..................................................... 18

*Vann v. Kempthorne, 534 F.3d 741 (D.C. Cir. 2008)* ...................................................... 39

*Verizon Maryland Inc. v. Public Service Commission of Maryland, 535 U.S. 635, 122 S.Ct. 1753 (2002)* ............................................................................................. 12, 16, 17

*Village of Los Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477 (10th Cir. 1990)* ... 29

## STATUTES

*7 U.S.C. 8301* ........................................................................................................................ 3

*28 U.S.C. 1367* .................................................................................................................... 39

*42 U.S.C. 2000bb-1* ................................................................................................. 1, 31, 33, 34

*42 U.S.C. 2000bb-2* ………………………………………………………………………………………*31*
*42 U.S.C. 2000bb-3* ……………………………………………………………………………*31, 34*
*42 U.S.C. 4321* ……………………………………………………………………………………*1*
*MCL 24.207* …………………………………………………………………………………………*22*
*MCL 24.241* …………………………………………………………………………………………*22*
*MCL 24.306* …………………………………………………………………………………………*36*
*MCL 287.706* ………………………………………………………………………………*21, 36*
*MCL 287.709* ………………………………………………………………………………………*22*
*MCL 287.745* ………………………………………………………………………………………*36*
*MCL 600.631* ……………………………………………………………………………*35, 36*

## *REGULATIONS*

*9 CFR Part 77* ………………………………………………………………………………………*3*
*9 CFR 77.2* …………………………………………………………………………………………*9*
*9 CFR 77.4* …………………………………………………………………………………………*4*
*9 CFR 77.5* …………………………………………………………………………………………*3*
*9 CFR 77.7* …………………………………………………………………………………*3, 5*
*9 CFR 77.9* …………………………………………………………………………………………*3*
*9 CFR 77.11* ………………………………………………………………………………………*3*
*9 CFR 77.20* ………………………………………………………………………………………*4*
*9 CFR Part 78* ……………………………………………………………………………………*3*
*9 CFR Part 79* ……………………………………………………………………………………*3*
*9 CFR Part 80* ……………………………………………………………………………………*3*
*40 CFR 1501.6* …………………………………………………………………………………*30*
*40 CFR 1501.5* …………………………………………………………………………………*30*
*40 CFR 1506.2* …………………………………………………………………………………*30*
*40 CFR 1508.5* …………………………………………………………………………………*30*
*40 CFR 1508.15* …………………………………………………………………………………*30*

## *OTHER AUTHORITY*

*Fed. Reg. 2658* …………………………………………………………………………………*13*

*I.*     *Introduction.*

*A.*     *Statement of the Case.*

The issue in this case is whether the Defendant Michigan Department of Agriculture's ("MDA") development and implementation of the National Animal Identification System ("NAIS") in the State of Michigan under the guise of its tuberculosis ("TB") eradication program is violating applicable state and federal law, and whether Plaintiffs have pled claims for which relief can be granted. Specifically, Plaintiffs have been forced to obtain a Premises Identification Number ("PIN") that involves the collection of their private, personal data and the transfer of that data to a national database, they have been forced to apply Radio Frequency Identification Devices ("RFIDs") on their cattle, and they are being forced to track the movements of their animals. These actions have resulted in injuries that are more fully described *infra* at pages 12-15.

MDA, however, argues that it is not causing any harm to Plaintiffs, and that it is not implementing any federal law in this case. As explained below, this argument rings hollow and Plaintiffs have standing to bring their claims; MDA is subject to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C.S. 4321, *et seq*. and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb, *et seq*.; and the 11th Amendment is not a bar to Plaintiffs' state law claims against MDA.

*B.*     *Background on NAIS.*

The basic premise underlying much of MDA's motion to dismiss is its assertion that it is not implementing "NAIS." Yet, as long ago as 2005, MDA entered into a cooperative agreement with Defendant United States Department of Agriculture

("USDA") and agreed to receive USDA's support for acquiring and developing an electronic identification program in accordance with NAIS and USDA regulations.

Moreover, USDA's own Cattle Industry Working Group noted in 2006 that one of the "guiding principles" of NAIS was that it would be conducted through cooperative agreements between USDA, the States, and other entities. *See* Exhibit A at slide 2. The USDA Working Group noted that premises registration under NAIS was to be done "through the State animal health authority" to achieve a "State 'compliant' system." *See* Exhibit A, slide 6. In this case, USDA's "State animal health authority" that is implementing NAIS in the State of Michigan is MDA.

USDA's "guiding principle" of implementing NAIS via cooperative agreements with the several States was memorialized in USDA's Draft and Final Business Plans for implementing NAIS. *See* USDA's 12/12/08 Administrative Record No. NAIS AR 1449 (hereinafter "Draft Business Plan") and Exhibit B, attached hereto (hereinafter "Final Business Plan.") Specifically, USDA's Draft and Final Business plans call for NAIS to be implemented by the States under cooperative agreements, using existing disease control programs on a species-by-species basis, with cattle as the highest priority. *See* Draft Business Plan and Exhibit B at pages 2, 3, 15, 19, 28-36. In other words, MDA has agreed to follow USDA's published, official documents on how to implement NAIS and is doing so under an existing TB eradication program at both the State and federal levels. *See also* Plaintiffs' Memorandum in Opposition to USDA's Motion to Dismiss at pages 1-4, incorporated herein by reference.

The "existing disease control program" under which MDA has implemented this burdensome and ill-conceived federal program is the TB program created by the federal

Animal Health Protection Act ("AHPA"), 7 U.S.C. 8301 *et seq.* and its predecessors.

MDA's implementation of this program has been accomplished through several

cooperative agreements it has entered into with USDA.  As described below, because

MDA is implementing federal law under color of law, it is subject to the claims raised by

Plaintiffs in their complaint.

   C.  *How the AHPA operates in theory.*

   USDA claims authority for NAIS under the AHPA.  The AHPA allows USDA to

regulate the import, export, and interstate movement of animals.  *See* Plaintiffs'

Memorandum in Opposition to USDA's Motion to Dismiss First Amended Complaint at

pages 9-10 for more details on the AHPA's provisions.  There is nothing in the AHPA,

however, that authorizes the *intrastate* regulation of animals.

   To accomplish the purposes of the AHPA, each State is required to cooperate with

USDA in order to eliminate or minimize certain diseases in animals, for example,

Tuberculosis and Brucellosis in cattle (9 CFR Parts 77 and 78), Scrapie in sheep and

goats (9 CFR Part 79) and Johnes disease in domestic animals (9 CFR Part 80).  Under

these programs, USDA designates States as "accredited free zones" (or disease free

zones) (*see, e.g.*, 9 CFR 77.7), "modified accredited advanced zones" (or MAAZ zones)

(*see, e.g.*, 9 CFR 77.9) or "modified accredited zones" (or MAZ zones) (*see, e.g.*, 9 CFR

77.11).  The prevalence of TB in an area is the criteria used for designating an area a

specific zone.  See 9 C.F.R. 77.5.

   For a State to retain its zone status the State *must*, among other requirements,

"enter into a memorandum of understanding with APHIS in which the state agrees to

adhere to any conditions for zone recognition particular to that request."  9 C.F.R.

77.4(a)(3). Plaintiffs will refer to these memoranda of understanding as "MOUs." USDA uses these MOUs to place restrictions on the interstate movement of livestock from various zones and States that fail to comply with MOU requirements can be heavily restricted or otherwise penalized by the USDA. *See* 9 C.F.R. 77.7 - 77.20.

As explained in the next section, USDA and MDA have entered into at least three such MOUs for implementing the TB program that have resulted in the mandatory imposition of NAIS requirements on Michigan residents.

        D.       *How the AHPA operates in the State of Michigan.*

On March 26, 2002, USDA entered into a memorandum of understanding ("2002 MOU") with MDA that established two TB zones in Michigan, modified accredited and modified accredited advanced. See MDA Appendix, pg. 27. According to page 1 of the 2002 MOU, Michigan has had continuing problems with TB due in large part to reservoirs of the disease in wildlife. In the 2002 MOU, USDA specifically required MDA to mandate "official identification" on "all domestic livestock that move from any premises" within these zones, including movement within disease-free areas. *See* MDA Appendix, pgs. 33-35. The 2002 MOU was entered into pursuant to the AHPA, (i.e., "the Organic Act of 1944," which was subsequently repealed and is now the AHPA). *See* MDA Appendix, pg. 28. However, the 2002 MOU did not specifically authorize, let alone mention or require, implementation of NAIS or its PIN, RFID, or animal identification or tracking requirements.

On October 7, 2004, MDA requested that USDA reclassify Michigan's Upper Peninsula as a TB accredited free zone, based on the fact that TB had not been diagnosed in any domestic or wild animal in the region since at least 1979. On October 6, 2005,

USDA published an interim rule establishing Michigan's Upper Peninsula as a TB accredited free zone. *See* 70 Federal Register 58,291-58,293; 9 C.F.R. § 77.7(b)(1).

On July 26, 2005, MDA entered into a new MOU with USDA ("2005 MOU"). See MDA Appendix, pg. 46. The 2005 MOU was also entered into under the authority of the AHPA. See MDA Appendix, pg. 46. Unlike the previous MOUs, the 2005 MOU now required MDA to begin implementing NAIS' electronic tagging program. Specifically, the 2005 MOU required MDA to mandate "electronic identification and a movement permit for any cattle moved from premises in the Modified Accredited Zone," while USDA would provide "support for acquisition and development for electronic identification, hardware and software in accordance with the National Animal Identification System (NAIS) and USDA regulations . . . ." *See* MDA Appendix, pgs. 47, 49. The use of NAIS-compliant RFID tags necessarily included the transition to PINs. The transition from NAIS being a "voluntary" program to a mandatory program was well on its way.

Following the 2005 MOU, MDA took substantial steps in 2006 toward implementation of NAIS. That year, MDA registered nearly 45,000 premises in the federal NAIS database, in part by copying people's information from state databases. *See* 2007 MDA Appendix, pg. 67. *See also* MDA's Memorandum in Support at pg. 10 (MDA admits that it applied to "convert the MDA's database … to NAIS-compatible premises identification numbers.") .

On July 28, 2006, MDA requested a grant of $179,000 from the USDA to implement NAIS, primarily to 1) register premises into the NAIS database; 2) convince the public that NAIS is good idea; and 3) implement the electronic identification required

by NAIS and mandated by USDA in its 2005 MOU. *See* MDA Appendix, pgs. 66-72. The 2006 grant proposal was re-drafted on May 7, 2007 and formally submitted to USDA on May 8, 2007. *See* MDA Appendix, pg. 66.

In that final proposal, MDA indicated it needed federal funding to support Michigan's "movement certification program for any cattle of any age moving from one zone in Michigan to another zone in Michigan;" that "all animals being moved must be tagged;" that livestock producers "will be issued a plastic premises registration card from MDA;" and that premises registration was required in order to "allow producers to purchase RFID tags." *See* MDA Appendix, pg. 69. In other words, Michigan residents such as the Plaintiffs would be required to use RFID tags, and before they could purchase any RFIDs they must first register their premises.

USDA's plan administrator approved the grant on May 8, 2007,[1] with the stipulation that "These funds may only be used for the implementation and administration of premises registration in accordance with the NAIS, and support of outreach efforts pertaining to all activities that promote the NAIS implementation plan for full participation by 2009." *See* MDA Appendix, pg. 66. Consequently, the 2007 grant was clearly intended to implement NAIS in Michigan and to make its requirements mandatory by 2009.

In November 2006, MDA issued a letter to all Michigan cattle producers informing them of MDA's impending mandatory implementation of NAIS as of March 1, 2007. *See* MDA Appendix, pg. 64. MDA acknowledged that its existing TB program had made significant progress in eradicating TB in Michigan but nevertheless also

---

[1] USDA signed the grant on June 29, 2007.

imposed new substantive requirements implementing NAIS.  At this point, the TB eradication program in Michigan had been expanded to include NAIS measures, statewide, regardless of the presence of TB.

Specifically, MDA required all cattle in the State of Michigan, in all TB zones, *including the TB free zone*, to be identified and tagged with a NAIS-compliant electronic RFID identification ear tag issued by MDA, linked to a NAIS premises identification number ("PIN"), prior to any movement from that premises.  MDA also required that any vehicle transporting livestock must stop at any posted inspection point and produce documentation proving compliance with all livestock moving requirements.  MDA did not promulgate these regulatory requirements as a formal rule or regulation, it did not seek any public comment, it did not evaluate any alternatives or impacts, and it did not otherwise comply with any procedural requirements.  Instead, MDA simply issued a letter signed by its Director.

With the November 2006 letter, MDA proposed to implement the first two phases of USDA's three-prong NAIS program with respect to cattle in that 1) *all* premises must be registered and issued a PIN; and 2) *all* cattle on said premises must be issued an animal identification number ("AIN") and tagged with an electronic RFID ear tag.[2] MDA stated that "As these changes . . . are implemented, the [USDA] . . . has indicated that it would consider reinstating TB Free Status for the current MAAZ [modified accredited advanced zone] area of lower Michigan," even though implementation of NAIS is not required by any federal or State statute or regulation.

---

[2]  The only apparent exception being cattle which never leave a premises are not required to be tagged.

Although MDA now denies that these requirements constitute "NAIS", Kevin Kirk of MDA made no such denial at a public meeting in the fall of 2006, attended by hundreds of Michigan residents, at which several other speakers and members of the audience clearly linked the MDA requirements to NAIS. *See* Declaration by Karin Bergener, Exhibit C. Moreover, Mr. Kirk at no time indicated that MDA's actions were taken solely pursuant to its authority under Michigan's version of the TB program. Thus, MDA had the opportunity to state that its actions were being taken pursuant to its own State TB program and not pursuant to NAIS, but failed to do so. That failure is compelling.

Similarly, at a conference with other States' officials and industry participants, Kevin Kirk of MDA presented a powerpoint that included the following slide: "Why Implement Mandatory Electronic ID Now? … May be required by USDA for moving TB zones to higher status (MAAZ to FREE)." *See* Exhibit D, slide 5. In addition, MDA admitted in one of its NAIS documents that it needed to implement RFIDs in order to receive continued approval of its "split state" status. See Exhibit E, pg. 12. In other words, USDA was holding hostage Michigan's attempt to have its areas declared TB free unless MDA agreed to implement NAIS. MDA complied by imposing the PIN and RFID requirements on Michigan residents who own cattle, including Plaintiffs.

In addition to the MOUs and the funding, MDA is using its accredited veterinarians to implement NAIS in the State of Michigan. Specifically, the 2007 MOU under Article 5, Item 10 provides that all "testing for quarantine release or testing of high risk herds will be performed by regulatory veterinarians only." MDA Appendix, pg. 56. The 2002 MOU under Article 7, Items 9 and 5 requires MDA to have "an effective

veterinary organization and infrastructure" in place and all movement records must be "approved by … an accredited veterinarian."  MDA Appendix, pg. 32.  Thus, MDA's reach of implementing federal law extends to its accredited veterinarians, who are private parties.

In addition to the MOUs, MDA's accredited veterinarians must also comply with two memoranda issued by USDA's Veterinary Services office, VS Memo No. 579.19 (one of which was "rescinded" due to public outcry) which provide, in part, that veterinarians who visit a farm will be required to obtain and record the farmer's private data and submit that data to the federal and state governments.

The first VS Memo 579.19, effective September 2008 (Exhibit F, attached), announced how USDA was going to implement its Veterinary Services' "cooperative animal disease program activities," stating that its purpose is to provide guidance to "VS personnel, state cooperators, and accredited veterinarians" on how to implement the premises registration component of NAIS.  MDA is a "state cooperator" and all private vets are "accredited veterinarians."  *See* 9 CFR 77.2.  Thus, MDA is again a partner with USDA in the implementation of federal law.

The September 2008 VS memo identified the several actions that would trigger the registration of a premises and the requirement to obtain and record an individual's personal, private data, e.g., a vaccination, a diagnostic test, an epidemiologic investigation, a routine inspection or an appraisal.  If the person responsible for the premises "chooses not to complete the form to register his/her premises" then either a State or a federal animal health official or even a private veterinarian "will collect the defined data fields" which will then "be provided to the State so the records may be

added electronically to the State's premises registration system." *See* Exhibit F, pg. 2.

The September 2008 VS Memo also provided that private veterinarians who collect the data will do so "for submission to the State or Federal office in that State for interfacing with the Allocator to obtain a PIN for the premises" and that the PIN will be "provided to the appropriate databases." *See* Exhibit F, pgs. 2, 3. The September VS memo concludes by stating that from "the date of issuance of this VS Memorandum, all PINs issued in accordance with this policy will be included in all NAIS premises registration statistical summary reports." Exhibit F, pg. 3.

The September 2008 VS Memo raised such a public outcry that it was rescinded by a "second" VS Memo 579.19, issued December 2008. *See* Exhibit G attached hereto. The December 2008 VS Memo reiterated its policy for using PINs in administering animal disease programs under the AHPA and specifically stated that PINs will refer to "all location identifiers issued for VS disease program activities;" that all locations where VS personnel conduct disease program activities "will be identified with a standardized PIN;" and that private veterinarians "while not directly involved in the issuance of the PIN, will collect the defined data fields on official disease program forms . . . for submission to the State or Federal office in that State." *See* Exhibit G, pgs. 1, 4.

The December 2008 VS Memo concluded by stating "APHIS is considering rulemaking to establish the standardized PIN as the sole premises identification number, when a PIN is otherwise required or assigned. In the meantime, the State PIN will be issued in the administration of animal disease program activities when the State or producer, or person responsible, for the premises elects not to have a standardized PIN assigned to the premises." *See* Exhibit G, pg. 5. In other words, a PIN (whether

"standardized" or "State") is mandatory and not voluntary.

It can be seen, therefore, that MDA's required use of NAIS-compliant PINs, RFID tags, and the resulting religious infringement of Plaintiffs' beliefs, is being done pursuant to the MOUs it has entered into with USDA, to the funding it has received from USDA, and to the two VS Memos it has to comply with. No Michigan statute mandates or even authorizes the actions that MDA has taken. Thus, MDA is implementing federal and not state law.

Consequently, when MDA argues in its motion to dismiss that it is not implementing federal law, that is should not be subject to NEPA and RFRA, or that it has immunity from suit under the Eleventh Amendment, its arguments are not well taken.

II.    *Plaintiffs have standing to bring their claims against MDA because MDA, acting in conjunction with USDA, is causing Plaintiffs' injuries.*

Standing does not require that Plaintiffs prove their case. All that standing requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 Sup. Ct. 1955, 1965 (2007). According to the United States Supreme Court, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 Sup. Ct. 1955, 1965 (2007) (citation omitted).

To demonstrate the likelihood of their probable recovery, Plaintiffs may establish their standing "by the submission of [their] arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding." *Sierra Club v. E.P.A.,* 292 F.3d 895, 900 (D.C. Cir. 2002). Consequently, this Court has jurisdiction over Plaintiffs' claims if their right to recover "will be sustained if the

Constitution and laws of the United States are given one construction and will be defeated if they are given another . . . ." *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). *See also Verizon Maryland, Inc. v. Public Service Com'n of Maryland,* 535 U.S. 635, 642-643, 122 S.Ct. 1753 (2002).

MDA argues on page 39 of its motion that Plaintiffs lack standing and incorporates USDA's arguments by reference. Plaintiffs, therefore, incorporate by reference their Memorandum in Opposition to USDA's Motion to Dismiss. Moreover, regardless of whether MDA is implementing NAIS as Plaintiffs contend, there is no dispute that MDA has imposed PIN and RFID tagging requirements on Plaintiffs, which has injured them.

All of the individual Plaintiffs are farmers. They are the salt of the earth and stewards of the land. They all raise livestock and they all do so in a sustainable manner. One of them lives in Pennsylvania and the others live in Michigan. Unfortunately, MDA and NAIS are destroying their agricultural way of life. *See* Attached Affidavits of Plaintiffs Dan Nolt (Exhibit H), Greg Niewendorp (Exhibit I), Robert Alexander (Exhibit J), Joe Golimbieski (Exhibits K and L), Robert Keyworth (Exhibits M and N), Glen Mast (Exhibit O), Andrew Schneider (Exhibit P) and Reverend Roseanne Wyant (Exhibit Q).

It is undisputed that, whether coerced as Plaintiffs allege or of its own free will as MDA alleges, MDA has required Plaintiffs to register their properties with federal PINs and to identify their cattle with RFID tags bearing an internationally unique animal identification number generated by USDA. MDA has uploaded the information on the Plaintiffs', together with the NAIS premises registration number, to the USDA database. MDA has taken federal funding to implement the program and is acting pursuant to its

MOUs with USDA. All of these actions have injured Plaintiffs.

For example, MDA is requiring that all of the Plaintiffs must incur the costs of purchasing RFIDs for all of their cattle. Not only is there a cost associated with each RFID (from $2 to $5 per tag), there is equipment associated with attaching the tag (a $20 applicator), having a veterinarian issue the appropriate documents (at least $50), and other costs. *See* Schneider Affidavit, pg. 3; Keyworth First Affidavit, Golimbieski First Affidavit. Thus, Plaintiff Andrew Schneider estimates his costs will total approximately $5,000 to $6,000 per year. *See* Schneider Affidavit, pg. 3. And if a tag is lost, the farmer faces yet more costs to re-tag the animal. *See* Exhibit R (noting that baling twine on hay is a "common cause of tag loss"). Other Plaintiffs are similarly injured. This does not even include the costs of purchasing the optical scanners and readers that are required for tracking animal movements.

A presentation from a USDA-funded study noted that the costs of NAIS for cattle include the RFID tags, RFID technology, labor (associated with each category), shrink, animal injury, human injury, depreciation, and opportunity costs. *See* Exhibit S, slide 17. Notably, when USDA analyzed the costs for the Country of Origin Labeling program, USDA noted that the costs would include capitol, labor, personnel training, modification of recordkeeping, loss of efficiency, and computer hardware and software. *See* 74 Fed. Reg. 2658, 2683-2685 (Jan. 15, 2009). All of these same costs are likewise imposed under NAIS and MDA's requirements.

The cost of this program is prohibitive and may put Plaintiffs out of business. *See* Schneider Affidavit, pg. 3, Keyworth First Affidavit, Golimbieski First Affidavit, Niewendorp Affidavit, pg. 3. In fact, dozens of other farmers in Michigan have already

gone out of business because of the prohibitive cost of NAIS. *See* Schneider Affidavit,

pg. 4. And these injuries are incurred whether or not MDA's requirements are found to

be "NAIS" as Plaintiffs allege or simply "State TB" requirements as MDA alleges.

Not only are Plaintiffs suffering increased economic costs in order to continue

farming, they are being assigned a PIN against their will, their personal information and

data are also being captured against their will, and those data are being placed into a

national database. *See* Alexander Affidavit, pg. 17, Nolt Affidavit, Golimbieski Second

Affidavit and Keyworth Second Affidavit. Specifically, Plaintiffs' "premises"

information has been placed into a database, including their name, address, telephone

number, size of farm, type of animal raised, number of animal raised, latitude and

longitude coordinates. Consequently, Plaintiffs' private information is no longer

confidential, another form of injury. *See, e.g.,* Schneider Affidavit, Keyworth Second

Affidavit, Golimbieski Second Affidavit, Niewendorp Affidavit.

This injury occurs whether the farmer is required to sign up his property or

whether the government assigns the number to his property after placing his information

into a database without his consent. MDA admits that it has "converted" its previous

database into NAIS-compatible numbers (*see* MDA Memorandum at pg. 10), which

presumably includes uploading the data to the federal database. This imposes a federal

numbering system on Plaintiffs and other animal owners in Michigan and it is not

voluntary. Similarly, although MDA states that it has made an "exception" for religious

objectors by allowing them to pay livestock markets to do the tagging for them at the

market (*see* MDA Memorandum at pg. 17), the fact that the Plaintiffs still have to pay for

the tagging and have a universal number assigned to their animals and linked to their

property constitutes a violation of their religious beliefs and imposes a financial burden on them.

The Plaintiffs have a belief in the Bible and that as humans they are endowed by their Creator with dominion and control over all the animals on earth. *See, e.g.,* Affidavits of Niewendorp, Rev. Wyant, Golimbieski First Affidavit and Keyworth First Affidavit. They believe NAIS violates this tenet of their religion because dominion and control has now been transferred to USDA and MDA. They also believe that they are not allowed to take "the mark" of NAIS and that by subscribing to NAIS, i.e., PINs and RFIDs, they are violating this tenet of their religion as well. *See, e.g.,* Affidavits of Niewendorp, Rev. Wyant, Golimbieski First Affidavit and Keyworth First Affidavit.

In addition to the harms mentioned above, Plaintiffs Glen Mast and Robert Alexander, who are Old Order Amish, are suffering further injury. *See* Affidavits of Mast and Alexander. For example, one tenet of their beliefs is that they must be farmers, yet the cost of complying with NAIS is prohibitive and may force these two Plaintiffs to quit farming altogether. Also, their religion eschews the use of technology, yet NAIS forces them to utilize technology in the form of RFIDs and scanners and computer programs. Finally, their beliefs discourage them from interfacing and co-mingling with the world, yet their private data is being communicated to a national database. In all three respects Plaintiffs Mast's and Alexander's religious beliefs are being violated. *See* Affidavits of Mast and Alexander.

Consequently, all Plaintiffs are being injured in one form or another in this case. This is what Plaintiffs have pled in their First Amended Complaint and thus they have standing to bring this action. Therefore, MDA's motion to dismiss is not well taken and

it should be denied.

III.     *The Eleventh Amendment is not a bar to Counts Five, Six and Eight because it does not apply to suits brought by citizens of a state against the state for ongoing violations of federal law.*

Ever since the United States Supreme Court's ruling in *Ex Parte Young*, courts have held that the Eleventh Amendment does not bar individuals from bringing a suit in federal court against a state officer to enjoin the implementation of a law or regulation that is unconstitutional. The rationale for this is that federal law is supreme and federal rights need to be vindicated. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908); *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Georgia R. & Banking Co. v. Redwine,* 342 U.S. 299, 304, 72 S.Ct. 321, 324, 96 L.Ed. 335 (1952); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 105 (1984) ("The Court also has recognized, however, that the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States. This is the significance of *Edelman v. Jordan, supra.")*. Thus, a State does not enjoy 11th Amendment immunity when it is sued for an ongoing violation of federal law.

In determining whether the doctrine of *Ex Parte Young* avoids the Eleventh Amendment bar to suit, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and [whether it] seeks relief properly characterized as prospective." *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645, 122 S.Ct. 1753 (2002) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296; 117 S.Ct. 2028 (1997)). If the

complaint alleges such an ongoing violation of federal law for which prospective relief is sought, the Eleventh Amendment does not apply.

Plaintiffs allege in counts 5, 6 and 8 allege that MDA is engaged in an ongoing violation of federal law, i.e., the Fourteenth Amendment (Count 5), NEPA (Count 6) and RFRA (Count 8) and seek nothing more than to stop the continued implementation of NAIS to the detriment of small farmers throughout Michigan and the United States. These claims do not impose past liability upon the state or its agencies. "It does not impose on the state 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officers.'" *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. at 646 (citing *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347 (1974)). Instead, Plaintiffs' claims against MDA seek to enjoin an ongoing violation of federal law, i.e, implementation of NAIS that has not been subjected to procedural and substantive safeguards.

Consequently, Plaintiffs have pled a proper claim in Counts 5, 6 and 8. Therefore, MDA's argument that the Eleventh Amendment bars Plaintiffs' 14th Amendment, NEPA and RFRA claims is not well taken and its motion to dismiss should be denied.

IV.    *MDA violated the procedural and substantive requirements of the 14th Amendment because none of the actions it took in concert with USDA were subjected to notice and comment, and because NAIS in the State of Michigan has nothing to do with the health of animals.*

    A.    *Count Five states a valid procedural due process claim under the 14th Amendment.*

The United States Supreme Court in the case of *Mathews v. Eldridge*, 424 U.S. 319 (1976), articulated the elements that must be proven to demonstrate a violation of procedural due process:

1. "First, the private interest that will be affected by the official action;
2. second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally,
3. the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id*. at 335. As explained below, Plaintiffs have established a valid procedural due process claim that must survive summary disposition.

As to the first prong of *Eldridge*, personal privacy is a right protected by the U.S. Constitution. *See Roe v. Wade*, 410 U.S. 113, 151 (1973) and cases cited therein. *See also Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Utz v. Cullinane*, 520 F.2d 467, 482 (D.C. Cir. 1975); *National Organization for Reform of Marijuana Laws (NORML) v. Bell*, 488 F.Supp. 123, 130 (D.D.C. 1980). In this case, Plaintiffs are having their private data collected and placed into a national database against their will. They did not ask to have a PIN assigned to them by MDA nor did they ask to have their personal information collected by MDA accredited veterinarians and forwarded to the USDA database. Consequently, a fundamental right of Plaintiffs is being impacted by MDA's complicity in implementing NAIS.

In addition, as discussed *supra*, pages 4-15, Plaintiffs' property rights are being impacted by MDA's actions. Plaintiffs are being required to expend both funds and time to comply with the tagging requirements.

For the second prong of *Eldridge*, the Plaintiffs have already been deprived of their privacy and property rights and with absolutely *no* procedures taken to prevent an erroneous action. The steps that USDA and MDA have both taken in creating NAIS and making it mandatory are specified in paragraph 286 (i)-(xxv) of Plaintiffs' First Amended Complaint. For example, those steps consist of the 2004 interim and 2007 final rules, the MOUs, the funding MDA received from USDA, the "guidance documents" issued under the alleged authority of the AHPA, and other documents such as strategy plans, business plans, guidelines, etc.

MDA acknowledges that it has received funding from USDA, it has entered into several MOUs with USDA, and that its accredited veterinarians are required to comply with the two VS Memos in securing and obtaining private premises information from the Michigan Plaintiffs. However, none of these actions were taken in accordance with procedural or substantive due process safeguards. Indeed, none of the MOUs, the funding documents or the VS Memos were preceded by notice and comment. There was no public input into these actions, there was no judicial oversight of these actions, and there was no legal authority for these actions. This constitutes a violation of the due process clause for which judicial review should attach.

With respect to the final prong of *Eldridge*, the Government does not have a significant interest in proceeding with this program without additional process. MDA has not shown that it gains anything by the immediate implementation of NAIS without going through the proper notice and comment procedures. Indeed, as Plaintiffs alleged in Count Five of their complaint, NAIS has nothing to do with animal health. *See* paragraph 285, First Amended Complaint. A more detailed explanation of why NAIS is not

rationally related is provided *infra* at *Section IV. B*.  Because the alleged interest being

protected by NAIS (animal health) is not advanced by NAIS (PINs, RFIDs and animal

tracking) MDA has violated the due process clause.

On pages 26-30, MDA refers exclusively to a March 1, 2007 Order[3] to the

exclusion of all the other documents identified by Plaintiffs in paragraph 286 (i)-(xxv) of

the First Amended Complaint and ignores all of the other documents in which MDA was

complicit with USDA in implementing NAIS in the State of Michigan.  Thus, MDA's

statement on page 26 of its motion that the 2007 Order is "the only document that

purports to impose legal requirements" lacks merit.

With respect to MDA's March 2007 Order, that Order also violates the due

process clause of the Fourteenth Amendment because it imposes new, substantive

requirements that were not in affect prior to its issuance.  Specifically, the March 2007

Order required *all* cattle in the state of Michigan, in *all* TB zones, *including the TB free*

*zone*, to be identified and tagged with a NAIS-compliant RFID ear tag issued by MDA

and to be linked to a PIN prior to any movement from that premises.  In its March 2007

Order, MDA also required that any vehicle transporting livestock must stop at any posted

inspection point and produce documentation proving compliance with all livestock

moving requirements.

These requirements never existed before the March 2007 Order.  MDA did not

promulgate these new regulatory requirements as a formal rule or regulation, it did not

seek any public comment, it did not evaluate any alternatives or impacts, and it did not

---

[3] Plaintiffs' First Amended Complaint refers to this Order as the February 2007 Order
because it was signed on February 9, 2007 but MDA refers to it as the March 1, 2007
Order because it was effective on that date.  The two Orders are one and the same.

otherwise comply with any procedural requirements.  Instead, MDA simply issued a letter signed by its Director followed by an Order.

In essence, MDA's March 2007 Order proposed to now make mandatory the first two phases of USDA's three-prong NAIS program with respect to cattle in that 1) *all* premises must be registered and issued a PIN; and 2) *all* cattle on said premises must be issued an animal identification number ("AIN") and tagged with an electronic RFID ear tag.[4]  MDA stated that if these changes were "implemented, the [USDA] . . . has indicated that it would consider reinstating TB Free Status for the current MAAZ [modified accredited advanced zone] area of lower Michigan," even though implementation of NAIS was not required by any federal or state statute or regulation. MDA has also admitted that if it did not impose there requirements it would lose its "split state" status from USDA.  *See* Exhibit E, pg. 12.

In addition, MCL 287.706(2) defines "official identification" as "any identification ear tag, tattoo, electronic identification, or other identification approved by" USDA.  Prior to the March 2007 Order, MDA recognized brands, tattoos, and metal tags as "official identification."  *See, e.g.*, MDA Order of June, 2004, MDA Appendix, pg. 14. MDA's unilateral March 2007 Order, however, eliminated all forms of official identification and recognized only NAIS-compliant RFIDs.  As stated by the D.C. Circuit in *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) "when an agency changes the rules of the game …  more than a clarification has occurred.  To conclude otherwise would intolerably blur the line between when the APA notice requirement is triggered and when it is not."

---

[4]  The only apparent exception being cattle which never leave a premises are not required to be tagged.

Finally, MCL 24.241 provides, in part, that before MDA can promulgate a new rule it "shall give notice of a public hearing." MCL 24.207 defines "rule" and the March 2007 Order does not fit within one of the exclusions from the definition of rule. Moreover, and contrary to MDA's assertions, MCL 287.709 does not authorize MDA to unilaterally change what constitutes "official identification" as it has done so in this case. Not only does MDA lack authority to eliminate all forms of official identification save one (RFIDs), doing so "change[s] the rules of the game." *Sprint Corp. v. FCC*, 315 F.3d at 374 (D.C. Cir. 2003).

Consequently, Plaintiffs have pled a procedural due process violation under the Fourteenth Amendment. Therefore, MDA's motion to dismiss is not well taken and it should be denied.[5]

> **B.** *Count V states a valid substantive due process claim under the 14th Amendment.*[6]

For the Plaintiffs to demonstrate a violation of substantive due process under the Fourteenth Amendment, the following elements must be shown:

1) That they had a property right;

2) That the state deprived them of this property or property interest; and

3) That the state's action falls so far beyond the outer limits of legitimate government activity that no process could cure the deficiency. *S. Blasting Serv., Inc. v. Wilkes County*, 288 F.3d 584, 594 (4th Cir., 2002).

As this Court has stated, "government conduct that was 'gravely unfair'" can give rise to a substantive due process claim." *Elkins v. District of Columbia*, 527 F.Supp.2d 36, 49 (J. Collyer) (D.D.C. 2007).

---

[5] MDA's argument that the Eleventh Amendment bars Plaintiffs' procedural due process claims under Michigan law (Counts 9, 10 and 11) will be dealt with *infra* at pages 37-40.
[6] In MDA's motion, it fails to specify which Rule it is seeking relief under.

On page 30 of its motion, MDA has admitted that Plaintiffs had a property right in "their cattle, bison, and goats" and that Plaintiffs have a property interest "in the two dollars they pay for each tag." In addition, Plaintiffs have provided an in depth discussion to support their property interest claims. See *supra*, pages 4-15.

MDA claims, however, that it did not deprive Plaintiffs of their property interest in their livestock. Its sole argument in support of this is "The only restriction placed on Plaintiffs under MDA's RFID program is that if Plaintiffs' animals leave their premises alive and enter commerce or the food chain, or if the cattle are located in the infected zone, they must be tagged with an RFID tag obtained by the state." This is not true. Plaintiffs have provided detailed facts to support their claim that the State deprived them of their property right. See *supra*, pages 4-15. MDA demonstrates its disdain for the Plaintiffs by once again charactering the "cost" to the Plaintiffs as two dollars per animal, without factoring in all of the other costs discussed previously by Plaintiffs. *See* Exhibit S, slide 17.

The third prong of the substantive due process analysis requires proof that MDA's actions fall so far beyond the outer limits of its legitimate activity that no process could cure the deficiency. In this case, as described in the next section below, MDA's actions are not rationally related to the legitimate government purposes of protecting human and animal health, and MDA's actions have gone far beyond the authority it enjoys under either its Animal Industry Act or the AHPA.

    *1.   There is no rational relationship between any of the NAIS program requirements and the legitimate government purposes of protecting human and animal health.*

There is no rational relationship between any of the NAIS program requirements

and the alleged purpose of the AHPA, animal safety or health. For example, placing an RFID in the ear of a cow will not make the cow healthier; requiring a farmer to obtain a PIN will not make the cow healthier either; and giving MDA hundreds of thousands of dollars to implement and staff such a program will not make cows healthier. *See, e.g.*, attached Affidavits of Veterinarians Melvin Massey (Exhibit T), Glen Dupree (Exhibit U) and Don McLeod (Exhibit V). Moreover, MDA's State Veterinarian Steve Halstead has admitted that use of RFIDs will not eradicate TB. *See* Schneider Affidavit, pg. 2. Nor will NAIS improve upon existing disease control programs. *See* Thornsberry Affidavit, Exhibit W. *See also* Letter from B. Masin, Electronic Identification Devises, Ltd. to Judith McGeary (May 31, 2006) (Exhibit X); Farm and Ranch Freedom Alliance, "Analysis of the National Animal Identification System" (July 15, 2006) (Exhibit Y). For these reasons, each of the NAIS program requirements violates the substantive due process because the conduct involved (RFIDs, PINs, AINs, animal tracking) is not rationally related to the government's interest of protecting animal health.

Accordingly, Plaintiffs have alleged that there is no rational relationship between the NAIS program and animal safety, and that MDA lacks authority under the AHPA to impose *intrastate* requirements on the movement of animals within Michigan. For these reasons, MDA has violated the substantive due process clause of the 14th Amendment.

Further, MDA makes the bald claim on page 31 of its motion that "requiring an easy, more accurate, and more efficient method of animal identification" eradicates disease and protects human health and Michigan's livestock industry. MDA then justifies its claim by stating: "Charging $2 per animal to achieve the goal of eradicating

bovine tuberculosis does not violate substantive due process rights." MDA's argument is not only unsupported by any evidence, it misses the point for two reasons.

First the true cost for small farmers to comply with program requirements is onerous and will force many out of business. *See* Schneider Affidavit; Exhibit S, slide 17. Second, MDA has not demonstrated how a program of this magnitude can be justified for the ostensible purpose of eradicating a disease that is almost non-existent and that cannot be treated with PINs, RFIDs or the tracking of animal movement. The fact that TB is almost nonexistent in Michigan is confirmed by the 2002 MOU that states, in part, the following:

> "Bovine TB is endemic in free-ranging white-tailed deer in northeastern lower Michigan. As of August 20, 2001, boving TB has been confirmed in 14 beef cattle herds, two dairy herds, and one privately-owned [deer] herd. The beef herds and the privately-owned [deer] herd have been depopulated."

*See* MDA Appendix, pg. 27. As of 2002, therefore, there were only two dairy herds in lower Michigan that had any trace of TB. Thus, NAIS will do nothing to eradicate TB in the State of Michigan.

Simply put, MDA has put forth no science on how NAIS will help to eradicate TB in the State of Michigan. Instead, MDA puts forth two affidavits from MDA regulatory personnel who lack any scientific credentials.

> 2. *MDA's actions have gone far beyond the authority it enjoys under either its Animal Industry Act or the AHPA.*

To repeat what this Court has stated, "government conduct that was 'gravely unfair'" can give rise to a substantive due process claim." *Elkins v. District of Columbia*, 527 F.Supp.2d 36, 49 (J. Collyer) (D.D.C. 2007). "A mere violation of law or deviation from regulations and procedures" is insufficient to find a substantive due process

violation.  *Id.*  Government acts "gravely unfair" when it either imposes a "substantial infringement of state law prompted by personal or group animus," or it deliberately flouts "the law that trammels significant personal or property rights."  *Id.*

The United States Supreme Court recognized in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 S.Ct. 1155 (2002) that the "crucial distinction" in determining whether an agency exceeds its authority is whether the agency's action can in fact be "enforced through the statute's pre-existing remedial scheme and in a manner consistent with it."  *Id.* at 92.  The D.C. Circuit has stated that an "agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colorado River Indian Tribes v. National Indian Gaming Com'n.*, 466 F.3d 134, 139 (D.C. Cir. 2006).  Whenever an agency does take an action, it is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  *Id.* at 139-140 (citing and quoting *MCI Telecomms. Corp. v. AT & T*, 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).  Therefore, when an agency such as MDA takes action beyond its statutory authority, it violates substantive due process.

In order to defeat Plaintiffs' substantive due process claim, MDA must show not only that the AHPA authorizes MOUs that impose NAIS conditions on an *intrastate* basis it must also show that NAIS is rationally related to animal health.  As explained below, MDA cannot make either of these demonstrations.[7]

With respect to whether the MOUs are legal, Plaintiffs have already explained, *supra* at pages 3-4, that the AHPA deals with the importation, exportation and interstate

_____

[7] MDA's argument that the Eleventh Amendment bars Plaintiffs' substantive due process claims under Michigan law (Counts 9, 10 and 11) will be dealt with *infra* at pages 37-40.

movement of animals yet MDA has been forced by USDA to impose requirements that deal with the *intrastate* movement and regulation of animals.  Plaintiffs also make this claim in their First Amended Complaint at paragraph 124, i.e., "the 2002 MOU required MDA to mandate 'official identification' on 'all domestic livestock that move from any premises' within these zones, including movement within disease-free areas within the State."  In addition, Plaintiffs allege at paragraph 143 that "the 2005 MOU now required MDA to mandate 'electronic identification and a movement permit for any cattle moved from premises in the Modified Accredited Zone.'"  Therefore, MDA has violated the substantive due process provision of the Fourteenth Amendment because it does not have the authority to impose *intrastate* terms and conditions in an MOU it enters into with USDA under the AHPA.

Not only are the MOUs illegal, there is no rational relationship between any of the NAIS program requirements and the AHPA.  *See* argument, *supra*, pages 22 and following.  Accordingly, Plaintiffs have alleged that there is no rational relationship between the NAIS program and animal safety, and that MDA lacks authority under the AHPA to impose *intrastate* requirements on the movement of animals within Michigan.  For these reasons, MDA has violated the substantive due process clause of the 14th Amendment.

Simply put, MDA has put forth no science on how NAIS will help to eradicate TB in the State of Michigan.  Instead, MDA puts forth two affidavits from MDA regulatory personnel who lack any scientific credentials.  Consequently, Plaintiffs have pled a claim for which relief can be granted and MDA's motion to dismiss is not well taken.  Therefore, it should be denied.

C.     *MDA is implementing federal law in the form of NAIS.*

MDA argues on page 25 of its motion to dismiss that it "is not implementing the NAIS, " yet ignores the undisputed facts that it is requiring NAIS-compliant premises registration and NAIS-compliant tagging of the Plaintiffs' cattle.  The use of identification numbers permanently connected to individuals' real property was not part of the TB program before USDA began to implement NAIS.  *See* Thornsberry Affidavit, Exhibit W.   As described *supra*, pages 4-11, MDA and USDA have engaged in a coordinated effort to implement NAIS in the State of Michigan.  It is undisputed that MDA has required Plaintiffs to have their property registered with a federal PIN and to identify their cattle with federally-approved RFID tags that have AINs generated by the USDA.  Moreover, the MOUs it has entered into with USDA, the funding it has applied for and received from USDA, and its agreement to implement the two VS Memos through its accredited veterinarians demonstrate that MDA is in fact implementing NAIS in the State of Michigan.

Therefore, MDA's argument that "there is no genuine issue of fact" is not well taken and its motion for summary judgment should be denied.

V.     *MDA is subject to the requirements of NEPA because it is a "cooperating agency" and its implementation of USDA's NAIS program in the State of Michigan constitutes "major federal action."*

It has long been held that under a NEPA analysis, "[n]onfederal actors can be involved in a major federal action."  *Center for Biological Diversity v. U.S. Dept. of Housing and Urban Development*, 541 F.Supp.2d 1091, 1099 (D.Ariz. 2008).  In order to subject non-federal activity to the requirements of NEPA, "[t]he 'agency[ ] [must have] the authority to influence significant nonfederal activity.  This influence must be more

than the power to give nonbinding advice to the nonfederal actor ... Rather, the federal agency must possess actual power to control the nonfederal activity.'" *Center for Biological Diversity v. U.S. Dept. of Housing and Urban Development*, 541 F.Supp.2d 1091, 1099 (D.Ariz. 2008) (citing and quoting *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1482 (10th Cir. 1990). *See also Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Bd.*, 453 F.Supp. 122, 126 (D.C. Va. 1978) ("This Court concurs in the view that in some instances federal involvement is so pervasive that the acts of the state are in reality federal actions.").

To determine whether an action is or is not a "major Federal action" for purposes of NEPA, Courts in this District "consider the following factors: (1) whether the project is federal or non-federal; (2) whether the project receives significant federal funding; and (3) when the project is undertaken by a non-federal actor, whether the federal agency must undertake 'affirmative conduct' before the non-federal actor may act." *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 54-55 (D.D.C. 2003). If the "state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be 'federal' for the purposes of NEPA." *Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333, 1347 (5th Cir. 1979).

The amount of discretion the federal agency has in the matter, therefore, is the crucial element. If the federal agency "does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable."

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). *See also RESTORE: The North Woods v. U.S. Dept. of Agriculture*, 968 F.Supp. 168, 175 (D.Vt. 1997); *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1053 (10th Cir. 1998). If, however, the federal agency has "any significant hand in determining, or made any decision concerning, its substantive aspects" then the State's action is subject to NEPA. *Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d at 1346-1347. In addition, whether a State project is subject to NEPA may "often entail analysis of the amount and significance of federal aid." *Id.* at 1347.[8]

As described *supra* at pages 4-11, USDA has exercised substantial discretion in how it implements the AHPA. USDA laid out its preferred method for implementing NAIS under the AHPA in its Draft and Final Business Plans, which specifically calls for the program to be implemented by the States under cooperative agreements, using existing disease control programs on a species-by-species basis with cattle as the highest priority. *See* Draft Business Plan (12/12/08 Administrative Record No. NAIS AR 1449) and Final Business Plan (Exhibit B) at pages 2, 3, 15, 19, 28-36. *See also* Plaintiffs' Memorandum in Opposition to USDA's Motion to Dismiss at pages 1-4, incorporated herein by reference. USDA has also funded MDA's efforts to implement NAIS in the State of Michigan and it has issued documents clearly demonstrating a policy to make NAIS mandatory throughout the country, including in Michigan. MDA's role in all of this is as an equal partner, and as such it has become a federal actor that is subject to the

---

[8] Regulations promulgated by The Council on Environmental Quality reinforce the court rulings described in this section. For example, *see* 40 CFR 1508.15 ("major federal action" defined); 40 CFR 1501.5(b) (allowing State or local agencies to act as "joint lead agencies"); 40 CFR 1501.6(b) (describing the role of "cooperating agencies"); 40 CFR 1506.2(b) and (c) (referring to cooperation between federal and State agencies); 40 CFR 1508.5 (defining "cooperating agencies" to include a State).

requirements of NEPA.

Accordingly, Plaintiffs have pled a claim against MDA under NEPA and its motion to dismiss is not well taken and should be denied.

VI.     *MDA is subject to the requirements of RFRA because it is implementing federal law as USDA's agent.*

As explained below, RFRA applies to the federal government and to all third parties acting on behalf of the federal government who act under color of federal law. Consequently, RFRA can be applied to MDA's conduct since MDA is implementing federal law in the form of NAIS in the State of Michigan and is doing so on behalf of USDA. Because it is implementing federal law as an agent of USDA, MDA is subject to the strictures of the RFRA.

RFRA (42 U.S.C. 2000bb, *et seq*.) provides, in part, that "Government shall not substantially burden a person's exercise of religion . . . ." *See* 42 U.S.C. 2000bb-1(a). The only time "government" can infringe upon religious exercise is when it "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *See* 42 U.S.C. 2000bb-1(b). "Government" is defined to include "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." *See* 42 U.S.C. 2000bb-2(1). RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise." *See* 42 U.S.C. 2000bb-3. Thus, RFRA applies "to individuals *as well as* governmental bodies, and conduct *as well as* legislation." *Jama v. U.S.I.N.S.*, 343 F.Supp.2d 338, 372 (D.N.J. 2004) (emphasis in original.).

31

The D.C. Circuit stated in *Henderson v. Kennedy,* 265 F.3d 1072 (D.C. Cir. 2001) that RFRA still applies to the federal government.  "The [RFRA] amendments remove the doubt expressed in our opinion, *(citation omitted)* that the portion of RFRA remaining after *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)-the portion, that is, applicable to the federal government …-survived the Supreme Court's decision . . . ." *Id*. at 1073.  *See also Jama v. U.S.I.N.S.*, 343 F.Supp.2d 338, 368 (D.N.J. 2004) ("Every single other Circuit court that *has* squarely addressed the question, however, has held that *Boerne* did *not* invalidate RFRA in its entirety, and that the statute remains valid as applied to the federal government.") (Emphasis in original).  Thus, RFRA remains binding on the federal government even after the *Boerne* decision.

Governmental entities, such as municipalities, that act as agents of the federal government may be liable under RFRA.  In the case of *Ibrahim v. District of Columbia*, 357 F.Supp.2d 187 (D.D.C. 2004), a prisoner of the District of Columbia pled a constitutional violation of RFRA against the District of Columbia under Section 1983 on a theory of agency.  The prisoner argued that Virginia prison officials while in Virginia under a prisoner custody arrangement threatened him with disciplinary action because of his desire to engage in what he believed was conduct proscribed by his faith.  The District of Columbia moved to dismiss, arguing that municipalities are immune under Section 1983 in their official capacity and that they cannot be held liable under Section 1983 under a theory of *respondeat superior*.

The Court, however, found that the prisoner had pled a predicate claim for a RFRA violation against the District of Columbia and that it could be liable when "execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 194 (quoting and citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694-695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "As Ibrahim has alleged that he was threatened with disciplinary action as a result of his desire to engage in what he believes is conduct proscribed by his faith, the Court finds that he has pled a predicate constitutional violation for religious discrimination." *Id*. at 195.

Thus, *Ibrahim* stands for the proposition that third parties who are not the federal government can be held liable for a RFRA violation under an "agency" theory of liability. *See also Hankins v. Lyght*, 441 F.3d 96, 103 (2nd Cir. 2006) (An action brought against a church and a bishop under the federal Age Discrimination in Employment Act could also allege a RFRA violation against the church and bishop because "RFRA's language surely seems broad enough to encompass such a case."); *Redhead v. Conference of Seventh-Day Adventists*, 440 F.Supp.2d 211, 218 (E.D.N.Y. 2006) (In a Title VII Civil Rights action brought by a teacher against a Seventh-Day Adventist school for improper termination because she was pregnant, the court stated "[The] holding [in *Hankins*] is appropriately extended to Title VII employment discrimination cases."). Consequently, a RFRA claim can be raised against MDA when it acts as the agent of USDA.

MDA cites *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) to argue that RFRA does not apply to the States. *Boerne*, however, dealt with whether a State could be subject to RFRA when it enforces state or local law; it did not address whether a State could be subject to RFRA when it acts as an agent of the federal government implementing federal law under the "color of law" language of 42 U.S.C.

2000bb-2(1). *Boerne* also did not address the language in RFRA that states it applies to "all Federal law, and the implementation of that law, whether statutory or otherwise." *See* 42 U.S.C. 2000bb-3. Because MDA is implementing "federal law," i.e., NAIS, in the State of Michigan "under color of law," it is subject to the requirements of RFRA.

When Congress "borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Long v. Director, Office of Workers' Comp. Programs,* 767 F.2d 1578, 1581 (9th Cir.1985) (citation and internal quotation marks omitted). Thus, the "judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applies equally in [a] RFRA action." *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835 (9th Cir. 1999). *See also Brownson v. Bogenschutz,* 966 F.Supp. 795, 797 (E.D. Wis.1997).

The question in deciding whether a person is "subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the [government]?" *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The United States Supreme Court has developed a two-part test to answer this question. "First, the deprivation must result from a governmental policy. … In other words, the deprivation "must be caused by the exercise of some right or privilege created by the [government] or a rule of conduct imposed by the [government]." *Sutton v. Providence St. Joseph Medical Center* (internal citation omitted), 192 F.3d 826, 835 (9th Cir. 1999). "Second, 'the party charged with the deprivation must be a person who may fairly be said to be a

[governmental] actor.'" *Id.*, citing and quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

In this case, the policy or rule of conduct being imposed that constitutes a deprivation of rights is (1) registering for a federal PIN, (2) using RFIDs linked to federal AINs, and (3) tracking all animal movements. USDA and MDA are both implementing these requirements as part of NAIS. Also, the persons that are causing the deprivation of rights are the USDA and the MDA jointly. *See supra* at pages 2-11. Indeed, MDA has admitted that it was, in effect, coerced into implementing RFIDs in order to receive continued approval of its "split state" status. See Exhibit E, pg. 12. Consequently, RFRA applies to MDA's conduct in this case because MDA is implementing federal law, NAIS and the AHPA, under color of law.

Accordingly, Plaintiffs have pled a cause of action against MDA under RFRA and MDA's motion to dismiss is not well taken and it should be denied.

VII.    *MDA's "collateral attack" argument lacks merit because the statute it cites does not apply.*

MDA argues on page 38 of its motion that MCL 600.631 prevents Plaintiffs from challenging MDA's March 2007 Order. Yet Michigan law provides three different mechanisms for review of agency action, only one of which is MCL 600.631: "(1) the review process prescribed in the statute applicable to the particular agency, (2) an appeal to circuit court pursuant to the Revised Judicature Act (RJA) ... or (3) the review provided in the Administrative Procedures Act (APA)." *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich. 508, 519; 684 NW2d 847 (2004). Thus, the 21-day limit for appeals under MCL 600.631, which MDA references, does not apply to every challenge to an agency action or order.

In fact, MCL 600.631 has a very limited scope, applying only to agency orders "from which an appeal or other judicial review has not otherwise been provided by law." *See* MCL 600.631. In this case, MDA alleges that it has authority to issue the March 2007 order under the Animal Industry Act (AIA) (*see* MDA Memorandum, p.5). However, the AIA specifically invoked the procedures of the Administrative Procedures Act. *See* MCL 287.745 ("The department may promulgate rules or the implementation and enforcement of this act pursuant to the administrative procedures act of 1969..."). Thus, Michigan's APA provides for review of agency orders that are alleged to be outside the agency's statutory authority. *See* MCL 24.306(1)(b).

In this case, Plaintiffs allege that MDA has overstepped its authority, both substantively and procedurally, under Michigan's AIA and APA by issuing the March 2007 Order. Specifically, MCL 287.706(2) provides a list of allowable forms of official identification yet MDA by administrative fiat has eliminated all but one of them. Although MDA may have the authority to adopt "scientifically based movement restrictions and requirements," it does not have authority to effectively amend MCL 287.706(2) by ignoring the statutory language that defines "official identification" as "an identification ear tag, tattoo, electronic identification, or other identification approved by the United States department of agriculture or the department." Thus, under the governing statute, this case does not fall within MCL 600.631, but rather within the third mechanism for review of agency action, namely review under the APA. The 21-day limit on appealing the agency order simply does not apply.

Consequently, Plaintiffs are not "collaterally" attacking the validity of the March 2007 Order and MDA's argument on this issue is not well taken.

VIII.	*A genuine issue of material fact remains on whether MDA has waived its sovereign immunity under the Eleventh Amendment.*

Sovereign immunity under the Eleventh Amendment is a personal privilege that the state can waive at pleasure. *Clark v. Barnard*, 108 U.S. 437, 427; 2 S.Ct. 878,883 (1883). In addition, a State can waive its sovereign immunity when it knowingly and voluntarily receives federal funds that are conditioned on such waiver. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981); *Smith v Allen,* 502 F.3d 1255 (11th Cir. 2007); *Bowers v. National Collegiate Athletic Association (NCAA)*, 475 F.3d 524 (3rd Cir. 2007); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13 (1st Cir. 2006); *Benning v. Ga.,* 391 F.3d 1299 (11th Cir. 2004); *Ragland v. Angelone,* 420 F.Supp.2d 507 (W.D.Va. 2006); *Madison v. Riter,* 411 F.Supp.2d 645 (W.D. Va. 2006); *Doe v. Nebraska*, 345 F.3d 593 (8th Cir. 2003); *Seminole Tribe of Florida v. State of Fla.*, 1 F.3d 1016 (11th Cir. 1994), certiori granted 115 S.Ct. 932, 513 U.S. 1125, affirming 116 S.Ct. 1114, 517 U.S. 44 (1996); *Tennessee Dept. of Human Services v. U.S. Dept. of Educ.*, 979 F.2d 1162 (6th Cir. 1992); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th Cir. 1987); *Jackson Sawmill Co. v. U.S.*, 580 F.2d 302 (8th Cir. 1978); *Hueker v. Millburn*, 538 F.2d 1241 (6th Cir. 1976). The determining factor in whether the State's acceptance of federal funds is voluntary and knowing is whether it knew what conditions and obligations were imposed on it: "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. at 17.

In this case, Plaintiffs have made several Freedom of Information Act requests of USDA seeking documents pertaining to the issuance of federal funds to MDA. USDA

has yet to act on those FOIA requests. Consequently, Plaintiffs do not know whether MDA waived its sovereign immunity in exchange for the receipt of USDA's funds to implement NAIS in the State of Michigan.

Unless and until USDA, and for that matter MDA, are forthcoming in releasing all of their documents that pertain to the conditions under which MDA could apply for and USDA could issue federal funds to implement NAIS, a genuine issue of material fact remains. In other words, a determination of what was expected of MDA in exchange for receipt of federal funds from USDA for implementing NAIS requires factual development that has not yet occurred and at a minimum defeats MDA's motion for summary judgment on whether Plaintiffs' claims against MDA under State law are barred by the 11th Amendment.

MDA misframes the issue of when courts will find that a State has waived or implicitly consented to a waiver of the State's sovereign immunity under the Eleventh Amendment. Courts do not require that a State administer and enforce a federal act, or that there be an agency relationship between the agency and the federal government. Instead, courts consider the following three factors:

> (1) Whether the state expressly consents to federal jurisdiction in the context of the litigation, *see Actmedia, Inc., v. Stroh,* 789 F.2d 766, 772 (9th Cir.1986);

> (2) Whether a state statute or constitutional provision expressly provides for suit in a federal court, *Atascadero State Hosp. v. Scanlon,* 105 S.Ct. 3142 at n. 1 (1985); or

> (3) Congress clearly intends to condition the state's participation in a program or activity on the state's waiver of its immunity. *Id.* at 3150; *Doe v. Maher,* 793 F.2d 1470, 1477 (9th Cir. 1986).

To determine if MDA waived sovereign immunity under these factors requires factual development and application to these factors. It is simply too early in the case to

have the answers to these questions.  It is undisputed, for instance, that the MDA received grant funds from the USDA to promote NAIS and implement NAIS.  *See* MDA Appendix, pg. 66.  For purposes of 11th Amendment waiver, whether NAIS is voluntary or involuntary is not the issue.  The critical inquiry relates to the obligations imposed on the MDA by the USDA in exchange for receiving federal funding.  It is too early in this case to award summary judgment on this issue.

MDA argues that *Pennhurst* prevents Plaintiffs from bringing its state based claims in Counts 9, 10, and 11.  *See Pennhurst State School & Hospital et al. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900 (1984).   As the Court is aware, *Pennhurst* was a controversial case in which Justices Stevens, Brennan, Marshall and Blackmun dissented.  Many Courts, including the D.C. Circuit, have declined to apply the decision in *Pennhurst.  See Vann v. Kempthorne*, 534 F.3d 741 (D.C. Cir. 2008).

In *Pennhurst*, the dissenting Justices cite a long string of cases that stand for the proposition that federal courts can exercise pendent jurisdiction over State law claims brought against State officers, which seek only prospective injunctive relief.  *See Pennhurst*, 465 U.S. at 126-167.  Plaintiffs believe that these principles should apply in this case.

A court's authority to exercise supplemental jurisdiction is contained at 28 U.S.C. 1367.  Specifically, 28 U.S.C. 1367(a) vests courts with supplemental jurisdiction over "all other claims that are so related . . . that they form part of the same case or controversy."  Supplemental jurisdiction is a codification of the Supreme Court's rulings on ancillary jurisdiction (*Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365 (1978)) and pendent jurisdiction (*United Mine Workers of America v. Gibbs*, 383 U.S.

715 (1966)) and a superseding of the Court's treatment of pendent party jurisdiction (*Finley v. United States*, 490 U.S. 545 (1989)).

In essence, supplemental jurisdiction is the authority of United States federal courts to hear additional claims substantially related to the original claim even though the court would lack the subject-matter jurisdiction to hear the additional claims independently. This means a federal court hearing a federal claim can also hear substantially related State law claims, thereby encouraging efficiency by only having one trial at the federal level rather than one trial in federal court and another in State court.

In this case, Plaintiffs believe this Court should exercise supplemental jurisdiction over their state based claims in Counts 9, 10 and 11 until a more complete record is clear on the issue of whether MDA waived its immunity in exchange for the receipt of federal funds.

Thus, Plaintiffs' claims are not barred by the 11th Amendment.

IX.    *Conclusion.*

*Ex Parte Young* defeats MDA's argument that it is not liable for violating the Fourteenth Amendment, NEPA or RFRA. Moreover, MDA has acted as the agent of USDA in implementing federal law, i.e. NAIS, under color of law. Therefore, Plaintiffs have pled claims in Counts 5, 6 and 8.

The record in this case is incomplete and it is too early to determine whether MDA waived its sovereign immunity in exchange for the receipt of federal funds to implement NAIS in the State of Michigan. Therefore, its motion for summary judgment on this issue should be denied and the Court should assert supplemental jurisdiction over Counts 9, 10 and 11 in the First Amended Complaint.

Consequently, Plaintiffs have pled claims for which relief can be granted, MDA's

motion is not well taken and it should be denied.

Dated: March 23, 2009                       Respectfully submitted,


                                            /s/ David G. Cox
                                            David G. Cox (D.C. Bar No. OH 0020)
                                            4240 Kendale Road
                                            Columbus, OH 43220
                                            dcoxlaw@columbus.rr.com
                                            Phone: 614-457-5167
                                            Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2009, I electronically filed PLAINTIFFS'

OPPOSITION TO DEFENDANT MDA'S MOTION TO DISMISS FIRST AMENDED

COMPLAINT AND FOR SUMMARY JUDGMENT with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to the following:

Peter T. Wechsler
peter.wechsler@usdoj.gov
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Counsel for USDA

and

James E. Riley
rileyje@michigan.gov
First Assistant
Danielle Allison-Yokom
allisonyokomd@michigan.gov
Assistant Attorney General
Michigan Department of Agriculture
Environment, Natural Resources
and Agriculture Division
525 West Ottawa Street
6th Floor Williams Building
Lansing, MI 48913
Counsel for MDA


/s/ David G. Cox
David G. Cox