BEFORE THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Farm to Consumer Legal Defense Fund, et al.<br><br>      Plaintiffs,<br><br>v<br><br>U.S. Department of Agriculture<br><br>and<br><br>Michigan Department of Agriculture Director Don Koivisto,<br><br>      Defendants. | Case No. 1:08-cv-01546-RMC |

## DIRECTOR OF MICHIGAN DEPARTMENT OF AGRICULTURE'S REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

Michael A. Cox
Attorney General

James E. Riley (P23992)
First Assistant
rileyje@michigan.gov

Danielle Allison-Yokom (P70950)
Assistant Attorney General
allisonyokomd@michigan.gov

Attorneys for Defendant Don Koivisto,
Director of Michigan Department
of Agriculture
Environment, Natural Resources,
and Agriculture Division
525 West Ottawa Street
6th Floor Williams Building
Lansing, MI 48913
(517) 373-7540

Dated: April 22, 2009

# Table of Contents

Page

Table of Authorities ............................................................................................................... iii

Introduction ............................................................................................................................ 1

    A.      The controversy ...................................................................................................... 1

    B.      State law authority for the MDA Director's actions ......................................... 3

    C.      The Cooperative USDA/MDA Tuberculosis Program .................................... 6

    D.      Plaintiffs' cattle and premises were identified by numbers and letters prior to the NAIS system being developed and implemented ..................................................... 8

    E.      The MOUs with the USDA did not mandate the implementation of federal laws or federal programs as Plaintiffs allege ......................................................................... 9

    F.      Accredited veterinarians are not implementing NAIS in Michigan as Plaintiffs argue ..................................................................................................................... 10

Argument ............................................................................................................................. 11

I.       The Eleventh Amendment to the United States Constitution clearly bars Count Five of Plaintiffs' Complaint. ............................................................................................................ 11

II.      Plaintiffs have failed to state a valid due process claim under the Fourteenth Amendment. ........................................................................................................................... 12

    A.      Plaintiffs' cannot demonstrate a procedural due process violation as there has been no violation of State law. ...................................................................................... 12

           1.     The MDA's actions affect at most Plaintiffs' property rights in the cost of the RFID tag and their cattle—but do not affect any constitutionally recognized privacy right. ........................................................................................................................ 13

           2.     The procedures employed by the MDA did not create any risk of erroneous deprivation and there was no probable value in additional procedures. .......................... 15

           3.     The MDA's interest in conserving resources and efficiently carrying out its duties weight against providing additional process. ................................................................... 17

    B.      Plaintiffs have failed to state a valid substantive due process claim. ........................... 19

           1.     MDA's animal identification program is rationally related to the MDA's egitimate governmental purpose of protecting animal and human health and the livestock industry. ............................................................................................................ 19

      2.     MDA's actions have not exceeded its authority under the AIA................................ 21

III.    The National Environmental Policy Act is not applicable to the MDA Director's actions. ...................................................................................................................................... 21

IV.    RFRA claims against Director Koivisto should be dismissed because application of RFRA to state actions and state regulations is unconstitutional and MDA is not implementing federal law on behalf of the USDA............................................................................................... 22

V.    Plaintiffs' claim that the Director of the MDA waived the State of Michigan's sovereign immunity is without merit because they have admitted that they have no evidence to prove such a claim.......................................................................................................................................... 23

VI.    Plaintiffs lack standing to maintain this suit because they are not injured. ....................... 24

Conclusion ...................................................................................................................................... 25

# Table of Authorities

Page

Cases

*American Federation of Government Employees v. Dept. of Housing and Urban
Development*,
118 F.3d 786 (D.C. Cir. 1997) ....................................................................................... 13, 15

*Barry v. New York*,
712 F.2d 1554 (1984) ........................................................................................................ 15

*By Lo Oil Co. v. Dep't of Treasury*,
703 N.W.2d 822 (Mich. App. 2005) ................................................................................. 18

*Cash Inn of Dade, Inc. v. Metropolitan Dade County*,
938 F.2d 1239 (11th Cir. 1991) ........................................................................................ 20

*Dodge v. Trustees of the National Gallery of Art*,
326 F. Supp. 2d 1 (D.C. Dist. 2004) ................................................................................. 14

*Doe v. Michigan Dept. of State Police*,
490 F.3d 491 (6th Cir. 2001) ............................................................................................ 20

*E.H. v Tirozzi*,
735 F. Supp. 53 (D.C. Conn. 1990) ................................................................................... 15

*Eagle v. Morgan*,
88 F.3d 620 (8th Cir. 1996) .............................................................................................. 14

*Fednav, Limited v. Chester*,
547 F.3d 607 (6th Cir. 2008) ............................................................................................ 20

*Jaffess v. Secretary of Dep't of Health, Education and Welfare*,
393 F. Supp. 626 (S.D.N.Y. 1975) .................................................................................... 15

*Jenkins v. Rock Hill Local School District*,
513 F.3d 580 (6th Cir. 2008) ............................................................................................ 14

*Kurst Envtl. Educ. & Prot., Inc. v EPA*,
475 F.3d 1291 (D.C. Cir. 2007) ........................................................................................ 22

*League of United Latin American Citizens v. Bredesen*,
500 F.3d 523 (6th Cir. 2007) ............................................................................................ 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......................................................................................................... 24

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ..................................................................................................... 13, 15

*New York v. Burger*,
482 U.S. 691 (1987) ................................................................. 15

*Paris Adult Theater I v. Slaton*,
413 U.S. 49 (1973) ................................................................... 13

*Pennhurst State School & Hospital v. Halderman*,
465 U.S. 89, 106 (1984) ........................................................... 12

*Rattlesnake Coalition v. EPA*,
509 F.3d 1095 (9th Cir. 2007) ........................................... 22, 28

*S. Blasting Serv., Inc. v Wilkes County*,
288 F.3d 584 (4th Cir. 2002) ................................................... 19

*Southwest Williamson Co. Comm. Ass'n. v. Slater*,
173 F.3d 1033 (6th Cir. 1999) ................................................. 22

*Stanko v. Montana*,
No. 93-35948, 1994 U.S. App. LEXIS 30660, at *10 (9th Cir. Oct. 7, 1994) ...................... 15

*Whalen v Roe*,
429 U.S. 589 (1977) ................................................................. 14

*Zaffuto v. City of Hammond*,
308 F.3d 485 (5th Cir. 2002) ................................................... 14

*Zanoni v. USDA*,
decided March 31, 2009 (Docket No. 08-939EGS) (D.C.D.C. 2009) ................................. 15

Statutes
5 U.S.C. § 701 ........................................................................ 21

5 U.S.C. §§ 702-706 ............................................................... 22

7 U.S.C. §§ 8301-8321 ............................................................. 6

7 U.S.C. §§ 8303-8305 ............................................................. 6

42 U.S.C. §§ 2000bb-2(1) ........................................................ 22

42 U.S.C. §§ 2000bb-3(a) ........................................................ 22

42 U.S.C. §§ 4331-32 .............................................................. 21

Mich. Comp. Laws § 24.207 .................................................... 16

Mich. Comp. Laws § 287.701 *et seq* ......................................... 4

Mich. Comp. Laws § 287.701(2) ................................................ 4

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 287.703(4) ........................................................................... 4

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 287.706(2) ........................................................................... 4

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 287.709(8) ........................................................................... 4

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 287.711 .............................................................................. 5

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 287.711b(1) ........................................................................ 4

Public Act 323 of 2000 ......................................................................................... 5

Rules
Fed. R. Civ. P. 12(b)(2)........................................................................................ 12

Regulations
69 Fed. Reg. 64644-64651 ................................................................................... 7

72 Fed. Reg. 39301-39307 ................................................................................... 7

9 C.F.R. § 77.2 ..................................................................................................... 7

9 C.F.R. § 77.3 ................................................................................................. 7, 10

9 C.F.R. § 77.4 ..................................................................................................... 7

9 C.F.R. § 77.5 ..................................................................................................... 7

**Introduction**

A.     The controversy

This controversy, as narrowed by the memoranda submitted to the Court, relates to the Director of the Michigan Department of Agriculture (MDA) ordering on March 1, 2007 that cattle producers identify each animal with an electronic ear tag that both transmits and visually displays on the surface of the tag a uniform national-identification number developed by the United States Department of Agriculture (USDA) before movement of those animals from premises within Michigan.[1]  Plaintiffs argue that the MDA Director exceeded his statutory authority by requiring Michigan cattle producers to use the USDA's National Identification System (NAIS) format for animal identification, that he also exceeded his authority by requiring electronic identification of their cattle, that he was unlawfully implementing federal law in imposing upon the Plaintiffs either "official identification" or the NAIS identification format, and that the use of the electronic identification and the NAIS identification format for their animals and their premises violate their religious beliefs.

The Director has moved to dismiss Plaintiffs' complaint for the reason that: a) he was clearly authorized by state law to impose animal and premises identification, including the NAIS identification format and, in fact, had been identifying Plaintiffs' animals and premises for years under a state-created identification format; b) he was acting within his authority by requiring electronic identification of the cattle, and was not implementing federal law by requiring "official identification" or the NAIS-formatted, electronic ear tags for identifying cattle when

---

[1] Animal Identification

    Effective March 1, 2007, all cattle must be identified with RFID electronic identification ear tags prior to movement from a premises within Michigan, unless exempted by the director.  Initial identification of cattle must utilize an RFID electronic identification ear tag issued by the Michigan Department of Agriculture to the premises at which the identification occurs.  (Appendix, p 16.)

they leave a premise; and c) he was not infringing upon the Plaintiffs' religious beliefs because an exemption exists from the identification requirements for producers who object on religious grounds to the numbered, electronic ear tags.

Plaintiffs' response serves to narrow the issues. Plaintiffs do not now contest that NAIS-formatted animal identification is being required in Michigan for cattle only in conjunction with its bovine tuberculosis eradication efforts, as contrasted to Plaintiffs' earlier claims that NAIS is being "implemented" in Michigan and applies to all Michigan farm animals.[2] Further, Plaintiffs do not contest that the MDA historically required individual animal identification and premises identification as part of disease control and eradication efforts.[3] Plaintiffs object to the MDA's transition from the unique state-created identification formats for animals and premises to the nationally-uniform NAIS identification format which is promoted, but not required, by the USDA.

Although Plaintiffs argue that they are being "forced" to use RFIDs on their cattle,[4] they do not contest the MDA's assertion that the identification tags need only be applied to cattle when they leave their premises.[5] One Plaintiff, Niewendorp, has cattle in the tuberculosis infected zone where RFIDs are placed on his cattle for accountability reasons and the frequent

---

[2] For examples of Plaintiffs' earlier claims, see First Am. Complaint, ¶¶ 1, 113, 114, 123, 124.
[3] See Plaintiffs' Memorandum in Opposition, p. 5, where Plaintiffs acknowledge the existence of a state database containing premises identification and complain about the conversion of that database to the NAIS format database; declarations of Plaintiffs acknowledge MDA's earlier requirements for animal identification under a state-created alphanumeric identification system and the required use of aluminum ear tags; see Declaration of Alexander, pp 14, 17, 30 (not opposed to MDA's former system involving use of metal identification tags; Declaration of Rev. Wyant (applied MDA issued metal tags registered in her name to her cattle), Affidavit of Kevin Kirk, Appendix, pp 2-3; MDA Memorandum to Cattle Producers, Appendix, p 65.
[4] Plaintiffs' Memorandum in Opposition, p 1.
[5] Except in the infected zone (the Modified Accredited Zone) of northern lower Michigan where cattle are being repeatedly tested for bovine tuberculosis and require the ear tags for identification at all times.

testing of cattle in that area by MDA veterinarians.[6]  All other Plaintiffs have premises outside of the infected zone,[7] and do not contest that a MDA-created religious exemption provides that cattle may be tagged at their destination upon relinquishment of possession.[8]  Plaintiffs do not dispute that the cost of the electronic ear tags (RFIDs) is $2, the cost of an applicator is $20, and that the cost of a tag and having someone else apply the tag is $5.[9]  Plaintiffs alleged that an electronic reader is expensive, but there is no need for Plaintiff's to acquire electronic readers and none is alleged by the Plaintiffs.  In fact, the electronic tags have legible animal identification numbers embedded in the surface should visual identification be needed.[10]

B.    State law authority for the MDA Director's actions

Without any analysis of the state laws the Director has presented to the Court in his Motion to Dismiss, Plaintiffs continue to claim that the NAIS is being implemented in the State in violation of state law.[11]  NAIS is a national animal-identification system that establishes uniform premises and animal-identification formats.  Plaintiffs characterize NAIS as both "a federal program" and as "a federal law."[12]  NAIS is clearly not a federal law and no federal law requires anyone to use NAIS.  And while NAIS may be a program, it is not a mandatory program at the federal level.  As set forth in the Director's Motion to Dismiss, the NAIS-identification formats for animals and premises have been gradually imposed for cattle under authority of state law.

---

[6] The reasons for the RFID in the MAZ are explained in the Declaration of Dr. Michael Vanderklok, Supplemental Appendix, pp 8-11.
[7] See Declaration of Kevin Kirk, Supplemental Appendix, p 2.
[8] See footnote 6.
[9] Declarations of Plaintiffs Golimbieski, Keyworth; Exhibits K and M, respectively.
[10] Declaration of Kevin Kirk, Supplemental Appendix, pp 2-3.
[11] Plaintiffs' Memorandum in Opposition to MDA's Motion to Dismiss, p 1.
[12] *Id.*, p 3:  "MDA's implementation of this program has been accomplished through several cooperative agreements it has entered into with USDA.  As described below, because MDA is implementing federal law under color of law, it is subject to the claims raised by Plaintiffs in their complaint."

Michigan's Animal Industry Act (AIA)[13] is intended "to protect the health, safety, and welfare of humans and animals."[14]  Section 9(8)[15] of the AIA authorizes the Director to implement and enforce scientifically based movement restrictions and requirements for the control of animal diseases.  Section 9(8) states:

> The director may develop, implement, and enforce scientifically based movement restrictions and requirements including official bovine tuberculosis test requirements, prior movement permits, official intrastate health certificates or animal movement certificates to accompany movement of animals, and official identification of animals for movement between or within a disease free zone, surveillance zone, and an infected zone, or any combination of those zones.

Section 11b(1) of AIA requires that:  "All cattle, goats, sheep, and privately owned cervids shall bear official identification before they leave a premises."[16]  "Official identification" is defined in the AIA as "an identification ear tag, tattoo, electronic identification, or other identification as approved by the United States department of agriculture or the department."[17] "Department" means the Michigan Department of Agriculture.[18]

In addition, section 33 of the AIA requires USDA-approved identification of all cattle, bison, goats, and privately owned cervid when either presented at any livestock auction market or are marketed for immediate slaughter.  Section 33 provides, in part:

---

[13] MICH. COMP. LAWS § 287.701 *et seq.*
[14] MICH. COMP. LAWS § 287.701(2).
[15] MICH. COMP. LAWS § 287.709(8).
[16] MICH. COMP. LAWS § 287.711b(1):

> "(1) All cattle, goats, sheep, and privately owned cervids shall bear official identification before they leave a premises.
>
> (2) Compliance with this section regarding official identification is the responsibility of the owner.
>
> (3) Official identification shall be supplied by the department."

[17] MICH. COMP. LAWS § 287.706(2).
[18] MICH. COMP. LAWS § 287.703(4).

(2) All cattle, bison, goats, and privately owned cervids presented at any livestock auction market in Michigan shall be identified as required in the bovine tuberculosis eradication: uniform methods and rules, effective January 22, 1999, and approved by veterinary services of the animal and plant health inspection service of the United States department of agriculture, and all amendments to those publications thereafter adopted pursuant to rules that the director may promulgate.

(3) Cattle, bison, goats, and privately owned cervids that are marketed for immediate slaughter shall be identified by official ear tag, sale tag, or official back tag in a manner designed to trace the animals to the premises of origin.

By either identification means, the animal may be traced back to its premises of origin.

Section 11 of the AIA[19] authorizes the MDA Director to enter into agreements with the secretary of the USDA "to protect or enhance the growth of the livestock industry or the human food chain of this state:"

If the director considers it a benefit to the health or condition of the livestock industry of this state, the director may enter into agreements with the secretary of agriculture of the United States department of agriculture, the secretary's authorized representative, or any other person to protect or enhance the growth of the livestock industry or the human food chain of this state.[20]

Plaintiffs complain initially about the MDA requiring official identification of domestic livestock, arguing that it was a USDA requirement imposed by a 2002 Memorandum of Understanding (2002 MOU), and not a state law requirement. They ignore the fact that Section 11b of the AIA requires "official identification" of cattle before they leave a premises and that Section 11b of the AIA was enacted in 2000,[21] two years before the 2002 MOU with the USDA. Thus, the 2002 MOU with the USDA did not reflect any USDA requirement being imposed on the MDA as Plaintiffs argue, but reflects the requirements imposed by the Michigan Legislature.

---

[19] MICH. COMP. LAWS § 287.711.
[20] Federal Grant Proposal 2006/2007, National Animal Identification System (NAIS), July 23, 2006/February 13, 2007, Appendix, p 65.
[21] Public Act 323 of 2000.
http://www.legislature.mi.gov/(S(yfth1x45t0l44m55bnbyuwqq))/mileg.aspx?page=getobject&objectname=2000-PA-0323&query=on&highlight=323

Plaintiffs go on the complain of the NAIS-compliant premises identification numbers and animal identification ear tags, the memoranda of understanding reached with USDA, and other obligations imposed under the USDA's tuberculosis-eradication program.  Plaintiffs then assert that "No Michigan statute mandates or even authorizes the actions that the Director has taken.  Thus, the MDA is implementing federal and not state law."[22]  Aside from such generalization, Plaintiffs have not responded with any analysis of Michigan's AIA.  They simply ignore the provisions of the AIA that clearly authorize and empower the Director to take these actions and continue on in their response with the same shallow litany scattered throughout their unwieldy complaint that the Director is "implementing federal law."

  C.  The Cooperative USDA/MDA Tuberculosis Program

  Since at least 1998, when bovine tuberculosis was discovered in cattle in the northeastern lower peninsula of Michigan, the MDA has participated in the USDA's Cooperative Federal-State Tuberculosis Program.  The USDA's authority for the program is derived from the Animal Health Protection Act (AHPA)[23] which authorizes USDA to prohibit or restrict the importation, entry, or interstate movement of any animal, article, or means of conveyance necessary to prevent the dissemination of any pest or disease.[24]  The USDA regulates the movement of animals in interstate and foreign commerce in order to prevent the spread of livestock or poultry disease and has imposed requirements for the official identification of such livestock or poultry moved in interstate commerce.  Various official identifications are allowed under USDA

---

[22] *Id.,* p 11.
[23] 7 U.S.C. §§ 8301-8321.
[24] 7 U.S.C. §§ 8303-8305.

regulations.[25]  By an interim rule in 2004 and a final rule in 2007, the NAIS identification format was added as an additional USDA-approved form of official identification.[26]

As part of its duties, the USDA classifies states depending on the prevalence of bovine tuberculosis.  Five classifications are used by the USDA, ranging from disease-free to non-accredited.[27]  A state may request that a zone comprising less than the entire state be given a particular classification.  In order for the USDA to grant such a request, the USDA must, among other requirements, enter a memorandum of understanding in which the state agrees to any conditions for zone recognition particular to that request.[28]  APHIS may grant zone (or "split-state") recognition if it is satisfied that the state has adopted and is enforcing regulations that are substantially the same as those in place for interstate movement.[29]

Similar to the AHPA, Michigan's AIA authorizes the MDA Director to restrict movement of livestock or poultry within the State of Michigan in order to control the spread of the disease and to require official identification of livestock or poultry.  Theoretically, the Director of the MDA could designate one form of official identification for the intrastate movement of livestock, and one of the various forms of official identification allowed under the federal regulations for livestock being shipped interstate, however, it makes practical sense for the Director to use one form of official identification sufficient for both interstate and intrastate movement purposes.

Over the past eight years, the MDA has gradually shifted from state-created formats for official cattle and cattle-premises identification allowed by state law and USDA regulations to the NAIS identification formats, likewise allowed under state law and federal regulations.  The

---

[25] 9 C.F.R. § 77.2.
[26] 69 Fed. Reg. 64644-64651; 72 Fed. Reg. 39301-39307.
[27] 9 C.F.R. § 77.5.
[28] 9 C.F.R. § 77.4.
[29] 9 CF.R. § 77.3.

MDA has gradually implemented electronic means of identifying cattle as technology evolved and became more accepted. While the controversy is also about the Director's required use of RFID ear tags for cattle, that is separate from the Director's utilization of the NAIS-identification format because NAIS does not require electronic-identification devices.

D.    Plaintiffs' cattle and premises were identified by numbers and letters prior to the NAIS system being developed and implemented

Plaintiffs portray this shift from the state-identification format to the NAIS-identification format as an event of Orwellian magnitude. They paint this as an intrusion into their privacy. But, in fact, the same information and more was in the MDA's database under the pre-NAIS identification system. Plaintiffs' cattle were issued state identification codes and their premises were given alphanumeric identifiers if they were taking their animals off premises. That information was in the MDA's database and available to the USDA.[30] For example, MDA records reveal that each of the Plaintiffs alleged in the complaint to reside in Michigan have had their premises registered in the Cooperative State-Federal Tuberculosis Program and assigned an identification number as a result of tuberculosis testing or delivering their cattle to an auction market.[31] Each animal tested or delivered was identified with an MDA approved animal identification number.[32]

For example, the MDA database reveals that on January 27, 2004, and January 30, 2004, Plaintiff Robert Keyworth had 28 head of cattle tested for tuberculosis at his farm. His farm was identified under MDA's former identification system as MIE5637. Each head of cattle was identified by MDA's animal identification format, such as 34BEF4002 for one of the cows tested. Mr. Keyworth's premises is now identified under the NAIS format. Similar premises and

---

[30] Declaration of Kevin Kirk, Supplemental Appendix, p 2.
[31] *Id.,* ¶ 1.
[32] *Id.,* ¶ 1.

animal identification codes were assigned to the other Plaintiffs' premises and animals and likewise converted to the NAIS format.[33]

      E.      <u>The MOUs with the USDA did not mandate the implementation of federal laws or federal programs as Plaintiffs allege</u>

Beginning at page 3 of their Memorandum in Opposition, Plaintiffs offer their rendition as to how "the APHA operates in the State of Michigan." They allege that MOU's entered with the USDA in conjunction with the joint federal-state tuberculosis eradication efforts required the MDA Director to take actions not otherwise authorized by state law. Their arguments lack analysis of Michigan's statutes, including the statutes relied upon by the Director and set forth in the Motion to Dismiss. Further, they ignore the fact that actions that Plaintiffs allege were mandated by the USDA through various MOUs were implemented by the Director through orders issued under the AIA before the MOUs were entered into with the USDA. In other words, the MOUs were more a reflection of what the MDA was implementing to control bovine tuberculosis than a USDA mandate[34]

Plaintiffs' first allegation of this nature is a claim that "official identification" of livestock being moved from a premise in Michigan was "mandated" by the USDA in a 2002 MOU. But as set forth earlier in this memorandum, a 2000 amendment to the AIA had already "mandated" official identification of cattle being moved from their premises. The 2002 MOU was not a federal mandate, but simply an acknowledgment of conditions existing in Michigan that would satisfy USDA eligibility for split-state tuberculosis status.

Their next claim is that a July 26, 2005 MOU with the USDA "now required MDA to begin implementing NAIS electronic tagging program." But in fact, and as set forth in detail in

_____

[33] Declaration of Kevin Kirk, Supplemental Appendix, p 2.
[34] The substance and sequencing of the Director's orders and the MOUs are set forth in the Director's Memorandum in Support of Motion to Dismiss.

the Motion to Dismiss, the Director had already ordered electronic identification (using the state-created identification format) of cattle in certain areas of Michigan on October 31, 2002, pursuant to his state law authority.  Then, on June 1, 2004, the MDA Director ordered that NAIS-formatted electronic identification be utilized on cattle in certain high-prevalence tuberculosis areas of Michigan.

To obtain from the USDA split-state status, a state must demonstrate that it has adopted and is enforcing regulations that impose restrictions on intrastate movement of cattle that are substantially the same as those imposed by the USDA for interstate movement.[35]  The MOUs are "agreements to adhere to any conditions for zone recognition particular to the state's request."[36] The conditions recognized in the MOU for intrastate regulation of cattle must be based on the state agency's statutory authority.  The cattle movement restrictions and identification requirements, requirements for electronic identification and, later, the requirement for NAIS compatible identification, were all within the Director's state law authority to order.

F.    Accredited veterinarians are not implementing NAIS in Michigan as Plaintiffs argue.

Plaintiffs argue that a 2007 MOU requires MDA to use its accredited veterinarians to implement NAIS in Michigan, specifically that "testing for quarantine release or testing of high risk herds will be performed by regulatory veterinarians only."[37]  They then argue that "MDA's reach of implementing federal law extends to its accredited veterinarians, who are private parties."[38]  How this relates to the NAIS program and not to the USDA's tuberculosis eradication program is not explained by Plaintiffs.  However, the "regulatory veterinarians"are MDA employed veterinarians, and not "private parties."

---

[35] 9 C.F.R. § 77.3.

[36] *Id.*

[37] Plaintiffs' Memorandum in Opposition, p 87.

[38] Plaintiffs' Memorandum in Opposition, p 9.

Plaintiffs go on to argue that as a result of two USDA Veterinary Services 2008 memoranda regarding use of premises identification numbers, accredited veterinarians must obtain information from the farm sufficient to establish a state or federal premises identification number.   That is not a new requirement in Michigan.  The MDA has long been establishing premises identification codes for farms at which federal disease control measures are undertaken, such as tuberculosis testing of cattle.  Each of the Plaintiffs had MDA premises codes.  The MDA has now converted to the NAIS identification format, which the VS favors but still allows other state-created premises identification numbers.  The VS memoranda imposed nothing new in Michigan.

**Argument**

I.      **The Eleventh Amendment to the United States Constitution clearly bars Count Five of Plaintiffs' Complaint.**

In his Motion to Dismiss, the Director argued that Plaintiffs' due process claims in Count Five of their complaint simply reiterated their pendent state law claims and were barred by the Eleventh Amendment.  Plaintiffs' respond that because they allege violations of the Fourteenth Amendment, RFRA, and NEPA, they have properly pled ongoing violations of federal law, the federal courts have jurisdiction over ongoing violations of federal law, and the Eleventh Amendment does not bar their claims.

First, RFRA and NEPA are federal laws that do not apply to the states.

Secondly, Plaintiffs allege violations of Michigan law in order to support their claim that the MDA has violated their due process rights.[39]  (First Amended Complaint, ¶ 285.) Additionally, Plaintiffs allege that an extended list of documents evidence illegal rule making.

---

[39] Although Plaintiffs complaint implies violations of the AHPA, the AHPA is a federal statute that grants authority to the USDA.  The MDA does not derive any authority to act from the AHPA and APHA is inapplicable to determinations regarding the MDA's authority.

Plaintiffs' argument is that the MDA's alleged violations of Michigan's AIA and the

Michigan Administrative Procedures Act (MAPA) have resulted in a violation of Plaintiffs'

Fourteenth Amendment due process rights. However, it is well settled law that the federal courts

lack jurisdiction and authority to instruct states on how to comply with state law.[40] As a result,

the Eleventh Amendment bars Plaintiffs' Fourteenth Amendment claims where the due process

claims stem from the alleged failure of the Director to comply with Michigan statutes. Plaintiffs'

claim should be dismissed for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

**II.      Plaintiffs have failed to state a valid due process claim under the Fourteenth
         Amendment.**

In his Motion to Dismiss, the Director argues that Plaintiffs' Fourteenth Amendment

claims lack merit and cannot be supported. In response, Plaintiffs argue that under a *Mathews v.

Eldridge*[41] analysis (1) they have both a privacy right and property interest that are affected by

the State's actions; (2) absolutely no procedures were employed by the State to avoid an

erroneous deprivation; and (3) the State has no significant interest in proceeding with its animal

identification program without providing additional process. Additionally, Plaintiffs argue that

they pled a valid substantive due process claim because the Director's actions deprive them of a

property right, the State's action is outside the bounds of legitimate government, the animal

identification program has no rational relationship to protecting human or animal health, and the

Director's actions exceed his authority under the AIA and AHPA.

    A.     <u>Plaintiffs' cannot demonstrate a procedural due process violation as there has been
             no violation of State law.</u>

The parties agree that the factors set forth in *Mathews v. Eldridge* should be considered in

evaluating whether Plaintiffs were afforded sufficient due process:

---

[40] *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984).
[41] *Mathews v. Eldridge*, 424 U.S. 319 (1976).

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[42]

Plaintiffs' argue in their memorandum in opposition that the *Mathews* factors weigh in their favor and, as a result, they have stated a valid claim. (Memorandum in Opposition, pp. 17-22.) However, the facts clearly demonstrate that Plaintiff's were afforded due process in accordance with Michigan law, Michigan law was not violated, and Plaintiffs' procedural due process rights were not violated.

1. <u>The MDA's actions affect at most Plaintiffs' property rights in the cost of the RFID tag and their cattle—but do not affect any constitutionally recognized privacy right.</u>

As the Director acknowledged in his Motion to Dismiss, Plaintiffs have a property interest in their cattle and the cost of the RFID tag.[43] (Motion to Dismiss, p. 30.) Plaintiffs' Memorandum in Opposition also asserts, in a blanket statement lacking any legal analysis, that Plaintiffs' have a constitutionally protected privacy right that is affected by the MDA's actions. The information that the MDA obtains and shares with the USDA's national database is not information that is protected by the right to privacy and, even if it was, the governments' interest in obtaining the data outweighs any privacy right that may exist.[44]

Contrary to Plaintiffs' assertions, the courts, and the D.C. Circuit in particular, have not recognized a general, fundamental right to privacy.[45] The courts recognize privacy rights arising

---

[42] *Mathews v. Eldridge*, 424 U.S. at 325.

[43] Plaintiffs allege additional monitoring and tagging costs associated with the MDA's cattle identification program. Those allegations have been previously discussed in this brief at p 3.

[44] *See American Federation of Government Employees v. Dept. of Housing and Urban Development*, 118 F.3d 786, 793 (D.C. Cir. 1997).

[45] *See Paris Adult Theater I v. Slaton*, 413 U.S. 49, 66 (1973). *See also American Federation of Government Employees*, 118 F.3d at 793.

out of two separate interests: "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions.[46]  The latter privacy interest has been recognized in limited situations where decisions related to marriage, procreation, contraception, family relationships, child rearing, and education are affected.[47]  The former privacy interest, and the one at issue in this case, has been limited by the courts to the disclosure of information which "by any estimation, must be considered extremely personal."[48]

The information the MDA collects does not implicate Plaintiffs' Constitutionally protected privacy rights.  The MDA collects the name of the farmer or corporation operating the farm, the farm's address, a phone number, the assigned PIN number, the numbers of the RFID tags provided to the farm, and the date the tags are assigned.  There is no difference between this information and the information previously collected as part of the MDA-identification system.[49]  Although the database is accessible to participating state departments of agriculture and the USDA, the information is not available to the public through FOIA, nor is it available to industry

---

[46] *Whalen v Roe*, 429 U.S. 589, 599-600 (1977).

[47] *Whalen,* 429 U.S. at 600.

[48] *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996).  *See also Jenkins v. Rock Hill Local School District*, 513 F.3d 580, 591 (6th Cir. 2008) ("any constitutional right to privacy must be restricted to those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty); *Zaffuto v. City of Hammond*, 308 F.3d 485, 490 (5th Cir. 2002) (government disclosure of private information to insurance companies was not an unconstitutional invasion of privacy); and *Dodge v. Trustees of the National Gallery of Art*, 326 F. Supp. 2d 1, 14-15 (D.C. Dist. 2004) (constitutionally protected privacy rights were not violated by the disclosure of personal information, including Plaintiff's social security number, in a security alert).

[49] MDA actually maintains additional information that is provided by livestock markets and auctions, including the type of animal and the animal's back tag number.  However, this information is not required to obtain PINs nor is it stored electronically.

groups.[50]  The courts have not recognized a right to privacy that prohibits the disclosure of information between governmental agencies as part of the agency's regular functions.[51]

Even if Plaintiffs have a constitutionally protected privacy interest in the information collected by the MDA, the State's interest in collecting and maintaining this data as part of an animal disease eradication program outweighs the privacy interests implicated.[52]  The information is part of a disease control and eradication program that protects and promotes Michigan's cattle industry.  The MDA's interest in protecting animal and human health, as well as the health of the agricultural industry, outweighs any privacy interests the Plaintiffs may have.  Outside the MAZ, Plaintiffs are only required to have a PIN if they intend to put their cattle into commerce—the MDA does not require that cattle bred, grown and consumed on the family farm bear electronic identification or that their owner obtain a PIN.  Moreover, the animal and food industry in Michigan, especially as it relates to animal diseases is a highly regulated industry in which the Plaintiffs' expectation of privacy is reduced.[53]

      2.   <u>The procedures employed by the MDA did not create any risk of erroneous deprivation and there was no probable value in additional procedures.</u>

The Motion to Dismiss discussed in great detail the procedures employed in adopting the March 2007 Order.  In response, Plaintiffs argue that all of the actions that the Director has taken

---

[50] *Zanoni v. USDA*, decided March 31, 2009 (Docket No. 08-939EGS) (D.C.D.C. 2009).

[51] *See Jaffess v. Secretary of Dep't of Health, Education and Welfare*, 393 F. Supp. 626 (S.D.N.Y. 1975).  *See also American Federation of Gov't Employees*, 118 F.3d at 793.

[52] *See Barry v. New York,* 712 F.2d 1554, 1559-60 (1984).  *See also E.H. v Tirozzi*, 735 F. Supp. 53, 58 (D.C. Conn. 1990) (the expectation of privacy can be diminished depending on the capacity in which person is operating and such interests can be outweighed by the government's legitimate and substantial interests).

[53] *See New York v. Burger*, 482 U.S. 691, 699 (1987) ("An expectation of privacy in commercial premises, however is different from , and indeed less than, a similar expectation of privacy in an individuals' home.")  *See also Stanko v. Montana*, No. 93-35948, 1994 U.S. App. LEXIS 30660, at *10 (9th Cir. Oct. 7, 1994) (holding that livestock marketing is a highly regulated industry).

have been taken without "public input into these actions, . . . judicial oversight of these actions, and there was no legal authority for these actions." (Memorandum in Opposition, p. 19.)

Plaintiffs' argument references the 2004 and 2007 final federal rules, MOUs, grant funding, guidance documents issued by the USDA, strategy plans, business plans, and guidelines. (Memorandum in Opposition, p. 19.) Of these documents, the MDA has only entered into MOUs with the USDA and applied for grant funding—the remaining documents are all products of the USDA that are not adopted or ratified by the MDA and have no bearing on whether the MDA violated Plaintiffs' procedural due process rights.[54]

Plaintiffs suggest that the MOUs and grant applications should have been subject to the rule promulgation process under the MAPA.[55] However, neither the MOUs nor the grant applications are an "agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by an agency,"[56] and in fact are contracts which are specifically exempted from the definition of a rule.

The March 2007 Order is the only document in Plaintiffs' list of twenty-five documents they claim have deprived them of their due process rights, that was produced by the MDA and "implement[s] or appl[ies] law enforced or administered by an agency."[57] The AIA provides a specific procedure to which the Director must adhere when issuing orders and the Director

---

[54] Plaintiffs' Memorandum in Opposition, p. 20 states that the MDA has ignored in their brief "all of the other documents in which MDA was complicit with USDA in implementing NAIS in the state of Michigan." Despite Plaintiffs' claims, the MDA has no control over the USDA's development of rules, plans, or other documents and plays no role in determining what due process is provided for federal actions.

[55] Plaintiffs' Memorandum in Opposition frequently references the APA, however, as argued at p 21 of this brief, Michigan agencies are not subject to the requirements of the Federal APA.

[56] MICH. COMP. LAWS § 24.207.

[57] MICH. COMP. LAWS § 24.207.

complied with all statutory requirements in issuing the March 2007 Order. (Motion to Dismiss, pp. 27-28.)

Plaintiffs imply that the MDA should not take any action unless such action is preceded by a notice and comment period. However, requiring the MDA to perform all of its duties—regardless of whether those duties amount to implementing or applying the law—only after complying with the provisions of the MAPA would drain MDA resources and prevent the MDA from performing its statutory responsibilities.

3. The MDA's interest in conserving resources and efficiently carrying out its duties weight against providing additional process.

The Motion to Dismiss outlined the statutory authority under which the MDA acted, the procedures the MDA followed, and argues that additional procedure would not aid the decision making process. In response, Plaintiffs make several blanket statements including that there is no substantial reason why the MDA could not provide additional procedures; NAIS has nothing to do with animal health; the March 2007 Order set forth new requirements in a letter sent by the Director without providing any due process protections; the March 2007 Order exceeded the MDA's statutory authority; and the MDA did not abide by the procedures set forth in the MAPA for promulgating a rule.

First, the MDA has significant interests in proceeding with its animal identification program without additional due process. As thoroughly discussed in the Motion to Dismiss, the Director provided ample notice and opportunities to be heard. The MDA expended large amounts of time and resources insuring that Plaintiffs—and all other Michigan citizens—had notice and an opportunity to be heard. Additional process would force the MDA to expend additional resources without providing any additional safeguards.

Secondly, although neither the RFID tag or the identifying of premises act as a medication or vaccine to ensure the health of cattle, they do allow for the MDA to complete a quick and accurate traceback of diseased animals, quickly respond to a disease outbreak by quarantining and/or destroying animals that may have been exposed or infected, reduce the risk of exposure because response time is reduced, and reduce the costs to the State and producers. This allows the MDA to better protect not only the health of cattle, but human health and the cattle industry as a whole.

Plaintiffs' third allegation—that the March 2007 Order was simply issued by a letter sent by the Director—is false and lacks any factual support.

Fourth, the March 2007 Order is specifically authorized by the AIA. Section 9(8) of the AIA authorizes the Director to implement and enforce scientifically based movement restrictions and requirements, including official identification. Both premises identification and RFID tags fall under movement restrictions and requirements and are authorized by the AIA.

Finally, the Michigan Legislature has set out a separate procedure—outside of the MAPA—for issuing zoning requirements. Sections 9(9) and 9(10) specifically describe what procedures the Director is required to employ when issuing movement restrictions and requirements. "Subsection 7(j) [of the MAPA] excepts administrative action from the [M]APA's definition of 'rule' when the Legislature has either explicitly or implicitly authorized the action in question."[58] The Michigan Legislature has specifically authorized the action that the Director took and provided for a procedure to which the Director must adhere when implementing and enforcing movement restrictions and requirements.

---

[58] *By Lo Oil Co. v. Dep't of Treasury*, 703 N.W.2d 822, 840 (Mich. App. 2005).

For these reasons, the *Mathews* factors clearly weigh in favor of the MDA and the Plaintiffs' procedural due process claims should be dismissed.

B.    <u>Plaintiffs have failed to state a valid substantive due process claim.</u>

The Director's Motion to Dismiss argued that Plaintiffs had failed to demonstrate that "the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency."[59] Plaintiffs respond that because the MDA's actions are not rationally related to a legitimate government purpose and exceed its statutory authority under the AHPA and AIA, the MDA's actions were far beyond the limits of legitimate government.

The parties agree that Plaintiffs' substantive due process claims are properly analyzed by applying the factors set forth in *S. Blasting Serv., Inc.*:

> (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.[60]

Because Plaintiffs' arguments regarding their property interest and any deprivation of that interest have been discussed in this brief and the Motion to Dismiss, the Director will focus on Plaintiffs' arguments regarding the third factor of the substantive due process analysis.

1.    <u>MDA's animal identification program is rationally related to the MDA's legitimate governmental purpose of protecting animal and human health and the livestock industry.</u>

The rational basis test sets a low bar for determining whether government actions are rationally related to a legitimate government interest. "This test is 'highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional

---

[59] *S. Blasting Serv., Inc. v Wilkes County*, 288 F.3d 584, 594 (4th Cir. 2002).
[60] *S. Blasting Serv., Inc. v. Wilkes County,* 288 F.3d at 594.

circumstances.'"[61]   A state law will be upheld under a rational basis analysis "so long as it bears a rational relation to some legitimate end."[62]

Section 1 of the AIA states: "This act is intended to protect the health, safety, and welfare of humans and animals, to be consistent with applicable federal and state laws, and shall be so construed."[63]   The preamble further articulates the purpose of the AIA and states in part:

> An act to . . . protect the human food chain and the livestock and aquaculture industries of the state through prevention, control, and eradication of infectious, contagious, or toxicological diseases of livestock and other animals; . . . to safeguard the human population from certain diseases that are communicable between animals and humans . . .[64]

The Legislature envisioned the AIA as a tool to protect not only the health of livestock, humans, and the food chain, but also the health of livestock industries.  These, along with increased efficiencies and accuracy in data collection, are all legitimate government purposes.[65]

Although Plaintiffs' may disagree with the MDA's conclusions that Michigan's animal identification program will increase efficiency, hasten traceback investigations, allow quicker isolation of exposed herds, and reduce industry-wide ramifications if diseased animals are traced back to Michigan producers, their disagreement does not nullify the rational relationship between the state action and a legitimate government purpose.[66]   Additionally, the MDA has stressed that it believes that its animal identification program increases efficiencies within the MDA and for

---

[61] *Fednav, Limited v. Chester*, 547 F.3d 607, 624 (6th Cir. 2008), *quoting Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2001).

[62] *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007).  *See also Cash Inn of Dade, Inc. v. Metropolitan Dade County,* 938 F.2d 1239, 1241 (11th Cir. 1991).

[63] MICH. COMP. LAWS § 287.701(2).

[64] Preamble MICH. COMP. LAWS § 287.701.

[65] Declaration of Dr. Michael Vanderklok, Supplemental Appendix, pp 8-11.

[66] Plaintiffs repeatedly state that "MDA only puts forth two affidavits from MDA regulatory personnel who lack any scientific credentials."  The MDA put forth one affidavit by Kevin Kirk who not only runs Michigan's animal identification program and is in the best position to assess its strengths and weaknesses, but who also holds a Bachelors of Science in Animal Science and a Masters of Science in Animal Science from Michigan State University.

livestock markets and auctions, reduces mistakes and inaccuracies in data collection, and may

assist the state in advancing its TB status.  MDA's actions clearly bear a rational relationship to

legitimate government purposes.

2.  <u>MDA's actions have not exceeded its authority under the AIA.</u>

Plaintiffs also argue that the MDA's actions exceed its authority under the AHPA and

AIA.  First, the AHPA is a federal statute from which the MDA derives absolutely no authority.

The MDA acts pursuant to and derives its authority from the AIA.  As a result, Plaintiffs'

arguments that the MDA has acted outside the authority granted to it by the AHPA are irrelevant.

Secondly, as discussed in detail in the Motion to Dismiss and previously in this brief, the MDA's

actions are specifically authorized by the AIA.

**III.    The National Environmental Policy Act is not applicable to the MDA Director's actions.**

Count Six of Plaintiffs' First Amended Complaint is a claim that the Director and the

USDA violated the National Environmental Policy Act (NEPA).[67]  To state a claim under the

APA, Plaintiffs must allege agency action.  The APA defines agencies as "each authority of the

Government of the United States…" [68]  Plaintiffs allege that none of the NEPA required

"environmental documents" were prepared by defendants.[69]  They further allege that the MDA

Director is subject to NEPA because his involvement in the USDA's NAIS program is so

pervasive that his actions are, in essence, the actions of the USDA.[70]

---

[67] 42 U.S.C. §§ 4331-32.
[68] 5 U.S.C. § 701.
[69] First Amended Complaint, ¶ 306.
[70] Plaintiffs' Memorandum in Opposition, pp 28-31.

Plaintiffs seek judicial review of their NEPA claim through the Administrative

Procedures Act (APA).[71]  But the APA does not apply to review of actions by state agencies.[72]

Even if the MDA prepared the environmental documentation that Plaintiffs allege to be

required by NEPA, that action would not qualify as the USDA's environmental review for

purposes of NEPA.[73]  Plaintiffs fail to state a claim against the Director.

**IV.    RFRA claims against Director Koivisto should be dismissed because application of RFRA to state actions and state regulations is unconstitutional and MDA is not implementing federal law on behalf of the USDA.**

Plaintiffs' claim that the Director's utilization of the NAIS-identification format for cattle

constitutes a violation of the Religious Freedom Restoration Act (RFRA).

RFRA defines government to "include[] a branch, department, agency, instrumentality,

and official . . . of the United States or of a covered entity."[74]  The Director of the MDA is not an

official or entity of the United States government.  According to its language, RFRA "applies to

all federal law, and the implementation of that law, whether statutory or otherwise, and whether

adopted before or after November 16, 1993."[75]  The Director has demonstrated that he is

administering state law and not federal law in choosing the NAIS format for identification of

cattle.  RFRA, by its own terms, is not applicable to state law.

To support their claim that RFRA applies to Michigan's RFID program, Plaintiffs argue

that the Director is implementing federal law as an agent of the USDA.  (First Amended

Complaint, ¶ 350.)  This is simply an inaccurate characterization of the MDA's program and

---

[71] 5 U.S.C. §§ 702-706; Amended Complaint, ¶¶ 290-291; NEPA does not create a private cause of action.  See *Southwest Williamson Co. Comm. Ass'n. v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999).

[72] *Kurst Envtl. Educ. & Prot., Inc. v EPA*, 475 F.3d 1291, 1298 (D.C. Cir. 2007).

[73] *Rattlesnake Coalition v. EPA*, 509 F.3d 1095, 1105 (9th Cir. 2007) (only the federal government can adopt an EA or an EIS).

[74] 42 U.S.C. §§ 2000bb-2(1).

[75] 42 U.S.C. §§ 2000bb-3(a).

highlights Plaintiffs' failure to recognize the Director's independent state law authority to implement its own bovine tuberculosis program. Plaintiffs have cited to only one MDA document, the Director's March 1, 2007 Order, which creates a legal responsibility that could be imposed on Plaintiffs. However, it does not implement USDA's NAIS program – rather the Order implements Michigan' cattle identification requirements as part of MDA's tuberculosis eradication program. Thus, Plaintiffs fail to state a claim against the Director.

**V.      Plaintiffs' claim that the Director of the MDA waived the State of Michigan's sovereign immunity is without merit because they have admitted that they have no evidence to prove such a claim.**

Plaintiffs argue that the MDA's receipt of federal funds to promote NAIS in Michigan and to implement its use in animal disease programs may have been on condition that the State of Michigan waive its sovereign immunity. They admit that no document in their possession evidences such a waiver. They apparently believe that the USDA may have extracted from the MDA a waiver of the state's immunity, and ask the Court for additional time to await documents requested from the USDA. Plaintiffs make no claim that the MDA has not fulfilled their requests for documents made under Michigan's Freedom of Information Act.

Aside from having no factual proof to support their allegations, they go on to list what they believe are three factors that are determinative of a waiver of sovereign immunity.

Applying the three factors to this case leads to the conclusion that no waiver has occurred, regardless of what other documents are obtained. The first factor, whether the state consents to federal jurisdiction in the context of litigation, is not met because there has been no such consent and none is alleged. The second factor, a state statute or constitutional provision expressly providing for suit in a federal court, is not alleged to exist. The third factor, "Congress clearly intending to condition the state's participation in a program or activity on the state's

waiver of immunity," is likewise not claimed by the Plaintiffs.  Thus, Plaintiffs have failed to state a claim against the Director.

**VI.    Plaintiffs lack standing to maintain this suit because they are not injured.**

To establish they have legal standing to bring this action against the Director, Plaintiffs must show:  (1) they have suffered an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[76]

Plaintiffs object to the NAIS-compatible electronic identification tags because they claim the tags harm their way of life by increasing the cost of farming and interfere with their religious beliefs.

The cost of compliance with the Director's order is nominal, as set forth earlier in this brief.  In fact, Plaintiffs may avoid those costs by not taking their animals off premises.  But if they choose to engage in commercial commerce or otherwise transport cattle in a state with a bovine tuberculosis problem, the benefits to the people of the State of Michigan and to the cattle industry resulting from the Director's orders outweigh the minimal costs to the Plaintiffs.  As to any interference with Plaintiffs' religious beliefs, the RFRA is not applicable to the Director's actions.  Plaintiffs are simply not harmed by the Director's order and their case should be dismissed for lack of standing.

---

[76] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992).

## Conclusion

WHEREFORE, the MDA requests that the Court dismiss the Complaint, in its entirety, or alternatively, grant its motion for summary judgment.

Respectfully submitted,

Michael A. Cox
Attorney General

*/s/  James E. Riley*
James E. Riley (P23992)
First Assistant
rileyje@michigan.gov


*/s/  Danielle Allison-Yokom*
Danielle Allison-Yokom (P70950)
Assistant Attorney General
allisonyokomd@michigan.gov

Attorneys for Defendant Don Koivisto,
Director of Michigan Department
of Agriculture

Environment, Natural Resources,
and Agriculture Division
525 West Ottawa Street
6th Floor Williams Building
Lansing, MI  48913
(517) 373-7540


Dated:  April 22, 2009


lf:farm to consumer defense/2008-3021908b/MDA's Reply to Memo in Opp